**ORIGINAL**

FILED IN CLERK'S OFFICE
U.S.D.C. - Newnan

PETITION FOR WRIT OF HABEAS CORPUS
UNDER 28 U.S.C. SECTION 2254

JUN 3 0 2009

JAMES N. HATTEN, Clerk
By: _____
Deputy Clerk

Prisoner's Name:                    FREDRICK R. WHATLEY

Prisoner's Number:                  UNO 909586

Place of Confinement:               Georgia Diagnostic and
                                    Classification Center
                                    Jackson, Georgia 30233

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

FREDRICK R. WHATLEY        )
    Petitioner,            )
                           )
                           )
vs.                        )   CASE NO. 3 09-CV- 74JTC
                           )
STEPHEN UPTON, Warden      )
Georgia Diagnostic and     )   CAPITAL CASE
Classification Center,     )
    Respondent.            )
_____)

**PETITION FOR WRIT OF HABEAS CORPUS
BY A PERSON IN STATE CUSTODY**

COMES the Petitioner, by and through undersigned counsel, and

invokes this Court's jurisdiction pursuant to 28 U.S.C. §2254.  The

allegations of this petition are in the form dictated by the Model

Form for Use in Applications for Habeas Corpus under 28 U.S.C.

§2254, prescribed by the Rules Governing §2254 Cases in United

States District Courts.  Petitioner seeks this Court's protection

and intercession because the Georgia state courts have violated,

and unreasonably and arbitrarily refused to correct violations, of

the Petitioner's Fourth, Fifth, Sixth, Eighth, and Fourteenth

Amendment rights, resulting in Petitioner's unconstitutional conviction of murder and sentence of death.

1. To the extent the state courts reached the merits of claims presented the holdings are either contrary to or are an unreasonable application of, clearly established Federal law as established by the United States Supreme Court. To the extent the state courts determination of the claims presented is based upon factual findings, the state court determinations rest upon an unreasonable determination of said facts in light of the evidence presented. See, 28 U.S.C. 2254(d); Terry Williams v. Taylor, 529 U.S. 362 (2000). The state court findings of fact and conclusions of law are entitled no deference because Petitioner was denied a full hearing in state court.

2. Petitioner requests that this Court afford him all the protections promised by federal habeas corpus statutes, the Rules Governing Section 2254 Cases in the United States District Courts, the Criminal Justice Act, and all other pertinent statutes, court rules, and case law. Finally, Petitioner seeks an order granting this petition for writ or habeas corpus.

## I.    **HISTORY OF PRIOR PROCEEDINGS**

3. The name and location of the court which entered the judgment of conviction and sentence under attack are:

Superior Court of Spalding County

Griffin, Georgia.

4. The date of the judgment of conviction was January 14, 1997.

5. The date of the judgment of sentence was January 16, 1997.

6. The nature of the offenses involved is that Petitioner was convicted of malice murder, aggravated assault (2 counts), armed robbery, motor vehicle highjacking, and possession of a firearm during the commission of a crime. Petitioner was sentenced to death for murder, life imprisonment for armed robbery, 20 years for each aggravated assault, 20 years for motor vehicle highjacking, and five years on the firearm count. All of the sentences are to be served consecutively. The court also imposed a $10,000 fine.

7. At his trial, Petitioner pled not guilty.

8. The trial on the issue of guilt or innocence and on the issue of sentencing was determined by a jury.

9. Petitioner did not testify during the guilt-innocence phase of the trial, but did testify during the sentencing phase.

10. Petitioner appealed his conviction and sentence.

11. The facts of Petitioner's appeal are as follows:

(a) The Supreme Court of Georgia affirmed Petitioner's convictions and sentence of death on December 4, 1998. Whatley v. State, 270 Ga 296, 509 S.E.2d 45 (1998).

3

(b) Petitioner filed a timely Petition for Writ of Certiorari in the United States Supreme Court. Certiorari review was denied on May 3, 1999. Whatley v. Georgia, 526 U.S. 1101, 119 S.Ct. 1582 (1999). A Petition for Rehearing was denied by the United States Supreme Court on June 14, 1999. Whatley v. Georgia, 527 U.S. 1016, 119 S.Ct. 2361 (1999).

12. On July 29, 1999, the Superior Court of Spalding County signed an order setting Mr. Whatley's execution date for the week beginning at noon on August 9, 1999.

13. Mr. Whatley filed a pro se petition for writ of habeas corpus in the Superior Court of Butts County on August 6, 1999. The petition was later amended by counsel. After an evidentiary hearing on July 30, 2002 and oral argument on December 8, 2005, Judge John S. Langford entered an order denying relief on December 4, 2006.

14. The Georgia Supreme Court granted Petitioner's application for certificate of probable cause to appeal on March 12, 2008. After oral argument, the Georgia Supreme Court affirmed the denial of habeas corpus relief on October 6, 2008. Whatley v. Terry, 284 Ga. 555, 668 S.E.2d 651 (2008). Reconsideration was denied on November 3, 2008.

15. The Supreme Court of the United States denied Mr. Whatley's Petition for Writ of Certiorari on May 18, 2009. Whatley v. Terry, ___ U.S.___, 129 S.Ct. 2409 (2009).

4

## II. **INTRODUCTORY FACTS**

16. On January 27, 1995, Mr. Whatley robbed a bait shop in Griffin, Georgia using a handgun. At some point during the robbery, the owner of the shop, Ed Allen, pulled out a gun from under the counter and there was a shoot out. Mr. Allen was shot in the chest and died as a result. The prosecution claimed that Mr. Whatley shot Mr. Allen at the counter in order to eliminate a witness. Mr. Whatley testified that he only shot after Mr. Allen started firing at Mr. Whatley as Mr. Whatley was leaving the store. As he was fleeing, Mr. Whatley unsuccessfully attempted to take a car at gunpoint. He ultimately fled on foot. Mr. Whatley was arrested a short time later. He had been shot in the leg. Whatley, 668 S.E.2d at 653. Mr. Whatley was convicted of malice murder, aggravated assault (2 counts), armed robbery, motor vehicle highjacking, and possession of a firearm during the commission of a crime.

17. The record in this case shows in striking detail that the judicial system imploded in Mr. Whatley's Spalding County murder case. The entire system simply broke down. It began when the Spalding County Commission and the local judges established an indigent defense system that was doomed to fail. The Commission hired Johnny Mostiler as the contract public defender for the county and gave him a set amount of money to defend all the felony, misdemeanor, and juvenile court cases in the county. Mr. Mostiler

5

subcontracted with other attorneys to handle the misdemeanor and juvenile court work, while he and another attorney in his office, Rosamond Braunrot, handled the felony cases. This meant that Mr. Mostiler and Ms. Braunrot each handled over 300 felony cases each year. Meanwhile, Mr. Mostiler had between two and four open death penalty cases at any given time and opened at least 30 civil cases each year outside of the contract. Mr. Mostiler's crushing case load was more than twice the size authorized by national recognized standards. As a result, Mr. Mostiler was the archetype of the "meet 'em and plead 'em" public defender. Unfortunately, he was also Mr. Whatley's appointed attorney in his capital case.

18. As one would expect given his unmanageable case load, Mr. Mostiler hardly lifted a finger on Mr. Whatley's case. According to widely accepted standards, it is estimated that an attorney in a capital case must spend between 1000 and 2000 hours to adequately prepare for a capital trial. Mr. Mostiler's time sheet shows that he spent 154 hours on the case, much of that in-court during the trial and jury selection. As will be discussed in detail, it is apparent that Mr. Mostiler did not adequately prepare the case. He did little investigation, did not talk to his witnesses in advance of trial, filed only form motions, and did not even talk to Mr. Whatley's mother. In a capital case, the defense attorney did not even talk to the defendant's mother! Because of the total lack of preparation for Mr. Whatley's trial, Mr. Mostiler did not discover

6

or present the compelling evidence that would have changed the outcome of both the trial and the sentencing.

19. The system also broke down in the prosecutor's office. At the sentencing phase, Mr. Whatley testified that he did not kill Ed Allen to eliminate a witness, as the prosecutor argued. He asserted that he shot Mr. Allen while running out of the store after Mr. Allen came around the bait shop counter with a gun and started firing. The district attorney vociferously argued that Mr. Whatley was not being truthful and that Mr. Whatley shot Mr. Allen while Mr. Allen was standing behind the counter to eliminate a witness. While making his powerful argument, the District Attorney was in possession of a taped interview of the only surviving witness that confirmed Mr. Whatley's version of events and disproved the prosecutor's theory. Instead of disclosing this critically important piece of evidence, as the law obligated him to do, the prosecutor hid it. The system failed again.

20. The breakdown did not stop there. The trial court failed Mr. Whatley as well. On the Friday before the Monday trial, the judge and the lawyers received a report from a mental health evaluation conducted by doctors at the West Central Georgia Regional Hospital. The report contained red flags indicating that the psychologists were worried that Mr. Whatley was not competent to stand trial. Instead of inquiring into the competency issue, as

7

he is required to do, the trial court apparently ignored the report and charged forward with the trial. Once again the system failed.

21. Finally, the icing on the cake of the fundamental break down of the judicial process was that Mr. Whatley was forced to stand trial and testify before the jury while wearing shackles. He had not acted out in the courtroom and had given the trial court no reason to shackle him. There was no hearing regarding the shackles and Mr. Mostiler did not even make an objection. Remarkably, when the prosecutor expressed a concern about Mr. Whatley testifying before the jury wearing shackles during the sentencing phase of trial, Mr. Mostiler still did not voice an objection to this obviously prejudicial and unconstitutional practice.

22. The allegations that follow will explore these and other serious constitutional deficiencies in greater detail and demonstrate a multitude of constitutional violations arising from Mr. Whatley's trial. It is abundantly clear that Mr. Whatley is entitled to habeas corpus relief on each of these grounds.

23. Because there is a qualitative difference between a death sentence and a term of years, "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." Woodson v. North Carolina, 428 U.S. 280, 305 (1976); Gardner v. Florida, 430 U.S. 349, 363-364 (1977). Mr. Whatley's conviction and sentence are so

8

tainted by significant constitutional errors that nothing about them are reliable. The writ must issue.

24. Additional facts will be discussed within each claim for relief.

## III.    GROUNDS FOR RELIEF

25. All grounds for relief in this petition are based on violations of the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

### CLAIM I

**THE STATE'S FAILURE TO DISCLOSE EXCULPATORY INFORMATION REQUESTED BY PETITIONER VIOLATED THE RULE OF BRADY V. MARYLAND, 373 U.S. 667 (1965), AND ITS PRESENTATION OF FALSE EVIDENCE VIOLATED GIGLIO V. UNITED STATES, 405 U.S. 150 (1972) ALL IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

26. This claim is evidenced by the following facts:

27. All other allegations in the Petition are incorporated into this claim by specific reference.

28. This case involved a robbery of a bait shop in which Ed Allen, the owner/store clerk, was shot and killed. The prosecutor's theory of the case was that Mr. Whatley shot and killed Mr. Allen as Mr. Allen stood behind the counter after handing over the money. The prosecutor portrayed the murder as an unnecessary killing for the sole purpose of eliminating the witness to the robbery. Mr. Whatley testified at sentencing that he was

9

leaving the store and Mr. Allen came around the counter with a gun and started firing. Mr. Whatley testified that it was only then that he fired at Mr. Allen. The prosecutor vilified Mr. Whatley as a liar. Yet, at the same time, he possessed a taped interview of Tommy Bunn, the only other person in the store, indicating that Mr. Whatley's story was the truth. The suppression of the Bunn tape is a serious violation of the rules of both Brady v. Maryland, 373 U.S. 667 (1965) and Giglio v. United States, 405 U.S. 150 (1972).

29. On January 26, 1995, at 11:25 p.m. (less than 3 hours after the crime), Tommy Bunn gave the police the following statement:

> I was in the store, Ed was behind the counter,
> I was up in from of the counter near the coke
> cola machine and this guy came in, I thought
> he was a customer. I walked back behind him
> and came up behind the counter where Ed was
> sitting at. When I got back around there the
> boy came up to the counter and pulled the gun
> up and was pointing it at me an Ed. He come
> around the counter and told us to lay down on
> the floor. I laid down on the floor, and he
> put the gun to the back of my head and told Ed
> to give him the money. Ed opened the cash
> register and got a paper sack and put the
> money in it, a brown paper bag. He asked Ed
> where the gun was and Ed said there wasn't no
> gun. Nothing but a knife. **He moved off me
> and backed around the counter, when he went
> around the counter and Ed come over top of me
> going after him. I don't know where he was.
> I was still laying on the floor when I heard
> the shot.** After that I got up and that when I
> heard some more shooting and Ed come back in
> and laid down on the floor and said call 911.

10

(HT. 1705, Bunn Initial Statement, Respondent Exhibit 30).[1]  This statement was disclosed to defense counsel prior to trial.

30.  At trial, Mr. Bunn's testimony was entirely different on the key point of when the shooting started.  Instead of Mr. Allen being shot after he came around the counter with the gun, Bunn testified that Mr. Allen was shot while he was standing behind the counter. (T. 899-900).

31.  Mr. Mostiler attempted to impeach Mr. Bunn with his statement to the police, but did not do very well.  When confronted with the prior written statement, Bunn said that he cave the statement to police immediately after the shooting when he was upset and this is why his testimony about the shooting is different at trial.(T. 929-930).  In short, Bunn totally changed his version of events on this important point.  By claiming he was upset during the initial interview with the police, Mr. Mostiler's impeachment of the only witness on this important issue fell utterly flat.

32.  The impeachment would not have fallen flat if the prosecutor had turned over the Bunn tape.  On January 27, 1995 at 9:35 a.m. (approximately 12 hours after the robbery), Tommy Bunn was interviewed by Griffin Police Department Investigators Sam Parks and Gail Mullins.  The interview was tape recorded.(Bunn Tape, Petitioner's Exhibit 46).  In the interview, Bunn statements

---

[1]  Throughout this Petition, "H.T. ___" will refer to page numbers in the habeas hearing transcript and exhibits.  "T. ___" will refer to the trial transcript.

11

about the shooting were consistent with his original statement to the police and contradicted his trial testimony. Specifically, during the interview, Bunn stated "the guy done got the money and all, you know, I figured he's going on out, and thats when I seen Ed go over me, and he went out, and thats when the shooting and all starts." (HT. 1413, Transcript of Bunn Tape, Petitioner's Exhibit 47). Because this statement was given the next day when Bunn was not upset, it would have been powerful impeachment at trial on a critical issue.[2]

33. It is axiomatic that the prosecution's suppression of evidence favorable to the accused violates due process. Kyles v. Whitley, 514 U.S. 419 (1995); Brady v. Maryland, supra. Under Brady, petitioner need only prove (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defendant; and (3) that the evidence was material to issues at trial. Strickler v. Greene, 527 U.S. 263, 119 S.Ct. 1936, 1948 (1999); Stano v. Dugger, 901 F.2d 898, 899 (11th Cir. 1990) (en

---

[2.] The GBI ballistics expert on this case was recently fired for not complete testing evidence and filing false reports. This information was also in the possession of the state and should have been disclosed. Her evidence has been challenged in this case and the disclosure of the information would cast additional doubt on the state's theory of defense. Kyles v. Whitley, 514 U.S. 419 (1995).

banc). Petitioner has fulfilled each of these three requirements
for relief under Brady.[3]

34. There is absolutely no question that the Bunn tape was
possessed by the State and not disclosed to trial counsel. The
tape was made by Sam Parks, the lead police investigator on the
case. The tape was not provided to Mr. Mostiler and was only
discovered by Mr. Whatley's current counsel pursuant to an Open
Records Act requests to the Griffin Police Department. Mr. Parks
testified at the evidentiary hearing that he was in possession of
the Bunn tape and that it was kept in the evidence room at the
police department. Parks indicated that only he and the evidence
room technician had access to the tape. (HT 75).

35. It appears that Mr. Parks did not give the tape, a
transcript of the tape, or a report of the tape to the District
Attorney. Mr. McBroom testified that he did not have the audiotape
in his file and he did not have a transcript of the tape. (H.T.
104). Mr. McBroom testified that reports and tapes that were in
his file were turned over to the defense. However, because he did
not have the tape or transcript of Bunn's interview in the file, it
was not turned over to Mr. Mostiler. (HT 104).

---

[3] In addressing this claim, the Georgia Supreme Court found
that the Bunn taped statement was suppressed by the prosecution and
that it was favorable to the defendant. However, it refused to
grant relief finding that there was no reasonable likelihood that
the result would have been different. Whatley v. Terry, 284 Ga.
555, 668 S.E.2d 651 (2008). This is contrary to and unreasonable
application of Brady and Giglio.

13

36. The fact that Mr. Parks had the tape rather than Mr. McBroom does not absolve the prosecutor of his Brady obligation. As a matter of law, information in the possession individuals "acting on the government's behalf in the case, including the police" is deemed to be in possession of the prosecutor for Brady purposes. Kyles v. Whitley, 514 U.S. at 437. There is no question that Sam Parks was acting on behalf of the State. Mr. Parks was the lead police investigator on the case and the case agent at trial. Parks worked closely with the district attorney and even sat at counsel table with the district attorney at the trial. Thus, there is absolutely no question that the evidence was in the possession of the state and that it was not turned over to the defense.

37. The suppressed Bunn tape was material and exculpatory. Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682 (1985).[4]

38. In Kyles v. Whitley, supra, the Supreme Court discussed the materiality standard, emphasizing that the adjective

---

[4] Under Giglio, to obtain relief, a petitioner need only show "any reasonable likelihood that the false testimony could have affected the judgment of the jury." This is "a different and more defense friendly standard. . ." United States v. Alzate, 47 F.3d 1103, 1110 (11th Cir. 1995).

14

"reasonable" in the term "reasonable probability" is important. Id, 514 U.S. at 434. "[T]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id.

39. In this case, the suppressed Bunn tape could easily have been the difference between a life sentence and a death sentence. According to Bunn's testimony at trial, the robber shot Mr. Allen simply to eliminate a witness. There was no provocation. It was simply the killing of the clerk as soon as he handed over the money. This makes the killing appear premeditated and reflects extremely badly on the state of mind of the shooter. However, Bunn's taped statement to police on the morning after the robbery make clear that this was not a witness elimination killing. Allen came after the robber with a gun and was killed in the ensuing shoot-out. Under this version of events, the killing is far less aggravated as the robber was leaving and would have been gone without shooting anyone, had Allen not opened fire. While certainly a criminal offense, a killing in this context is far less aggravated than a premeditated witness elimination murder.

40. At trial, Bunn was able to discount the initial statement to police as a misstatement made when he was under stress shortly after the robbery. However, the subsequent statement the next

15

morning, made after Bunn had calmed down could not have been so easily dismissed. Had Mr. Mostiler had access to the taped statement, he could have impeached Bunn's trial testimony far more powerfully. This could easily have changed the outcome of the sentencing phase.

41. Since the Georgia death penalty statute requires jury unanimity to impose a death sentence,[5] "the proper frame of reference...is whether the mind of one juror could have been changed with respect to the imposition of the sentence of death." Kirkpatrick v. Whitley, 992 F.2d 491 (5th Cir. 1993); Duest v. Singletary, 997 F.2d 1336, 1339 (11th Cir. 1993). Without the Bunn tape, the key pillar of the case for death would be removed and the emotional tenor of the sentencing phase would have been entirely different. Thus, without prosecution theory that this was a witness elimination killing, there is a reasonable probability that at least one juror would have voted for life and the result would have been different

## CLAIM II

**PETITIONER WAS DEPRIVED OF AN IMPARTIAL JURY THROUGH IMPROPER JUROR EXCLUSION IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

42. This claim is evidenced by the following facts:

---

[5]. See Hill v. State, 250 Ga. 821, 301 S.E.2d 269, 270 (1983).

43. All other allegations in the Petition are incorporated into this Claim by specific reference.

44. The trial court violated Petitioner's rights under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution and the analogous provisions of the Georgia Constitution by excusing for cause jurors whose views on the death penalty were not extreme enough to warrant exclusion. A capital defendant's right to an impartial jury prohibits the exclusion of venire members "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Witherspoon v. Illinois, 391 U.S. 510, 522 (1968). To permit the exclusion for cause of prospective jurors based on their views of the death penalty unnecessarily narrows the cross section of venire members. It 'stack[s] the deck against the [defendant] .'" Gray v. Mississippi, 481 U.S. 648, 658 (1987) (quoting, Witherspoon, 391 U.S. at 523).

45. The exclusion of venire members based in their views concerning the death penalty must be limited to those who are "irrevocably committed . . . to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings," and to those whose "attitude toward the death penalty would prevent them from making an impartial decision on the question of guilt." Witherspoon, 391 U.S. at 523 n.21; see Burns v. Estelle, 626 F.2d 396, 397 (5th Cir. 1980). "[T]hose who

17

firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." Lockhart v. McGree, 476 U.S. 162, 176 (1986).

46. When a trial court misapplies Witherspoon, and excludes from a capital jury a prospective juror who in fact is qualified to serve, a death sentence cannot stand. Davis v. Georgia, 429 U.S. 122 (1976) (per curiam).

47. All jurors who were excluded by the trial court for their position regarding the death penalty are included in this claim.

## CLAIM III

**PETITIONER WAS DEPRIVED OF HIS RIGHT TO BE TRIED BY AN IMPARTIAL JURY THROUGH THE IMPROPER INCLUSION OF BIASED INDIVIDUALS, IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

48. This claim is evidenced by the following facts:

49. All other allegations in the Petition are incorporated into this Claim by specific reference.

50. Petitioner's rights to due process and to a fair and impartial jury guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated by the failure to exclude biased jurors for cause, including, but not limited to, the jurors discussed below.

18

51. Under the Sixth Amendment to the United States Constitution, a criminal defendant is entitled to an impartial jury, and not merely to jurors who swear to be indifferent. Irvin v. Dowd, 266 U.S. 717, 728 (1961) ("No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows is often its father."); Smith v. Phillips, 455 U.S. 209, 221-22 (1982) (O'Connor, J., concurring) ("juror may have an interest in concealing his own bias and . . . the juror may be unaware of it."); United States v. Davis, 586 F.2d 190 (5th Cir. 1978) (a juror "is poorly placed to make a determination as to his own impartiality"). The Constitution requires that a juror appear to be, as well as be, unbiased. Aldridge v. United States, 283 U.S. 308, 315 (1931) ("more injurious to permit it to be thought that persons entertaining a disqualifying prejudice were allowed to serve"); Estelle v. Williams, 425 U.S. 501, 503-04 (1976) (when circumstances threaten to "undermine the fairness of the fact-finding process" by allowing the influence of prejudgment to "dilut[e] . . . the principle that guilt is to be established by probative evidence and beyond a reasonable doubt[,] . . . the probability of deleterious effects on fundamental rights calls for close judicial scrutiny.")

52. When the death penalty is at stake, absolute neutrality on the part of the jurors is especially critical. "It is of vital

19

importance to the defendant and the community that any decision to impose the death penalty be, and appear to be, based on reason rather than caprice or emotion." Gardner v. Florida, 430 U.S. 349, 358 (1978); Turner v. Murray, 476 U.S. 28 (1986). Thus, "[a] juror who has made up his mind prior to trial that he will not weigh evidence in mitigation is not impartial. Such a juror's views on capital punishment would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Wainright v. Witt, 469 U.S. 412 (1985).

53. The following jurors should have been excused:

54. **Prospective Juror Steele:** During voir dire, prospective juror Steele was asked "Do you have any racial prejudice resting on your mind?" (T. 167). Mr. Steele answered, "A little." (T. 167). He went on to testify that, if called upon to make a decision in the case, he could "probably" put aside the fact that Mr. Whatley is black. (T. 168). He did not state that he was certain that he could put his racial prejudice aside.[6]

55. Later in voir dire, in response to the court's leading questions, Mr. Steele answered that he could base his decision on the facts of the case rather than the race of the people involved. (T. 169).

---

[6]  Mr. Whatley is African-American. The victim was white.

56. When asked non-leading questions, Mr. Steele admitted some racial prejudice. His openness on the matter is especially revealing because, in today's climate of political correctness, most people are extremely reluctant to acknowledge any racial bias. Making such an admission can subject a person to tremendous hostility, and Mr. Steele's honesty was almost certainly painful. Nonetheless, he was honest when asked non-leading questions. It was only when asked leading questions that reinforced the "correct" answer with judicial approbation that he stated that he would not consider the races of the defendant and the victim in reaching a verdict.

57. It is axiomatic that racial prejudice or bias has no place in the administration of criminal justice. In case after case, the Supreme Court has attempted to ensure that racial prejudice plays no role in the administration of criminal justice, even if it meant requiring the parties to explain their use of peremptory strikes, Batson v. Kentucky, 476 U.S. 79 (1986) (requiring race-neutral reasons for peremptory strikes once defendant makes out prima facie showing of racial discrimination); or expanding voir dire to explore the issue of racial prejudice, Turner v. Murray, 476 U.S. 28 (1986) (defendant in capital case accused of interracial crime entitled under Constitution to have jurors informed of race of victim and questioned on issue of racial bias). See also Amadeo v. Zant, 486 U.S. 214 (1988) (relief

21

granted in capital case where prosecutor conspired to underrepresent black people and women in jury venire).

58. In this case, it took no extraordinary measures to discover the racial prejudice. When Mr. Steele was permitted to speak for himself--rather than being asked leading questions--he was painfully honest, and admitted his racial prejudice. When faced with such an admission, the trial court should have granted Mr. Whatley's motion to excuse for cause, rather than leading the juror to different, acceptable answers. As a result of the court's failure to grant Mr. Whatley's motion to excuse the prospective juror, Mr. Whatley's trial was rendered fundamentally unfair; his conviction and sentence should be vacated.

59. **Prospective Juror Higgins**: During voir dire, prospective juror Higgins testified that, although she did not know the victim, her "daughter-in-law and son did and I've heard a lot from them." (T. 239). She went on to testify that her son and the victim "were real good friends." (T. 240). She testified that "naturally they think the guy was guilty." (T. 240). Finally, she stated that she had learned from her son how the crime took place. (T. 252).

60. As did prospective juror Steele, when asked non-leading questions Ms. Higgins admitted to disqualifying circumstances: that she had heard a good deal about the case and that her son was a good friend of the victim's and thought the defendant was guilty. However, when asked leading questions that suggested a "correct"

answer, Ms. Higgins agreed that she would listen to the evidence. (T. 241).

61.  By finding Ms. Higgins qualified (and allowing her to serve on the jury), the trial court left Mr. Whatley's fate in the hands of a juror whose own family believed him guilty.  If she had voted to acquit, she would have had to explain to her family why she had acquitted the person they were convinced had murdered their friend.  There was a great risk that Ms. Higgins would convict Mr. Whatley because her family believed him to be guilty, and because she did not want to do anything contrary to their beliefs.  Thus, Ms. Higgins should have been disqualified both because of her extra-judicial knowledge of the case and because of her close familial relationship to a close friend of the victim.

62.  **Prospective Juror Killingsworth:**  Prospective juror Killingsworth testified that the victim's daughter-in-law knew Mr. Killingsworth's wife, and that he had discussed the case with the two women.  (T. 552, 558).  Initially, Mr. Killingsworth volunteered that he was friends with the victim's daughter-in-law. (T. 552).  However, after leading questions, he agreed with the court that his friendship with the victim's relative would not influence his verdict.  (T. 553).  Mr. Killingsworth was placed in the same position as Ms. Higgins:  a vote to acquit would be an affront to a friend or relative who was close to the victim.

23

63. By asking leading questions, the trial court told the jurors what they needed to say to be qualified. The voir dire setting is intimidating and unsettling for most prospective jurors, and most jurors want to appear to be good and fair citizens. Despite this honorable intention, there are jurors whose racial bias, knowledge of the case, or connection to the victim or his family must disqualify them. Because jurors surely know that admitting to bias or knowledge will suggest that they are "bad citizens," once a juror makes a such an admission, he or she should be questioned in a way that will encourage further honesty--however painful or embarrassing--rather than in a way that suggests what the juror needs to say to be qualified. In this case, after the trial judge heard the jurors make admissions of bias or prejudice or a connection to the victim, he then followed up with leading questions which made it crystal clear to the jurors how to answer and what to say so they would be qualified. This practice, and the presence of unqualified jurors, rendered Mr. Whatley's trial fundamentally unfair; his convictions and sentence should be set aside.

64. **Jurors Frances Dunham, Rilla Dunn, and Juanda Ponsell:** Mr. Whatley was denied his rights to a fair and impartial jury, due process, equal protection, a fair trial, and a reliable determination of punishment, pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, Morgan

v. Illinois, 504 U.S. 719, 728 (1992) and other applicable law, by
the trial court's failure to excuse for cause prospective jurors
Frances Dunham, Rilla Dunn, and Juanda Ponsell.

65.  Ms. Dunham testified on voir dire that "if it's proven to
me that this person went out and willfully killed this man," she
would "move for the death penalty" and she would not consider the
other possible sentences.  (T. 653).  Her testimony was clear and
unequivocal, and Mr. Whatley moved that she be excused for cause.

66.  But then the leading questions and suggestion of answers
started.  The district attorney told her "you've got to be willing
-- you don't have to accept the others, but you've got to
realistically say, I will consider whether or not we have proved
that aggravating circumstance, and I will consider if there's any
mitigating evidence."  (T. 656).  Ms. Dunham responded "Exactly."
(T. 656).  Naturally, after the district attorney told her
precisely what she needed to agree to in order to be qualified, and
then helped even further by asking leading questions to confirm his
explanation, the juror indicated that she would consider evidence
offered in mitigation.  (T. 656).  Based on this response, the
trial court denied Mr. Whatley's motion to excuse for cause.  (T.
656).

67.  Ms. Dunn testified that "if they're guilty, I think they
should have the limit."  (T. 676).  Then the explanations and
leading questions started.  The trial court told her that, "[i]n

25

order for you to sit on this case, you have to agree to look at life, life without parole and death. Now, you can -- it's your pick as to which one you're going to do based on the evidence. But we would -- we need to know if you would consider all three of those verdicts."  (T. 676).  Upon receiving such explicit instructions, Ms. Dunn said what she needed to say and was found qualified.

68.  During voir dire, prospective juror Juanda Ponsell testified that the death penalty should be imposed in cases of "violence [or] premeditation." (T. 687). Then the explanation started. The trial court told her:

> Under Georgia law a person who can consider the three options, life with parole, life without parole and the death penalty, and a person who could, if they felt the circumstances were so severe, could consider the death penalty as a possible penalty and could, if they felt the circumstances were so severe, vote to impose the death penalty -- if a person can do that, then that person is qualified to sit on a jury of this type.

(T. 688). Once again, the trial court told the juror exactly what she needed to say to be found qualified, and she said it.  Ms. Ponsell eventually served on the jury.

69.  These three jurors are clear examples of prospective jurors forthrightly admitting bias, and then changing their answers once the "correct" answers were explained to them. This Court should look at the prospective juror's own words and explanations and not at what she said after being instructed through leading and

26

suggestive questions. And what all three said when allowed to speak for themselves was that they believed that imposition of the death penalty should be automatic in certain circumstances.

70. In Wainwright v. Witt, 469 U.S. 412 (1985), the Supreme Court held that a juror's views on capital punishment will render him unqualified to serve if "the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Witt, 469 U.S. at 424 (quoting Adams v. Texas, 448 U.S. 38, 45 (1980)). Putting this standard to practical use, the Court later reasoned that jurors who will vote for the death penalty in every case are incapable of performing their duties in accordance with the law. Morgan, 504 U.S. at 729. Here, none of the three was qualified to serve on a jury in a death penalty case.

71. Because the trial court improperly failed to excuse for cause prospective jurors Dunham, Dunn, and Ponsell, Mr. Whatley's trial was rendered fundamentally unfair, and his convictions and sentence should be set aside.

## CLAIM IV

**THE INTRODUCTION OF PREJUDICIAL AND INFLAMMATORY EVIDENCE AT TRIAL VIOLATED MR. WHATLEY'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

72. This claim is evidenced by the following facts:

27

73. All other allegations in the Petition are incorporated into this Claim by specific reference.

74. The trial court erred in admitting gruesome and prejudicial photographs taken of the victim prior to the medical examiner's autopsy, but after medical intervention. None of these photographs, which were deliberately chosen by the prosecutor to appeal to the passions and prejudice of the jury, served to do anything to illuminate the jury's understanding of the victim's death. The admission of this evidence and the photographs violated Petitioner's rights to a fair trial and reliable sentencing determination. This evidence lacked probative value and served only to inflame and prejudice the jury against the Petitioner.

75. "The Due Process Clause guarantees fundamental elements of fairness in a criminal trial." Spence v. Texas, 385 U.S. 554, 563-64 (1967); Lisenba v. California, 314 U.S. 219, 236 (1941). The Supreme Court and the Eleventh Circuit have held that the right to due process includes the right to relief from a conviction that was rendered fundamentally unfair by a trial court's ruling on a question of evidence. Green v. Georgia, 442 U.S. 95 (1979); Chambers v. Mississippi, 410 U.S. 284 (1973); Rochin v. California, 342 U.S. 165 (1952); Boykins v. Wainwright, 737 F.2d 1539, 1544 (11th Cir. 1984). Here, the State's introduction of gruesome victim photographs violates both the Georgia and federal constitution, as well as Georgia law, and unduly prejudiced the Petitioner at trial.

28

Osborne v. Wainwright, 720 F.2d 1237 (11th Cir. 1983); Brown v. State, 250 Ga. 862, 302 S.E.2d 347 (1983); Williams v. State, 250 Ga. 533, 300 S.E.2d 301 (1983).

76. The introduction of gory photographs and other improper evidence raises special concerns in capital trials. In Gregg v. Georgia, 428 U.S. 153 (1976), the Supreme Court facially sustained, against Eighth Amendment attack, Georgia's death penalty statute. In doing so, the court relied on statutory safeguards such as a separate penalty hearing and automatic appellate review, which were designed to restrict and channel the discretion of the sentencing jury so as to avoid the arbitrariness found unconstitutional in Furman v. Georgia, 408 U.S. 236 (1972). The heightened reliability mandated in death penalty cases requires that courts carefully scrutinize evidence admitted against the defendant. The admission of these gruesome photos and other evidence designed simply to inflame the passion and prejudice of the jury against Mr. Whatley violated his Fifth, Sixth, Eighth and Fourteenth Amendments rights under the United States Constitution and the analogous provisions of the Georgia Constitution.

## CLAIM V

**PETITIONER WAS VISIBLY SHACKLED DURING HIS TRIAL AND SENTENCING IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

77. This claim is evidenced by the following facts:

29

78. All other allegations in the Petition are incorporated into this Claim by specific reference.

79. Mr. Whatley was require to wear shackles throughout his trial and sentencing. There is no evidence that Mr. Whatley misbehaved in any way or caused any disturbance during any court proceeding.

80. The law regarding the shackling of defendants is straightforward and longstanding. See Deck v. Missouri, 544 U.S. 622, 125 S.Ct. 2007 (2005); Illinois v. Allen, 397 U.S. 337 (1970); Elledge v. Dugger, 823 F.2d 1439 (11th Cir. 1987), rehearing denied with opinion, 833 F.2d 250 (1987).

81. There are two basic reasons for the "common law right of a person being tried . . . to be free of all manner of shackles or bonds . . . when in court in the presence of the jury." Rush v. State, 301 So.2d 297, 300 (Miss. 1974).

> Initially, the prejudice perceived when a defendant is seen in shackles by the jury involves the presumption of innocence. The issue has generally arisen in the context of a determination of quilt or innocence. Courts focus on the prejudicial impact restraints have on the defendant's presumption of innocence.

Elledge, 823 F.2d at 1450, citing Allen v. Montgomery, 728 F.2d 1409, 1413 (11th Cir. 1984).

82. The use of shackles affects not only the presumption of innocence. Even after the defendant is convicted "a jury might view the shackles as first hand evidence of future dangerousness

30

and uncontrollable behavior which if unmanageable in the courtroom may also be unmanageable in prison, leaving death as a proper decision." Elledge, 823 F.2d at 1450. Petitioner had the right to be tried and sentenced without the obvious trappings of dangerous criminality. In Deck, the Court held that the use of visible shackles on a defendant at the sentencing phase of a capital trial violates the United States Constitution.

83. The Supreme Court has held that courts must be exceedingly careful before the accused is placed in shackles:

> The Supreme Court has characterized shackling as an "inherently prejudicial practice." Holbrook v. Flynn, 475 U.S. 560, ____, 106 S.Ct. 1340, 1345, 89 L.Ed.2d 525, 534 (1986). "Not only is it possible that the sight of shackles and gags might have significant effect on the jury's feelings about the defendant, but the use of the technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold." Illinois v. Allen, 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970). When shackling occurs, it must be subjected to "close judicial scrutiny...." Estelle v. Williams, 425 U.S. 501, 503-04, 96 S.Ct 1691, 1992-93, 48 L.Ed.2d 126 (1976).

Elledge, 823 F.2d at 1451 (footnote omitted), citing Woodward v. Perrin, 692 F.2d 220, 221 (1st Cir. 1982); Hardin v. Estelle, 365 F.Supp. 39, 47 (D.Tex.) aff'd on other grounds, 484 F.2d 944 (5th Cir. 1973). Because of the inherent prejudice of shackling, the trial court must have a valid reason for ordering the defendant shackled, afford the defense a hearing on the issue, and consider

other less restrictive alternatives to shackling. United States v. Battle, 173 F.3d 1343 (11th Cir. 1999); Elledge, 823 F.2d at 1452. If there is a less restrictive alternative, due process requires the court to employ that alternative. United States v. Collins, 109 F.3d 1413, 1418 (9th Cir. 1997). Removal from the courtroom is considered a less drastic security measure than shackling. Illinois v. Allen, 397 U.S. 337, 342-44 (1970). Between shackling and removal from the courtroom, "shackling . . . is surely the least acceptable." Allen, 397 U.S. at 350 (Brennan, J., concurring).

84. There was no justification for the shackling. There was no adequate hearing and the trial court did not consider alternatives to shackling. As such, the shackling of Mr. Whatley violated the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. A new trial and sentencing is required.

## CLAIM VI

**THE TRIAL COURT VIOLATED PETITIONER'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS BY FAILING TO PROVIDE PETITIONER WITH THE NECESSARY ASSISTANCE OF COMPETENT AND INDEPENDENT MENTAL HEALTH EXPERTS.**

85. This claim is evidenced by the following facts:

86. All other allegations in the Petition are incorporated into this Claim by specific reference.

87. Petitioner was not provided with the necessary assistance of competent, independent, mental health experts at his trial, which not only prejudiced his defense, but also his attorneys'

32

ability to develop and present his defense effectively at both phases of trial, in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments, the analogous provisions of the Georgia Constitution, and the rule of Ake v. Oklahoma, 470 U.S. 68 (1985).

88. As the Court held in Ake, "[A] reality that we recognize today . . . [is] that when the State has made the defendant's mental condition relevant to his criminal culpability and to the punishment he might suffer, the assistance of a psychiatrist may well be crucial to the defendant's ability to marshal a defense." The Court in Ake held that due process of law requires that the State provide an independent and competent mental health expert to indigent defendants under such circumstances to "assist lay jurors, who generally have no training in psychiatric matters, to make a sensible and educated determination about the mental condition of the defendant at the time of the offense," and to help determine the presence or absence of aggravating and mitigating factors. Id. at 80-81. The Court expressly recognized that jurors listen to, are influenced by, and rely upon the testimony of such experts:

> Unlike lay witnesses, who can merely describe symptoms they believe might be relevant to the defendant's mental state, psychiatrists can identify the "elusive and often deceptive" symptoms of insanity, and tell the jury why their observations are relevant. Further, where permitted by evidentiary rules, psychiatrists can translate a medical diagnosis into language that will assist the trier of fact, and therefore offer evidence in

33

> a form that has meaning for the task at
> hand.... When jurors make this determination
> about issues that inevitably are complex and
> foreign, the testimony of psychiatrists can be
> crucial.... By examining a defendant's mental
> history, examination results and behavior,
> interpreting it in light of their expertise,
> and then laying out their investigative and
> analytic process to the jury, the
> psychiatrists for each party enable the jury
> to make its most accurate determination of the
> issue before them.

Id. at 80 (citations omitted). The Court emphasized that "[i]n

addition, '[t]estimony emanating from the depth and scope of

specialized knowledge is very impressive to a jury. The same

testimony from another source can have less impact.'"   Id.

(citation omitted).

89. Trial counsel filed a motion requesting the appointment

of an independent mental health expert. This motion was heard by

the trial court on November 7, 1996. At that hearing, the court

ordered that instead of a confidential, defense, mental evaluation,

Mr. Whatley would be evaluated at a state mental hospital and the

results of the evaluation would be shared with the court and the

prosecutor. Mr. Whatley was evaluated by state evaluators in

December, 1996. The results of the evaluation were faxed to all

parties on the afternoon of Friday, January 3, 1997. Mr. Whatley's

trial began on Monday, January 6, 1997.

90. This procedure was significantly flawed and created a

multitude of constitutional violations. First, Mr. Whatley was

denied a confidential, independent mental health evaluation. The

34

requirements of Ake are not satisfied by providing a mental health evaluation that has no confidentiality and the results of which are shared with the state. As a result, counsel was unable to work with a mental health professional to prepare defenses, investigate Mr. Whatley's background, and develop mitigation evidence for trial and sentencing.

91. Second, because the evaluation was not completed until days before trial, Defense counsel also lacked the necessary time to adequately to prepare to have the mental health experts testify in pretrial proceedings, at the trial, or during the penalty phase.

92. Third, because of the late disclosure of the evaluation, trial counsel was unable to utilize the court ordered evaluation to obtain an independent mental health evaluation.

93. If defense counsel had been given adequate access to expert assistance, he would have been able to present a complete picture of Mr. Whatley's life history and mental condition, and could have explained how that information wholly supported the position that Mr. Whatley did not deserve to die.

94. Accordingly, Mr. Whatley was denied access to expert psychiatric assistance, in violation of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States and the analogous provisions of the Georgia Constitution.

95. In addition, the denial of timely psychiatric assistance rendered Mr. Whatley's counsel utterly ineffective at his trial and sentencing, in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States.

## CLAIM VII

**TRIAL COUNSEL'S IMMENSE AND OVERWHELMING CASELOAD RENDERED THE ADVERSARIAL PROCESS MEANINGLESS UNDER THE RULE OF UNITED STATES V. CRONIC 466 U.S. 648 (1984), IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

96. This claim is evidenced by the following facts:

97. All other allegations in the Petition are incorporated into this claim by specific reference.

98. As the contract public defender for Spalding County, Georgia, Johnny Mostiler and an associate represented all indigent individuals charged with felony offenses in Spalding County. During the two years during which Mr. Whatley's case was pending and prior to the trial in January 1997, the two attorneys handled 1,558 felony cases, opened 70 civil cases and represented four individuals in death penalty cases. (H.T. 514, Affidavit of Yvette Martinez, Petitioner's Exhibit 26; H.T. 495, Affidavit of Norman Lefstein, Petitioner's Exhibit 25; H.T. 1369 and 1376, Petitioner's Exhibits 40 and 41; H.T. 1450-1506, Petitioner's Exhibits 52-55). Mr. Mostiler handled 70% of the felony cases under the contract while the associate handled the other 30%. (H.T. 468, Affidavit of

36

Dewey J. Yarbrough, Petitioner's Exhibit 19). This staggering caseload far exceeds the caseload recommendation promulgated by the Georgia Indigent Defense Council[7], created circumstances preventing counsel from providing competent representation to Mr. Whatley and failed to subject the prosecution's case to meaningful adversarial testing. As a result, prior to trial, during trial, at sentencing, at motion for new trial, and on direct appeal, trial counsel failed to be a meaningful advocate as required by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and analogous provisions of the Georgia Constitution, and the rule of United States v. Cronic, 466 U.S. 648 (1984). As a result, Mr. Whatley is entitled to a new trial without having to make a showing of actual prejudice.

99. It has long been recognized that lawyers are "necessities not luxuries." Gideon v. Wainwright, 372 U.S. 335, 344 (1963). The right to counsel is the right to the "*effective* assistance of counsel." McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970) (emphasis added). In Cronic, the United States Supreme Court described this right as "the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing." 466 U.S. at 656. Cronic requires the grant

---

[7] At the time of trial GIDC was the state agency that oversaw indigent defense services in Georgia. The GIDC guidelines were in line with those generally accepted caseload numbers suggested by national indigent defense standards.

of habeas relief **without a showing of actual prejudice** in circumstances, "when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." Id. at 659-60. Mr. Mostiler's overwhelming caseload at the time of Mr. Whatley's trial created one of those circumstances in which prejudice is presumed.

100. There are three specific circumstances under which a presumption of prejudice is justified. Bell v. Cone, 535 U.S. 685 (2002). The first case is when there is a complete denial of counsel. Id. Second, a presumption is warranted if counsel fails to subject the prosecution's case to meaningful adversarial testing and the failure is complete. Id. Finally, there is a presumption of prejudice where counsel is called on to render assistance in a situation where competent counsel very likely could not. Id. Mr. Whatley's case easily falls into the third category of cases. The sheer magnitude of counsel's caseload created circumstances where it is so unlikely counsel could provide effective assistance that prejudice must be presumed.

101. Professor Norman Lefstein is one of the foremost experts in the country on indigent defense systems. He is the Dean of the Indiana University Law School, and the drafter four chapters of the American Bar Association's Standards for Criminal Justice,

including the chapters dealing with the Prosecution Function, the Defense Function, Providing Defender Services, and Pleas of Guilty. Professor Lefstein has reviewed the Spalding County Indigent Defense System and Mr. Mostiler's case numbers and provided an analysis to the state court. (H.T. 493, Affidavit of Norman Lefstein, Petitioner's Exhibit 25). As part of his analysis, Professor Lefstein reviewed the literature on case numbers for public defenders:

> 10) The rule of thumb recognized by most published standards on indigent defense services is that a public defender should handle no more than 150 felony case in a single year. See United States Department of Justice Office of Justice Programs, Compendium of Standards for Indigent Defense, Volume 1 (Administration of Defense Services) pages E49-E62 (December, 2000). The standards in Georgia adopt this 150 felony case limit. Georgia Indigent Defense Council, Guideline 6.1. In fact, under the GIDC standards, the number of felony cases handled by each attorney should be even lower if the attorney handles civil cases or criminal appeals. Moreover, according to the GIDC standards, the 150 felony case limit "assumes that no cases where the state is seeking the ultimate penalty of death are included. Studies indicate that attorney time in the defense of a case involving the death penalty averages between 1000 and 2000 hours. *In situations where indigent defenders are actively involved in the defense of death penalty cases, the number of other cases that can be handled must be adjusted correspondingly.*" GIDC Guideline 6.1.
>
> 11) The American Bar Association Standards do not make reference to specific case numbers, but instead state that defenders should not "accept workloads that, by reason

> of their excessive size, interfere with the rendering of quality representation or lead to the breach of professional obligations." Standard 5-5.3. Moreover, "special consideration should be given to the workload created by representation in capital cases." Id.

(H.T. 496, Affidavit of Norman Lefstein, Petitioner's Exhibit 25)(emphasis added)[8]

102. Based on counsel's own applications for funds, in 1995-1996, Mostiler's caseload as a *part-time* public defender easily exceeded 300 felonies per attorney per year. In addition, he was handling at least 30 civil cases each year and at any given time, Mr. Mostiler represented two to four death penalty clients outside the contract. Shortly before Mr. Whatley's trial, Mr. Mostiler's represented an individual named Kevin Todd Hampton in a double murder case in Carroll County. Mr. Mostiler was retained in that case. This trial took place just six weeks before Mr. Whatley's trial in a county that was over sixty miles from Mostiler's office

---

[8] The Spalding County indigent defense program operated under the Georgia Indigent Defense Act, O.C.G.A. § 17-12-1, et seq. and was therefore subject to the Guidelines of the Supreme Court of Georgia for the Operation of Local Indigent Defense Programs (GIDC Guidelines), approved in October 1989. See McCorkle v. Bignault, 399 S.E.2d 916 (1991). In McCorkle the Supreme Court of Georgia recognized that if a county chose to participate in the state-funded program, the county must follow the program's guidelines. Id. at 760. One purpose of the Georgia Indigent Defense Council was to recommend uniform guidelines under which local indigent defense programs "*shall* operate." O.C.G.A. § 17-12-33 (emphasis added). Thus, Mr. Mostiler should have been handling no more that 150 clients per year, without death penalty or civil cases. Section 6.1 of the GIDC Guidelines.

in Griffin, Georgia. (H.T. 514, Affidavit of Yvette Martinez, Petitioner's Exhibit 26; H.T. 1436, Hampton Records, Petitioner's Exhibit 51).

103. The GIDC Guidelines underscore the special status of capital cases by providing for a higher fee rate based on the "seriousness, complexity, and longevity of death penalty cases." § 2.6 GIDC Guidelines. In this case, Mostiler billed a total of 157.8 hours, 55 of which were in-court hours. The GIDC Guidelines note that "[s]tudies indicate that attorney time in the defense of a case involving the death penalty averages between 1000 to 2000 hours." § 6.1 GIDC Guidelines. When the 102.8 hours trial counsel spent preparing Mr. Whatley's case is compared with the 1000 to 2000 hours that a competent attorney should spend preparing to defend a capital case--the only proper conclusion is that "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate." Cronic, 466 U.S. at 659-60.

104. Professor Lefstein makes the following assessment of Mr. Mostiler's caseload and his ability to handle Mr. Whatley's death penalty case:

> 12) The commentary to ABA Standard 5-5.3 aptly describes the situation when it states that "not even the most able and industrious lawyers can provide quality representation when their workloads are unmanageable." No matter how talented Mr. Mostiler was, there is simply no way he could have competently represented all of the clients he had. I have

41

> grave concerns about Mr. Mostiler's ability to
> adequately defend any of his clients given the
> workload he was carrying. His felony case
> load was far too high. When this caseload was
> coupled with a healthy civil practice, Mr.
> Mostiler's ability to adequately and
> competently represent all of his clients was
> further compromised. It is particularly
> troubling that he attempted to handle even one
> death penalty, let alone several, with a
> felony caseload of at least 330 cases per year
> and a civil caseload. With that case load,
> there was no room for one death penalty
> client, let alone the two, three or four death
> penalty clients that Mr. Mostiler was
> representing at any given time during the
> pendency of Mr. Whatley's case.

(H.T. 496-497, Affidavit of Norman Lefstein, Petitioner's Exhibit
25).

105. Reasonably effective assistance of counsel means that
"the lawyer not only possesses adequate skill and knowledge, but
also that he has the time and resources to apply his skill and
knowledge to the task of defending each of his individual clients."
State v. Peart, 621 So.2d 780, 789 (La. 1993)(finding presumption
of ineffective assistance of counsel where counsel is overworked).
With a case load that easily exceeded *double* the recommended number
of felonies per attorney per year, *plus* civil cases, *plus* capital
cases there are simply not enough hours in the day for counsel to
have provided adequate assistance to Mr. Whatley. Regardless of
counsel's experience "[n]ot even a lawyer with an S on his chest
could effectively handle [such a] docket." Peart, 612 So.2d at 789.

106. That trial counsel's meager effort was tantamount to having no counsel, however, is supported by more than the sheer number of cases he handled. This court need not rely solely on establishing a minimum number of hours for counsel to work on behalf of Mr. Whatley. The totality of the surrounding circumstances demonstrates that Mr. Whatley is entitled to a presumption of prejudice under Cronic. The record demonstrates that trial counsel's motions were form pleadings devoid of case specific facts with little citation to applicable case law, counsel presented no coherent theory of mitigation, the mitigation defense was brief, and sentencing witnesses were "obviously unprepared." (H.T. 498, Lefstein Affidavit, Petitioner's Exhibit 25). The billing records indicate that at one point, Mr. Mostiler went six months without seeing his Mr. Whatley, paid a visit, then did not visit again for another nine months.(H.T. 1397, Mostiler Bill, Petitioner's Exhibit 44). Trial counsel's immense caseload demanded more time than any competent lawyer could handle, creating the likelihood that no lawyer could provide effective assistance to Mr. Whatley in any phase of a capital case. Prejudice should be presumed.

107. As discussed above, there are a certain group of cases in which the circumstances are such that no counsel could provide effective representation. In these cases, a Petitioner need no show that specific errors prejudiced him. As the Supreme Court

explained "in cases like <u>Powell v. Alabama</u>, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), where counsel is called upon to render assistance under circumstances where competent counsel very likely could not, the defendant need not show that the proceedings were affected. <u>Cronic</u>, <u>supra</u>, at 659-662, 104 S.Ct. 2039." <u>Bell v. Cone</u>, 535 U.S. 685, 696, 122 S.Ct. 1843, 1851 (2002). A situation, such as Mr. Whatley's case, where counsel is overwhelmed by his caseload, one that is covered by the rule of Cronic.

108. Because there was a breakdown in the adversarial process Mr. Whatley is entitled to a presumption of prejudice. <u>Cronic</u>, 466 U.S. at 657. The Sixth Amendment adversarial process requires that counsel act as an advocate at all critical stages of the case. <u>Id.</u> at 656. The Court noted that "if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated." <u>Id.</u> In a criminal trial, while there is no expectation that advocates be equally matched, "neither is it a sacrifice of unarmed prisoners to gladiators." <u>Id.</u> at 657 (quoting <u>United States ex rel. Williams v. Twomey</u>, 510 F.2d 634, 640 (7th Cir. 1975)).[9]

_____

[9] In Mr. Whatley's case, trial counsel functioned more as an agent of the state than an advocate for the defense. In the <u>Proposal for the Provision of Indigent Defense for Spalding County</u> (Proposal), created and presented to the Spalding County Commission by trial counsel, trial counsel emphasized that his representation of indigent defendants "resulted in a significant reduction in cost of service as shown in the cost comparison between the former system and the current system." Proposal at 2. At the same time as counsel championed the cost savings over the prior panel system of

44

109. Dean Lefstein's did not mince words about his opinion of

Mr. Mostiler and the Spalding County indigent defense system:

> Mr. Whatley's conviction and death sentence
> are the product of a deeply flawed system for
> the provision of indigent defense. There are
> simply not enough hours in the day for any
> attorney to competently provide legal
> representation in all of the cases that Mr.
> Mostiler was assigned to defend. In my years
> of work in this area, this is one of the most
> appalling systems for the provision of
> indigent defense services that I have seen.
> Because of the overwhelming workload, it was
> impossible for Mr. Mostiler to represent Mr.
> Whatley in accordance with the rules of
> professional conduct and the accepted practice
> standards for public defenders. Therefore, it
> is my opinion that Mr. Whatley's death
> sentence was the result of a breakdown in the
> adversarial process and that Mr. Mostiler was
> not Mr. Whatley's constitutionally required
> "meaningful advocate."

(H.T. 498, Affidavit of Norman Lefstein, Petitioner's Exhibit 25).

---

appointed attorneys he described a "significant increase" in the
overall number of cases. Finally, counsel argued that another
benefit of his contract defense of indigent defendants is that the
"court personnel, the District Attorney and Solicitor deal with
only one attorney regarding all indigent defense cases [resulting
in] faster disposition of cases and more efficient operation of the
courts." Proposal at 10. While prompt and efficient administration
of criminal law may be commendable, "[t]o satisfy the Constitution,
counsel must function as an advocate for the defendant, as opposed
to a friend of the court," Cronic, 466 U.S. at 657 n.17 (quoting
Jones v. Barnes, 463 U.S. 745, 758 (1983) (Brennan, J.,
dissenting)). When the process loses its character as a
confrontation between adversaries, the constitutional guarantee is
violated. Cronic, 466 U.S. at 656-57. When defense counsel acts as
a friend of the court, his representation is a "complete failure"
for the accused such that prejudice should be presumed. Bell, 535
U.S. 685.

## CLAIM VIII

**TRIAL COUNSEL'S OVERWHELMING CASELOAD UNDER THE SPALDING COUNTY INDIGENT DEFENSE CONTRACT CREATED AN ACTUAL CONFLICT BETWEEN MR. WHATLEY'S RIGHTS AND THE RIGHTS OF THE MULTITUDE OF OTHER INDIGENT CRIMINAL DEFENDANTS REPRESENTED BY COUNSEL IN VIOLATION OF THE FIFTH SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

110. This claim is evidenced by the following facts:

111. All other allegations in the Petition are incorporated into this claim by specific reference.

112. Trial counsel worked as the contract public defender for Spalding County at the time he represented Mr. Whatley. Because the contract required counsel to accept far too many cases than Mr. Mostiler could handle, Mostiler was forced to choose between defending the rights of Mr. Whatley and the rights of the many other clients to which he was assigned. In other words, with just a limited amount of time in the day, Mostiler had to chose between working on Mr. Whatley's case and putting in time on the cases of his many other clients. By choosing to work on the other cases, at the expense of Mr. Whatley, trial counsel failed to satisfy his duty of loyalty to Mr. Whatley. The excessive demands on his time and resources created an actual conflict and violated the Sixth Amendment right to counsel and the rule of Holloway v. Arkansas, 435 U.S. 475 (1978) and Cuyler v. Sullivan, 446 U.S. 335 (1980).

46

113. In Holloway, the Court presumed prejudice in a case in which the trial counsel was forced by the trial court to represent codefendants who had conflicting interests. 435 U.S. at 490. The Court recognized that unlike most cases, in a case of conflicting interests, the defendant is as likely to be prejudiced by what counsel failed to do as what counsel actually did. Therefore making an inquiry into a claim of harmless error constitutes nothing more than "unguided speculation." Id. at 491. In Cuyler, the Court held that in order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance. 446 U.S. at 350. Because it is difficult to measure the effect on the defense of representation corrupted by conflicting interests, "it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest." Strickland v. Washington, 466 U.S. 668, 692 (1984). Finally, in Mickens v. Taylor, 535 U.S. 162 (2002) the Court stated that "an actual conflict of interest" meant a "conflict that affected counsel's performance-- as opposed to a mere theoretical division of loyalties." Id. at 1243.

114. The conflict of interest in this case is apparent. Trial counsel had a duty of loyalty to Mr. Whatley. To fulfill this duty, counsel should have spent between 1,000 and 2,000 hours preparing the case for trial. Instead, counsel spent less than 100

hours. The reason Mr. Mostiler spent so little time on the case is that he had an overwhelming felony caseload as a result of the indigent defense contract. This created an inherent conflict of interest between Mr. Whatley and Mr. Mostiler's other clients. Mr. Mostiler had to choose between working on Petitioner's case and representing his other 300 felony clients. Because Mr. Mostiler had to sacrifice the needs of Mr. Whatley for the needs of other clients, there was a conflict of interest of constitutional dimension.

115. The Florida Supreme Court recognized this type of conflict of interest in a case involving appeals done by a county public defender. In re Order on Prosecution of Criminal Appeals by the Tenth Judicial Circuit Public Defender, 561 So.2d 1130, 1135 (1990). In that case, there were too few lawyers and too many clients for all the appeals to be done in a timely manner. As a result, the public defender processed some appeals while others languished for excessively long periods of time. Finding a conflict, the Florida Supreme Court explained that when

> excessive caseload forces the public defender to choose between the rights of the various indigent criminal defendants he represents, a conflict of interest is inevitably created. As the court below stated, 'The rights of defendants in criminal proceedings brought by the state cannot be subjected to the fate of choice no matter how rational that choice may because of the circumstances of the situation.'

48

In re Order on Prosecution of Criminal Appeals by the Tenth
Judicial Circuit Public Defender, 561 So.2d at 1135.

116. The trial court was plainly on notice of the conflict.
The trial court was aware of Mr. Mostiler's case numbers from the
court docket as well as Mr. Mostiler's contract renewal requests.
These requests spelled out how many clients Mostiler represented.
The Court also knew how many death penalty cases were on-going in
Spalding County.  Because the trial court either knew, or should
have known of the conflict, and failed to take remedial action, Mr.
Whatley is entitled to a presumption of prejudice. Holloway v.
Arkansas, 435 U.S. at 489.

## CLAIM IX

### TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL BEFORE, DURING, AND AFTER TRIAL IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

117. This claim is evidenced by the following facts:

118. All other allegations in the Petition are incorporated
into this claim by specific reference.

119. The proper standard for evaluating claims of ineffective
assistance of counsel is well settled.  Strickland v. Washington,
466 U.S. 668 (1984); Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527
(2003); Rompilla; Williams.  In order to demonstrate that counsel
was ineffective, Petitioner must show both deficient performance by
counsel and a likelihood that counsel's deficient performance
affected the outcome of the trial. Strickland, 466 U.S. at 687.

The deficient performance prong is satisfied with a showing that the attorney's representation in a specified instance fell below "an objective standard of reasonableness." Strickland, 466 U.S. at 695-96. The second prong is satisfied if there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 695-96.

## A. Failure to Investigate and Prepare Mitigation and Failure to Rebut Aggravation.

### 1. Deficient Performance

120. The Supreme Court has written that trial counsel in a capital case has an "obligation to conduct a thorough investigation of defendant's background." Williams v. Taylor, 529 U.S. 362, 396, 120 S.Ct. 1495, 1515 (2000). The Supreme Court has further held that a reasonable sentencing phase investigation should "comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." Wiggins, 123 S.Ct. 2537. The Supreme Court also positively cited that ABA guidelines which state "the lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor and to the court at sentencing . . . Investigation is essential to fulfillment of these functions." Wiggins, quoting 1 ABA Standards for Criminal Justice 4-4.1, Commentary, p.4-55. In addition, counsel has a duty

50

to conduct investigation designed to counter the state''s aggravation. Rompilla v. Beard, 545 U.S. 374, 125 S.Ct. 2456 (2005).

121. Because this case was so badly neglected by trial counsel, the instances of deficient performance in the investigation and presentation of the defense case at sentencing are overwhelming. The following is a sampling of counsel's deficient performance:

122. Trial counsel spent total of 15 hours preparing for the sentencing phase of trial. (H.T. 1397). He interviewed only a few witnesses who happened to be around Griffin, Georgia even though Mr. Whatley left Griffin when he was 16 years-old and spent almost half his life in Washington, DC. Mostiler failed to interview the witnesses who knew the most about Mr. Whatley's background or history. Trial counsel failed to even talk to Mr. Whatley's mother. (H.T. 421). As a result, Mr. Whatley was forced to endure a death penalty sentencing hearing without even having his mother asking the jury to spare his life.

123. Counsel did not do any investigation in Washington, D.C. (H.T. 2251). Mr. Whatley's mother, step-siblings, two uncles, and aunt lived there. These people had compelling mitigating information to provide, but were never contacted. (H.T. 403, 409, 442). Prior lawyers, doctors, and criminal justice cases were in Washington. Trial counsel did not interview any of these critical

witnesses or get any of the records that were available there. (H.T.
470).

124. Counsel did not use his investigator to conduct any
significant investigation.  The investigator's bill shows that 55
of the 96 hours he billed on the case were in court for the first
appearance hearing, trial, and voir dire. (H.T. 1401, Yarborough
Bill, Petitioner's Exhibit 45). In other words, the investigator
spent more time in court than he did investigating the case.  Of
the 41 hours he actually worked doing investigation, the
investigator spent 10.5 hours interviewing guilt innocence
witnesses and one hour doing a phone interview of one mitigation
witness.  Id. These are the only witness interviews listed on the
detailed bill submitted by the investigator and credited by the
state habeas court. Because the investigator was paid by the hour
on capital cases, he kept close track of his time.  He testified
that his bill is an accurate statement of all of the work he did on
Mr. Whatley's case. (H.T. 470, Affidavit of Dewey Yarbrough,
Petitioner's Exhibit 19).

125. At sentencing, Mostiler introduced only one exhibit, a
copy of Mr. Whatley's Spalding County school records.  Defense
counsel failed to obtain or present any other documents,
photographs, or records to support a life sentence. (Trial
Transcript, Index of Exhibits). The only records relating to Mr.

52

Whatley obtained by defense counsel were provided by the D.A. in discovery.

126. Trial counsel presented testimony of Eugene Watson, a social worker who worked with Mr. Whatley. Trial counsel's first contact with this important mitigation witness was shortly before trial and it was not extensive. In fact, a note written by Mostiler to Mr. Whatley during voir dire indicates that Mostiler did not know who Mr. Watson was at that time. (H.T. 2045). Trial counsel never obtained or reviewed Mr. Watson's case file. (H.T. 378). The file contained many records including information about Mr. Whatley's family and prior mental health evaluations. According to Watson, Mostiler did little to prepare him to testify.

127. Trial counsel did not get Mr. Whatley's court and prison records from Washington, D.C. These contain mental health evaluations and show that Mr. Whatley was brutalized in prison. (H.T. 793, 1234).

128. Even though Mr. Whatley had two mental health evaluations within the 7 years prior to the trial, trial counsel did not obtain copies of either evaluation.(H.T. 699-710, 723). These evaluations flagged Mr. Whatley as a young person in need of extensive mental health treatment. Unfortunately, he fell through the cracks and never received the needed treatment.

129. Counsel failed to speak to the mitigation witnesses who did testify at sentencing in any significant way before the trial.

53

Besides Petitioner and Mr. Watson, trial counsel called eight witnesses to testify at the sentencing phase. However, he never met with them individually to find out what they knew or what they had to say. The witnesses all simply got subpoenas and showed up at court. Just before they testified, trial counsel called them together as a group and told them to say something nice about Mr. Whatley. Thus, at sentencing, counsel knew next to nothing about his client or the testimony that the mitigation witnesses were going to give. These witnesses did not know Mostiler's theory and did not know what they were going to be asked on direct or cross-examination. (H.T. 422, 429, 437, 447, 450, 459, 459, 465, 456).

130. Trial counsel did not visit Mr. Whatley in the eight months between April 3, 1996 and December 19, 1996. The trial began on January 6, 1997. Mostiler failed to meet with Mr. Whatley for six months between September 28, 1995 and April 3, 1996. (H.T. 1397). The investigator working with Mostiler did not visit Mr. Whatley during these periods either.

131. Counsel did not speak to friends, inmates or jailers of Mr. Whatley to determine whether Mr. Whatley was remorseful. Had counsel done this investigation, he would have found several people, including jailers, who would have testified that Mr. Whatley showed heartfelt and honest remorse. (H.T. 489, 491, 424, 427-428, 461, 1507).

132. Trial counsel did almost no legal research in preparation for pretrial or trial proceedings. Trial counsel's case file contains copies of only three judicial opinions. (H.T. 1599-1638).

133. Had counsel done the proper investigation, or even a minimal investigation, into Mr. Whatley's background, he could have presented Mr. Whatley's powerfully mitigating life history that included abandonment, violence, and sexual and physical abuse. The information could have been presented to the jury and interpreted by a mental health professional.

134. Trial counsel did next to nothing to investigate Mr. Whatley's background. According to Mr. Mostiler's billing records, in 22 months as Mr. Whatley's attorney, Mr. Mostiler spent a total of 12 hours preparing the mitigation case. Similarly, the only mitigation work done on the case by the investigator, Dewey Yarborough, was a one hour phone call with witness Eugene Watson on December 19, 1996. (H.T. 1401).[10]

135. Trial counsel had a fundamental duty to conduct a reasonable investigation in preparation for the sentencing phase of trial. Baxter v. Thomas, 45 F.3d 1501, 1513 (11th Cir. 1995); Harris v. Dugger, 874 F.2d 756, 759 (11th Cir. 1989). Obviously, this includes an investigation into the defendant's childhood and

---

[10] Yarborough testified that his bill is an accurate statement of all of the work he did on Mr. Whatley's case. He testified that Mostiler's bill was a similarly accurate statement.(H.T. 470).

55

background. See Hardwick v. Crosby, 320 F.3d 1127 (11th Cir. 2003); Williams v. Taylor, 529 U.S. at 396, 120 S.Ct. at 1515. Courts have regularly found that it is deficient performance for an attorney not to conduct a reasonable investigation into a death penalty client's background. See Wiggins, 123 S.Ct. at 2541-2544; Williams v. Taylor, 529 U.S. at 395, 120 S.Ct. 1495.

136. Mostiler's investigation, preparation and presentation of the mitigation case was clearly unreasonable. The sentencing phase of a capital trial is often the place "where counsel can do his or her client the most good." Glenn v. Tate, 71 F.3d 1204, 1207 (6th Cir.1995); Jermyn v. Horne, 266 F.3d 257, 308 (3rd Cir. 2001). Mr. Mostiler knew the State had a strong guilt phase case and that sentencing would be important. However, in spite of this understanding, he failed to devote time the time to the preparation for this phase of the case. As a result, there was no reasonable strategic decision not to investigate mitigation.

137. As discussed in Claim VII, trial counsel had a crushing caseload. He made no strategic choice to jettison the mitigation investigation. He did not have enough hours in the day to defend Mr. Whatley and handle his other cases.

## 2. Harm Flowing from the Deficient Performance

138. At trial, counsel told the jury in closing argument that Mr. Whatley came from a "good strong family."(T.1549). Had counsel done a reasonable investigation, he would have learned that just

56

the opposite was true.  In addition, had counsel done a basic investigation, he would have been able to present a compelling life history of Mr. Whatley, much like what is described in the affidavit presented by Dr. David Lisak and affidavit by Richard Dudley. See (HT 310; 335).  The jury would have heard powerful testimony about a childhood filled with physical, psychological, and sexual abuse.  The jury would have been told of Mr. Whatley's mental problems and learned how they developed. For example, the jury did not hear that Mr. Whatley's mother was raped by her uncle when she was nine months pregnant with Mr. Whatley.  After Mr. Whatley was born, his mother left him to be raised by the rapist uncle and his wife.  The uncle was such a violent alcoholic that when Mr. Whately was growing up, his aunt would keep hammers by the doors of her house so that she could fight off her husband's violent attacks during his drunken rages.  This is the type of testimony which could have convinced one juror to vote for life. Wiggins, 123 S.Ct. at 2543.

139. A proper investigation by counsel, would have caused the jury to see that Mr. Whatley was deeply sorry and remorseful for his actions.  Several witnesses, including an employee of the sheriff's department, could have testified that Mr. Whatley cried about the offense and expressed remorse outside of court.  At trial, the prosecutor mocked Mr. Whatley's expression of remorse in his sentencing phase testimony. With proper investigation, Mostiler

57

could have easily rebutted the prosecutor's allegations and made a
strong argument on behalf of his client.

140. Had counsel done a proper investigation, there is a
reasonable probability that the result of the trial would have been
different.    Therefore, trial counsel rendered constitutionally
ineffective assistance and the writ must issue.

## B.    Counsel Completely Mishandled Requests for Mental Health Experts

141. When a defendant can make a specific showing that mental
health will be an issue at trial – via an insanity defense, a
diminished capacity defense, or as mitigation in the sentencing
phase, then the trial court is obligated to provide the defendant
funds for the assistance of a competent and independent mental
health expert. See,    Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1095
(1985).   Because defense counsel was ineffective in handling all
aspects of the mental health case, Mr. Whatley was denied access to
independent mental health experts and prevented from presenting
powerful mitigation.

### 1.    Deficient Performance

142. Counsel's performance was deficient in at least four
separate ways.   First, because counsel failed to investigate Mr.
Whatley's background, he did not have any information to present to
the trial court to support his request for an independent
evaluation.   Had counsel investigated, he would have discovered
previous psychiatric evaluations of Mr. Whatley indicating that he

58

suffered from substantial mental diseases. There is even a diagnosis of schizophrenia in a previous evaluation by the District of Columbia Department of Corrections.

143. Second, counsel filed only a form motion for funds for a mental health expert that provided no case specific reasons supporting the request. It cited no legal authority - not even the seminal case of Ake v. Oklahoma which was decided a decade earlier. By failing to provide any information regarding Mr. Whatley's need for a mental health expert, counsel did not give the trial court a basis for granting the motion. Third, counsel did not file the motion *ex parte*. Fourth, when counsel received the results of the non-confidential state evaluation indicating that Mr. Whatley might well be incompetent, he failed to speak to the expert who conducted the non-confidential evaluation and failed to renew his request for a private evaluation. Each of these items individually and cumulatively, constitute deficient performance.

144. Had counsel done even the most basic investigation, he would have discovered ample evidence to support an Ake motion that would have required the trial court to an independent expert. For example, had counsel interviewed Mr. Whatley's mother, he would have learned that Mr. Whatley was raised by a great uncle who was a violent alcoholic who beat his wife and sexually abused Mr. Whatley into his teenage years.(H.T. 414). Similarly, had trial counsel obtained the records or attorney files of Mr. Whatley's

Washington, DC criminal cases, he would have learned of two previous psychological evaluations indicating that Mr. Whatley was possibly schizophrenic. (H.T. 700, 710). At the time of the filing of the motion, counsel had not contacted Eugene Watson, a social worker who had close contact with Mr. Whatley and who possessed prior psychological evaluations. (H.T. 376-377). These are basic and simple investigative tasks that should have been done in the 18 months prior to the filing of the Ake motion.

145. The filing of a form Ake motion without any of the required case specific factual information was deficient performance. Because trial counsel did not include any specific information about his client, the trial court denied the motion for funds for a defense mental health expert. While the trial court did provide a non-confidential evaluation, this is not a substitute for a defense evaluation. As the state evaluator indicated, the evaluation done by West Central Georgia Regional hospital was only an evaluation for competency and criminal responsibility. The state evaluators did not look for mitigation and did not include that information in the report. (H.T. 230; H.T. 279-280).

146. The trial court here offered to make funds available for an evaluation after the state report, but trial counsel never followed up. See Wiggins, 123 S.Ct. at 2536 (Trial counsel ineffective for not procuring forensic social worker when funds were made available). The state evaluation indicated that Mr.

Whatley suffered from a "significant psychopathology" and the doctors had concerns about his competency to stand trial. This put trial counsel on notice that there were issues for a second opinion. Had trial counsel done an independent evaluation, significant evidence in mitigation could have been uncovered. See H.T. 335 (Affidavit of David Lisak).

147. Trial counsel did not make a strategic decision not to present a particularized motion for expert assistance. Because counsel totally failed to conduct a minimal investigation into Mr. Whatley's background, counsel had no information to put into a particularized motion. As the Supreme Court explained in Wiggins, counsel cannot make a strategic decision to forego a particular issue or defense, unless counsel has conducted a reasonable investigation. Wiggins, 123 S.Ct. at 2535-2536; accord, Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir. 1991). Counsel's failings were not the result of any strategic decision.

## 2. Harm Stemming from Deficient Performance

148. Had counsel properly litigated the Ake motion, there is reasonable probability that the result of the proceedings would have been different. Had counsel been provided an appropriate, independent expert, he would have had access to a report much like those presented by Petitioner at the habeas corpus hearing. (H.T. 310, 335). These reports provide substantial insight into Mr. Whatley's background, social history, and mental illness. They

61

present compelling evidence in mitigation that could have easily produced a life sentence in this case.

149. The non-confidential, state evaluation was not an appropriate substitute for an independent, defense evaluation. See Cowley v. Strickland, 929 F.2d 640 (11th Cir. 1991). A defense expert does more than simply determine issues of competency or sanity. The defense expert assists counsel in developing mental health mitigation and also assists counsel in preparing to cross-examine the state's experts. In Mr. Whatley's case, the state evaluator made very clear that she did not believe it was her job to determine if there was any mitigation arising out of the state mental health evaluation. She was not looking for mitigation and would not include it in her report if she saw it. (H.T. 230; 279-280). This is in stark contrast to what a defense evaluator does. A major part of the defense evaluation is to determine if there is anything in the defendant's mental health that would be mitigating.

150. Because trial counsel unreasonably failed to properly litigate the mental health issues in the case, Mr. Whatley was denied the opportunity to present this powerful mitigating evidence to the jury. This evidence offers an explanation of how Mr. Whatley ended up where he did, a detailed understanding of his past, and the mental illnesses that have plagued him throughout his life. This compelling and humanizing evidence would have had a huge impact on the jury. See Wiggins, 123 S.Ct. at 2542.

151. Clearly, the mental health mitigation that could have been presented is so powerful that one juror could have been swayed. Had counsel adequately prepared the mental health aspects of the case, there is a reasonable likelihood that the result of the sentencing phase would have been different. This Court must find counsel ineffective and vacate Mr. Whatley's death sentence.

## C. Counsel Failed to Object to the Unwarranted and Improper Shackling of Petitioner

152. One of the most stunning errors of trial counsel was to allow Mr. Whatley to appear and testify before the jury at sentencing while shackled. Mr. Whatley had not misbehaved in any way and did not provide any reason for the trial court to shackle him. Failing to object to the visible shackling of Petitioner in front of the jury is ineffective assistance of counsel.

### 1. Deficient performance

153. From the beginning of jury selection, Mr. Whatley was shackled. Counsel made no objection and there is no discussion on the record about why Mr. Whatley was shackled. The Spalding County Sheriff had a blanket policy of shackling all capital defendants during trial. (H.T. 98). The trial court indicated that the decision to shackle Mr. Whatley rested with the Sheriff and not with the court. At one point the trial court stated that it had no problem removing Mr. Whatley's shackles, but did not so order because "obviously, that's not up to me." (T. 974).

63

154. During the sentencing phase, the defense called Mr. Whatley to testify. When the prosecutor pointed out that there might be an issue with having the defendant testifying in shackles, defense counsel informed the trial court that there was no problem because "he's been convicted now."(T. 1412).

155. During the cross-examination of Mr. Whatley, the prosecutor exploited the fact that Mr. Whatley was testifying while in shackles. The prosecutor asked Mr. Whatley to step out of the witness box and act out the crime in front of the jury. (T. 1478-1481). With the shackles in full display, the prosecutor put the gun in Mr. Whatley's hand and had him stand in front of the jury. All of this occurred without objection from trial counsel.

156. Counsel's actions easily satisfy the deficient performance prong of the Strickland test. Not only did trial counsel fail to object to the use of shackles, he took no steps to prevent the jury from seeing Mr. Whatley in shackles. In Roche v. Davis, 291 F.3d 473 (7th Cir. 2002), the Seventh Circuit had little trouble finding deficient performance where an attorney in a death penalty case failed to object to the shackling of his client and did not act to prevent the jury from seeing the shackles. The Seventh Circuit agreed with the finding of the district court that "counsel's failure to object on the record to the use of shackles is a clear example of deficient performance." Roche 291 F.3d at 483.

64

157. This was not a strategic decision on the part of counsel. There can be no strategic reason for a criminal defense attorney to acquiesce in the visible shackling of his client in a capital murder trial. This action is so prejudicial that it is outside the range of professionally reasonable decisions of an attorney.

## 2. Harm Flowing from the Deficient Performance

158. The law regarding the shackling of defendants is straightforward and longstanding. See Deck v. Missouri, 544 U.S. 622, 125 S.Ct. 2007 (2005); Illinois v. Allen, 397 U.S. 337 (1970); Elledge v. Dugger, 823 F.2d 1439 (11th Cir. 1987), rehearing denied with opinion, 833 F.2d 250 (1987). In Deck, the Court held that the use of visible shackles on a defendant at the sentencing phase of a capital trial violates the United States Constitution.

159. The Court explained in Deck that there are three main reasons why shackling a defendant in the guilt phase of a trial is problematic. First, the use of visible shackles undermines that presumption of innocence and the related fairness of the factfinding process. Deck, 125 S.Ct. at 2013. Second, the use of shackles can interfere with the defendant's ability to communicate with his attorney thereby undermining the right to a meaningful defense. In a comment particularly relevant to Mr. Whatley's case, the Court noted that "indeed, [shackles] can interfere with a defendant's ability to participate in his own defense, say by freely choosing whether to take the witness stand on his own

65

behalf." Deck, 125 S.Ct. at 2013 citing Cranburne's Case, 13 How.
St. Tr. 222 (K.B. 1696). Third, the use of shackles undermines the
symbolic, yet concrete objective of maintaining a dignified
judicial process. "The courtroom's formal dignity, which includes
the respectful treatment of defendants, reflects the importance of
the matter at issue, guilt or innocence, and the gravity with which
Americans consider any deprivation of an individual's liberty
through criminal punishment." Deck, 125 S.Ct. at 2013.

160. Turning to the use of shackles at the sentencing phase of
a capital trial, the Supreme Court explained that "the
considerations that militate against the routine use of visible
shackles during the guilt phase of a criminal trial apply with like
force to penalty proceedings in capital cases." Deck, 125 S.Ct. at
2014. The Court further explained that "the appearance of the
offender during the penalty phase in shackles, however, almost
inevitably implies to a jury, as a matter of common sense, that
court authorities consider the offender a danger to the community--
often a statutory aggravator and nearly always a relevant factor in
jury decisionmaking, even where the State does not specifically
argue the point." Deck, 125 S.Ct. at 2014. In light of these
findings, the Court held that shackling a defendant at the
sentencing phase of trial, without a compelling reason is
inherently prejudicial and violates the due process clause. This

is the same conclusion that the Eleventh Circuit reached in 1987 in Elledge.

161. Because shackling is "inherently prejudicial," by definition, Mr. Whatley was prejudiced by counsel's failure to object to the shackles. Shackling a defendant during the sentencing phase of trial "unconstitutionally prejudicial" if there is not first a hearing to challenge the use of shackles and the consideration of less restrictive alternatives. In Mr. Whatley's case, there was neither. Had counsel made appropriate objections and argument, Mr. Whatley would have been tried without the unconstitutional prejudice of being seen in shackles or had his sentence reversed as a result of being tried while in shackles.

162. In Mr. Whatley's case, there was no reason to shackle him. He had not misbehaved at any previous court appearance, was not being disruptive, and did not act out in any way. According to the testimony of District Attorney McBroom, the sheriff had a blanket policy of shackling the defendant in death penalty trials. (H.T. 98). Thus, Mr. Whatley was not shackled for any reason particular to him, but rather in accordance with a blanket policy. Under the rule of Elledge, the state must demonstrate a compelling reason for shackling a defendant that is strong enough to overcome the inherent prejudice caused by shackling. Reliance on a blanket policy of shackling all capital defendants is not good enough. There was simply no justification for the shackling of Mr. Whatley.

163. In addition, there was no hearing on the issue.   Had there been an adequate hearing that included citation to proper authority on the issue, it is likely that Mr. Whatley would not have been shackled in front of the jury.   Counsel's failures resulted in the inherently prejudicial and unconstitutional shackling of Mr. Whatley.   Moreover, counsel lost this winning issue on appeal because counsel failed to preserve an objection.

## D.   Counsel Was Ineffective for Failing to Obtain the Assistance of a Ballistics Expert and for Failing to File a Proper Motion for a Ballistics Expert.

### 1.   Deficient Performance

164. Trial counsel was ineffective for failing to obtain the services of a ballistics expert.   In a request for such an expert filed with the court, counsel stated "the attorney for the Defendant, Johnny B. Mostiler, is not a ballistics or medical expert and cannot provide the expertise in these fields that is needed to build a proper defense."   Counsel never withdrew this motion, but it was also never addressed at the motions hearing and does not appear to have been ruled on.

165. Ballistics was a critical issue in this case.   The prosecution argued that Mr. Whatley killed Ed Allen at the counter to eliminate a witness.   Mr. Whatley maintained that there was no shooting until Allen came around the counter with a gun and opened fire at Mr. Whatley.   Given these two versions of events, the

68

ballistics and crime scene reconstruction evidence was critical. The state's experts supported the prosecution's position.

166. A defense ballistics expert was critical. Counsel has an obligation to investigate the state's scientific evidence as well as the evidence presented by the state in aggravation of sentence. See Rompilla v. Beard, 545 U.S. 374, 125 S.Ct. 2456 (2005); Troedel v. Dugger, 828 F.2d 670 (11th Cir. 1987); Jackson v. Herring, 42 F.3d 1350, 1368 (11th Cir. 1995)(aggravation). Counsel's failure to obtain such an expert was deficient performance.

167. There was no strategic decision here. Counsel informed the court that counsel did not have the necessary expertise to properly litigate the issue. It appears that the issue was dropped until shortly before trial. Counsel's bill indicates that he visited the crime scene for the first and only time on December 30, 1997. This was a mere seven days before trial. At that point, it was too late to retain an expert.

## 2. Harm Flowing from the Deficient Performance

168. Mr. Whatley suffered substantial harm from the failure of trial counsel to obtain a ballistics expert. Had counsel employed such an expert, he would have been able to present testimony that indicated that the State's experts were incorrect and that the physical evidence actually supported Mr. Whatley's story that he did not shoot until fired on by Allen and that he did not shoot at Bunn. Kelly Fite, one of the foremost ballistics and crime scene

experts in the country, reviewed the evidence in Mr. Whatley's case and determined that the State's experts and the prosecutions theories based on its experts are not supported by the evidence and that the facts support Mr. Whatley's version of events.[11]

169. Moreover, the State's ballistics expert, Bernadette Davy, has recently been fired for not conducting testing and making false reports. While it is unclear how long Ms. Davy was committing fraud and providing false testimony, a defense expert could have been helpful in rooting out this fraud at the time of trial if it had been going on at the time.

170. Had trial counsel retained an expert, he would have refuted some of the strongest arguments in aggravation and shown that the facts supported Mr. Whatley's story. With the expert testimony, there is a reasonable likelihood that the result of the sentencing phase would have been different.

---

[11.] The habeas court granted Respondent's motion to strike the Fite affidavit. The habeas court had left the record open for specific depositions and affidavits. Mr. Fite was not included on that list. While the record was still open, Petitioner submitted this affidavit. Petitioner requested that the Georgia Supreme Court consider the Fite Affidavit as part of the record. That Court noted that the state habeas court considered the evidence and the merits of the claim. Whatley, 668 S.E.2d at 664. Thus, the evidence is properly before this Court for consideration.

**E. Counsel Was Ineffective for Failing to Object to Improper Closing Argument Made by the Prosecutor During the Sentencing Phase.**

### 1. Deficient Performance

171. During his closing argument at the sentencing phase of the trial, the district attorney made a highly improperly closing argument comparing Mr. Whatley to two prisoners from other states and their alleged exploits while in prison. The prosecutor argued:

> Any of you remember Albert DeSalvo, the Boston Strangler? I did a little -- I read a lot about crimes and stuff like that, and I found out that when he was in prison he made jewelry. You know what kind of jewelry he made? He made ladies (sic) chokers. Remember Richard Speck, the man that around 1968 killed six nurses in Chicago? That man -- some of you may have seen it. They had him on video. He made a video while he was in jail, it was undercover. They found it after he had died of natural causes, cause he didn't get the death penalty. The thought he deserved another chance. And on that film they're asking him, well, did you commit the crime? He said, hell, yes, I did it. And he made a statement I wrote down. I had taped this, and I went back -- and I went back and got it, and he said, if people knew how much fun I was having, they would turn me loose.

(T. 1533-1534).

172. Trial counsel made no objection to this highly improper closing argument. On appeal, the Georgia Supreme Court found that the argument was improper. Specifically, the Supreme Court wrote:

> "Analogizing a defendant or a defendant's case to [a] well-known defendant or case is permissible during argument if the analogy is supported by facts in evidence." Carr v. State, 267 Ga. 547, 555(7)(a), 480 S.E.2d 583

71

> (1997). In this case, there was no
> evidentiary basis for this analogy because no
> evidence was introduced about whether Whatley
> enjoyed prison. Compare Mize v. State, 269
> Ga. 646, 653-654(8), 501 S.E.2d 219 (1998)
> (Charles Manson analogy appropriate to
> argument that Mize was criminally responsible
> for murder based on his instructions to kill
> and his control over the shooter). There was
> also no evidence introduced about the obscure
> fact that Richard Speck enjoyed prison, or to
> support the state's other analogies.
> Therefore, the state's injection of
> extraneous, prejudicial information into its
> argument was improper. See Bell v. State,
> 263 Ga. 776, 777-78, 439 S.E.2d 480 (1994)

Whatley v. State, 270 Ga. 296, 303, 509 S.E.2d 45, 53 (1997). Even though the argument was improper and prejudicial, the Supreme Court refused to reverse the conviction because trial counsel waived the issue by failing to object. Trial counsel's failure to object to this improper argument constituted deficient performance.

## 2. **Harm Flowing from Deficient Performance**

173. Mr. Whatley was substantially harmed by the failure to object. Had counsel made the objection, Mr. Whatley's sentence would have been reversed on appeal. Under Georgia law, once a constitutional violation is found to exist, such as an improper closing argument at the sentencing phase of trial, the court must grant relief unless the error is harmless. The familiar harmless error test of Chapman v. California, 386 U.S. 18 (1967), governs. Under the Chapman test, the State must prove beyond a reasonable doubt that the error did not contribute to the outcome of the trial. State v. Hightower, 236 Ga. 58, 222 S.E.2d 333 (1976). "'The

72

fact that there was other sufficient evidence to convict does not make the error harmless.'" Yancey v. State, 275 Ga. 550, 558, 570 S.E.2d 269, 275 (2002) quoting Mangum v. State, 274 Ga. 573, 577, 555 S.E.2d 451 (2001). "Rather, the test is whether the evidence may have influenced the jury's verdict." Jones v. State, 265 Ga. 84, 86, 453 S.E.2d 716, 718 (1995) quoting Moore v. State, 254 Ga. 674, 674, 333 S.E.2d 605 (1985). In the context of a capital sentencing, the fact that aggravating circumstances and evidence exist to support a death sentencing does not render the error harmless. The test is whether the improper argument may have influenced the jury's decision to sentence the defendant to death.

174. As the Georgia Supreme Court found, the prosecutor's improper argument was highly prejudicial for a host of reasons. First, neither of the two other criminals mentioned was in prison in Georgia. Thus, the conditions under which they served their sentences were wholly unrelated to the current conditions in Georgia's prisons. Second, both were notorious serial killers who killed more than one victim. By equating Mr. Whatley, convicted of one murder, with two of the most notorious killers in American history was highly prejudicial, and was done solely to inflame the jurors by misleading them into thinking that Mr. Whatley was as dangerous as two notorious multiple murderers. This is not to suggest that one murder is somehow not serious; rather, the important point is that there is a difference between a serial

73

killer or multiple murderer and a person convicted of one homicide. Third, there was no evidence to support the district attorney's "testimony." The jury had no way to know if it was even true that the Boston Strangler made ladies' chokers while in prison or that Speck enjoyed prison life. It is entirely improper for the district attorney to argue facts that he did not even attempt to prove. Finally, even if the district attorney's "testimony" were proven to be true, it was wholly irrelevant to Mr. Whatley's punishment. The jury was charged with making a reasoned decision on the appropriate punishment for Mr. Whatley based on the crime and Mr. Whatley's personal characteristics. It was highly prejudicial for the prosecutor to inflame the jury by arguing that other criminals, serving time in other states, in prison up to 30 years ago, had an easy time in prison.

175. Because Mr. Whatley's sentence would have been reversed on appeal if counsel had properly preserved the objection, he was substantially harmed. Thus, there is a reasonable probability that the result would have been different. Chatom v. White, 858 F.2d 1479, 1487 (11th Cir. 1988) (prejudice shown when result of appeal would have been different); Daniel v. Thigpen, 742 F.Supp. 1535 (M.D. Ala. 1990) (appellate counsel ineffective for failing to raise Pate issue; prejudice lay in reasonable probability that outcome of appeal would have been different and in need to overcome procedural default). Mr. Whatley's sentence must be vacated.

74

**F.     Trial Counsel Was Ineffective for Failing to Strike for Cause Prospective Jurors Eugenia C. Higgins, Johnny Killingsworth, Rilla Dunn, and Juanda Ponsell.**

### 1.     Deficient Performance

176. During jury selection, prospective jurors Eugenia Higgins and Johnny Killingsworth admitted that they knew about the case, and had family members who knew the victim and his family. In addition, prospective jurors Rilla Dunn and Juana Ponsell expressed strong bias in favor of the death penalty. Because of these statements, these jurors should have been stricken for cause. However, trial counsel failed to move to strike these jurors for cause. Because of trial counsel's failure, one of these biased jurors, Ms. Higgins, ended up serving on the jury while Mr. Mostiler had to waste peremptory strikes on the other jurors. Because trial counsel failed to move strike these jurors, Mr. Whatley was deprived of a fair and reliable trial. In addition, had these strikes been overruled, Mr. Whatley's conviction would have been reversed on appeal.

177. Trial counsel's failure to strike these jurors constituted deficient performance.

### 2.     Harm flowing from the deficient performance

178. Mr. Whatley was harmed significantly by counsel's failure to object to these jurors. First, because counsel failed to move to strike these jurors, two biased jurors served on Mr. Whatley's

jury. Had unbiased jurors served in their place, there is a resonable probabilty that the result of the trial and sentencing would have been different. Second, because counsel failed to move to strike these jurors, the Georgia Supreme Court refused to consider the issue on appeal. Thus, Mr. Whatley was prejudiced by counsel's failure to preserve the objection.

## G. **Counsel Failed to Object to the Court's Improper Response to a Juror Question Regarding the Possibility of Parole.**

179. Mr. Whatley's rights to due process, the assistance of counsel, a fair trial, and a reliable determination of punishment, pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution were violated by the trial court's failure to answer the jury's question about the meaning of life without parole.

### 1. **Deficient performance**

180. After both sides had completed their closing arguments, but before the trial court's instructions, the jury foreman informed the trial judge that one of the jurors had a question. He stated "the question is, Your Honor, how often though they sentence (sic) to life without parole actually get committed (sic) out. Could this sentence get commuted at a later date, parole, discharge due to crowded conditions, etcetera." (T. 1563).

181. In response, the trial judge stated, "I cannot specifically answer that question because I don't know and nobody

else knows what is going to occur in the future. Let me invite your attention to my charge of law ...." (T. 1564). This answer was inadequate, and implied that a death sentence was the only sentence which would ensure that Mr. Whatley would not be released. Trial counsel was ineffective for failing to object to this incorrect response. The Georgia Supreme Court refused to address this claim on appeal because trial counsel failed to object. Had counsel objected, the jurors would have been given the proper answer, which is, a sentence of life without parole means just that. Had the court failed to give this instruction, Mr. Whatley's conviction would have been reversed.

182. There was no strategic reason for this failure to object. Counsel apparently simply did not know the law. Ignorance of the law is not a tactical reason.

### 2. **Harm Flowing from the Deficient Performance**

183. Mr. Whatley was tried after O.C.G.A. § 17-10-31.1 added life without parole as a sentencing option. Before this statute went into effect, the jury chose either a life or a death sentence. Under the old law, a judge was prohibited from commenting on the possibility or remoteness of parole if the defendant was sentenced to life imprisonment. Davis v. State, 255 Ga. 598, 340 S.E.2d 869 (1986). The rationale behind this rule was that the "jury should not be encouraged to recommend the death penalty because it fears

77

that parole officials may grant parole if the defendant is given a life sentence." Id., 340 S.E.2d at 885.

184. In contrast, since the passage of O.C.G.A. § 17-10-31.1, juries are encouraged to consider the possibility of parole when making a sentencing decision. McClain v. State, 267 Ga. 378, 477 S.E.2d 814, 824 (1996), cert. denied 117 S. Ct. 2485 (1997). Because of this dramatic change in the law, the way trial courts respond to questions about parole eligibility must also change.

185. Although counsel for the defense and the state had discussed life without parole in their closing arguments, the jury was left with a question. This is a clear indication that the jury was confused on this important issue, and that it needed clear and specific information from the court. The jury's question also indicates that the jury was skeptical of defense counsel's explanation of life without parole, (T. 1562), and wanted confirmation from the court that life without parole meant what it appeared to mean.

186. Had counsel requested the proper instruction, the jury would have been disabused of the incorrect notions about the meaning of a sentence of life without parole. Philpot v. State, 268 Ga. 168, 486 S.E.2d 158, 160 n.2 (1997).

## H.   **Additional Areas of Ineffective Assistance of Counsel**

187. In addition to the grounds discussed above, trial counsel's ineffectiveness includes, but is not limited to the following:

(a) Counsel failed to conduct an adequate pretrial investigation into the State's case and defenses available to Petitioner;

(b) Counsel failed to file several motions pretrial to protect Petitioner's right to a fair trial;

(c) Counsel filed only form motions and failed prepare or file any case specific motions;

(d) Counsel failed to conduct an adequate examination of potential jurors to ensure that Petitioner received a fair and impartial jury.

(e) Counsel failed to confront adequately the State's case during the guilt phase of trial;

(f) Counsel failed to object to the admission of several items of evidence offered by the State during the guilt phase of trial. Timely objections would have insured that certain improper evidence was not received and considered by the jury;

(g) Counsel failed to object to the admission of unreliable scientific evidence and failed to argue the unreliability of the evidence;

79

(h) Counsel failed to give closing argument at the conclusion of the guilt phase which adequately exposed the shortcomings of the State's case against Petitioner;

(i) Counsel failed to raise the proper objections to improper charges given by the trial court to the jury at the conclusion of the guilt phase of trial;

(j) Counsel failed to object properly to items of improper evidence offered by the State in aggravation at the penalty phase of trial;

(k) Counsel failed to properly object to the admission of custodial statements allegedly made by Mr. Whatley;

(l) Counsel failed to object to improper and incorrect portions of the trial court's sentencing phase jury charge;

(m) Counsel failed to adequately advise Mr. Whatley regarding his testimony at the penalty phase;

(n) Counsel failed to adequately prepare Mr. Whatley to testify at the penalty phase;

(o) counsel failed to present the pharmacological, medical, psychological, emotional and neurological defenses which were available;

(p) The Georgia Supreme Court found that many of Petitioner's grounds for relief on direct appeal were waived because counsel failed to make appropriate objections. Counsel was

80

ineffective for failing to make appropriate objections at trial to preserve each of these grounds for appeal.

188. But for counsel's ineffective representation, there is a reasonable probability that the result of each phase of trial would have been different.

## CLAIM X

**PETITIONER WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AT MOTION FOR NEW TRIAL AND ON APPEAL IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND STRICKLAND v. WASHINGTON, 466 U.S. 688 (1984).**

189. All other allegations in this Petition are incorporated into this Claim by specific reference.

190. Counsel unreasonably failed to investigate, research, and prepare for the Motion For New Trial. Counsel presented no evidence at the Motion for New Trial hearing and cited no law in support of any of his legal arguments.

191. Appellate counsel unreasonably failed to raise or litigate at motion for new trial and on direct appeal numerous serious errors which violated Petitioner's rights under the United States Constitution and the Constitution of the State of Georgia. But for counsel's ineffective representation, there is a reasonable probability that the result of the motion for new trial and the appeal, would have been different.

81

192. It is undisputed that in Georgia motion for new trial and direct appeal are critical stages at which constitutionally effective counsel is required. See Pennsylvania v. Finney, 481 U.S. 551 (1990); Douglas v. California, 372 U.S. 353 (1963); Williams v. Turpin, 87 F.3d 1204 (11th Cir. 1996). Evitts v. Lucey, 105 S.Ct. 830 (1985). Appellate counsel must function as "an active advocate on behalf of his client," Anders v. California, 386 U.S. 738 (1967), and must render "expert professional . . . assistance . . . [which is] necessary in a legal system governed by complex rules and procedure. . . ." Lucey, 105 S.Ct. 830, 835 n.6.

## CLAIM XI

**THE PROSECUTOR AND OTHER LAW ENFORCEMENT OFFICIALS ENGAGED IN SERIOUS MISCONDUCT BY SECRETLY PAYING AND THREATENING WITNESS RARLAND JACKSON AND THEN FAILING TO DISCLOSE THE THREATS AND PAYMENTS IN VIOLATION OF THE FIFTH, SIXTH, EIGHT, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND THE RULE OF GIGLIO V. UNITED STATES.**

193. This claim is evidenced by the following facts:

194. All other allegations in the Petition are incorporated into this claim by specific reference.

195. At the guilt-innocence phase of Mr. Whatley's trial, the state presented the testimony of Rarland Jackson. Jackson testified that prior to the robbery, Mr. Whatley told Jackson that he was "planning to do a lick on experiment street." and that Mr.

82

Whatley admitted to Jackson that he had committed the robbery. The state disclosed no information relating to any promises, benefits, or deals provided to Mr. Jackson. However, in the habeas corpus proceedings, Petitioner has proven that 1)the State paid Mr. Jackson for his testimony, 2) the State threaten Jackson with prosecution if he did not testify for the State in a manner that the prosecutor wanted, and 3) Jackson changed his testimony in response to the threats.

196. Jackson provided information in an affidavit:

> 6.    The night of Fredrick's arrest I was over at Franklin White's house. I went there because I noticed that police were over at Franklin's house. Franklin is older and he is very hard of hearing, so I went over to make sure he was okay. When I arrived, I was not really sure just what was going on. Franklin handed me a piece of paper with a telephone number on it and asked me to call it to see if Fredrick was there. The police told me he was in a lot of trouble and that he was wanted in Washington DC. I called the number and got Fredrick on the phone. We talked briefly. The police were motioning me to keep him on the phone so other officers could go to the house where Fredrick was. I learned later from the T.V. news and newspapers that Fredrick was arrested for robbing a convenience store and shooting the owner.

> 7.    Sometime in 1996, I started receiving subpoenas from the District Attorney's Office to come and testify at Fredrick's trial. I did not want to get involved, so when I received the subpoenas I put them back in the mail box. I asked the mailman to take them back where they came from.

8. Shortly after I sent back the subpoenas, I was arrested on a technical violation of my probation. I had not been reporting or paying my fine. No one was bothering to come and find me or arrest me. All of a sudden, when I am not taking these subpoenas to come to court and testify against Fredrick, I am locked up for violating probation.

9. While I was locked up, Sam Parks, from the Griffin Police Department, and Mr. McBroom, the District Attorney, came to the Spalding County Jail to see me. They said I had to testify. If I didn't testify they were going to charge me with obstruction of justice and withholding information. They also told me I would be charged as an accomplice to murder. They said that my father's gun was the murder weapon and I gave it to Fredrick. None of this was true, but they scared me into thinking that they were going to frame me for murder. They made it clear that if I helped them, they would help me. However, it was also obvious to me that if I did not testify like they wanted, they were planning to lock me up and throw away the key.

10. I testified at Fredrick's trial. I was still in jail when I did. When I met with Sam Parks and Mr. McBroom, they told me that they needed me to testify that Fredrick was planning to rob the store. On the night Fredrick was arrested, I told the police that Fredrick was planning to do a lick, meaning a robbery. When I met with Sam and Mr. McBroom, I explained that he was planning to rob a drug dealer, not a store. They told me not to mention that when I testified. When I did testify, I followed their instructions and did not mention the drug dealer. I was scared about their threats and did not want to get wrapped up in the mess that Fredrick was in. I said what I did, because of the threats by Mr. McBroom and Sam Parks.

11. Almost immediately after I testified, I was suddenly made a trustee at

84

the jail. This made jail life much better
because I had more freedom and privileges.
Soon after that Sheriff's Deputy Richard
Sanders came to see me at the jail. He wanted
to know what or how much it would take to get
me out of jail. I told him I owed money for a
fine. He told me he could get some money for
me and I could be out of jail because "the
city owes you one" for testifying against
Fredrick. Approximately one week later he
came back to see me told me to call someone to
come and get the money and take it to my
Parole Officer to pay off my fine. I called a
friend to go pick up the money and take it to
my Parole Officer. My friend received cash
from the Deputy Sanders and took it to my
Parole Officer, Cynthia Turner. I was
released in the first week of February, 1997.

12. Fredrick's attorney, Johnny Mostiler
never tried to talk to me about Fredrick or my
testimony. No one working with Mr. Mostiler
tried to talk with me either.

(H.T. 483-485, Affidavit of Rarland Jackson, Petitioner's Exhibit

21). The affidavit shows that Jackson initialed every paragraph

and signed it under oath.

194. The information in Jackson's affidavit is corroborated by

other sources. First, Jackson's sister, Cara Jackson, corroborates

that Jackson did not want to testify against Mr. Whatley, that he

refused the subpoena's from the district attorney, and that he was

arrested shortly after that. Specifically, Ms. Jackson testified:

> I know that my brother, Rarlan Jackson, was
> asked to testify, by the prosecutor's office.
> I saw him refusing the subpoenas that were
> being mailed to him. He told the postal
> person to take them back. After that, Rarlan
> was locked up and he stayed in jail until
> after Fredrick's trial.

85

(H.T. 481, Affidavit of Cara Jackson, Petitioner's Exhibit 20).

195. In addition, Mr. Jackson's cousin, Marion Jones, confirms the payment. He testified that in February, 1997, Mr. Jackson asked him to come to the sheriff's office, pick up some money, and take it to the parole office. Jackson explained that this would get him out of jail. Mr. Jones testified that he went to the Sheriff's Office and was given money by "Deputy Sanders." Jones took the money and paid off Mr. Jackson's fine with the parole office. Jones further testified that within a week, Jackson had been released from jail. (H.T. 486, Affidavit of Marion Jones, Petitioner's Exhibit 22).

196. Further corroboration comes from Jackson's friend, Jimmy Stanford. Stanford testified that "After Rarlan testified in Fredrick's trial, in January, 1997, everything changed. He stopped worrying about being arrested. He behaved recklessly, continued to drink and drive, and even made comments about never having to worry about being arrested ever again. After he testified, all of the sudden, he had a close relationship with a Spalding County deputy named Richard Sanders." (H.T. 492, Affidavit of Jimmy Stanford, Petitioner's Exhibit 24).

197. Records located in the possession of the Griffin Spalding Narcotics Task Force indicate that law enforcement officials went to extraordinary lengths to get Mr. Jackson paid. Jackson was paid using fund from the task force. Under the policies and procedures

86

of the task force, informants can only be paid from this fund for work on task force narcotics investigations.  Jackson was being paid for work on the Whatley case.  Because of this, the officer in charge of disbursement of task force informant funds, Sargent Clarence Cox, refused to authorize the payment for Jackson. (H.T. 1525, Affidavit of Clarence Cox, Respondent's Exhibit 1). According to Cox, he only made the payment after being directed to make the payment by one of his two superiors in the department. (H.T. 1525, Affidavit of Clarence Cox, Respondent Exhibit 1).

198. Cox also testified that Deputy Sanders failed to follow the procedures for payment of informants.  These procedures required that specific information regarding the informant be gathered and put into a confidential informant file and that the informant's behavior be carefully monitored.  While Deputy Sanders filled out some paperwork, much of the important information was missing from the file. (Deposition of Cox, Respondent Exhibit 93)

199. The records also reflect that the payments made to Mr. Jackson were for his testimony on the Whatley case.  The payment record signed by Sanders, Cox, and Jackson, indicate that Jackson was being paid for work on Case Number "S95-01-1884" because "information was provided in the above case # along with testimony in court relating to homicide case." (Petitioner's Exhibit 48). The case number corresponds to the Spalding County Sheriff's

87

Department case number for Mr. Whatley's case. (H.T. 1423, Arrest Report, Petitioner's Exhibit 49).[12]

200. Under the rule of Giglio, any deals, promises, or threats between the State and Jackson had to have been disclosed to the defense. These deals do not have to be formal written agreements or promises of immunity. If there is an understanding between the parties, that is a deal that must be revealed. Alderman v. Zant, 22 F.3d 1541, 1554 (11th Cir. 1994). Several statements made to Jackson by the district attorney and investigating officer should have been revealed to the defense. First, the statement that Jackson would be taken care of if he helped the prosecution is a promise that needed to be disclosed. Second, the threat that they would prosecute Jackson if he did not testify should have been disclosed. Third, the instruction to change his testimony and leave out the information that Mr. Whatley wanted to rob a drug dealer rather than a store should have been revealed. Finally, the

---

[12.] During the habeas corpus hearing, Jackson recanted much of his affidavit. However, his recantation is not credible. It is clear that every time Jackson gets in trouble, he attempts to act as an informant to get out. At the time of his recantation, he was allowed to get out of a jail sentence because he was cooperating with the sheriff's department in Spalding County.(H.T. 249-250). Jackson was driven to and from the habeas corpus hearing by an investigator from the Spalding County District Attorney's office. (H.T. 163). Jackson received no benefit from Petitioner in exchange for his testimony. This leads to the conclusion that he was telling the truth. However, once he got into trouble and needed the assistance of law enforcement to get out of it, he recanted his affidavit. This makes his recantation highly suspect, especially when his original affidavit is corroborated by so many other sources.

payment to Jackson in exchange for his testimony and assistance in the case should have been revealed.[13]

201. Mr. Whatley could have been convicted on the testimony of Rarland Jackson standing alone. His testimony was critical to the State's case. Given the serious misconduct of the prosecution, the reliability of Mr. Whatley's conviction and the integrity of the judicial system have been seriously undermined. This type of prosecutorial misconduct cannot be countenanced and Mr. Whatley's conviction must be vacated.

## CLAIM XII

**THE PROSECUTOR ENGAGED IN IMPROPER CONDUCT DURING HIS CLOSING ARGUMENT AT THE PENALTY PHASE IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

202. This claim is evidenced by the following facts:

203. All other allegations in the Petition are incorporated into this claim by specific reference.

204. Mr. Whatley was denied his rights to due process, equal protection, a fair trial, and a reliable determination of punishment, pursuant to the Fifth, Sixth, Eighth, and Fourteenth

---

[13] The prosecutor has a continuing obligation to disclose evidence favorable to the defense after the trial is over, even in habeas corpus proceedings. See High v. Head, 209 F.3d 1257, 1264 n.8 (11th Cir. 2000)(State's duty to disclose exculpatory material is ongoing and continues throughout habeas proceedings); Thomas v. Goldsmith, 979 F.2d 746, 749-50 (9th Cir. 1992) (state has duty to disclose during habeas proceedings any evidence in its possession which is favorable to petitioner on the issues of guilt, punishment, or procedural bar).

Amendments to the United States Constitution; Donnelly v. DeChristoforo, 416 U.S. 637, 644-47 (1974) and Darden v. Wainwright, 477 U.S. 168, 181 (1985); Woodson v. North Carolina, 428 U.S. 280 (1976), Davis v. Zant, 36 F.3d 1538 (11th Cir. 1994); Tucker v. Kemp, 802 F.2d 1293 (11th Cir. 1986) (en banc); Wilson v. Kemp, 777 F.2d 621 (11th Cir. 1985), cert. denied, 476 U.S. 1153 (1986); Brooks v. Kemp, 762 F.2d 1383 (11th Cir. 1985) (en banc); and other applicable law, by the prosecutor's improper, misleading, and prejudicial closing argument at the penalty phase of Whatley's trial.

## A. The Prosecutor Improperly Argued That Mr. Whatley Had Committed Other Crimes and That His Criminal History Was More Extensive than the Evidence Showed

205. In his argument, the district attorney attempted no fewer than four times to exaggerate the criminal conduct for which Mr. Whatley had been accused or convicted. Each instance, and all the instances taken together, were highly prejudicial and were calculated to convince the jury that Mr. Whatley was more violent, more dangerous, and more deserving of death than the actual evidence submitted at trial would have suggested.

206. First, the prosecutor argued at two different points that Mr. Whatley shot at Tommy Bunn. (T. 1523, 1528). As stated above, there was no evidence that Mr. Whatley shot at Mr. Bunn, and the district attorney did not charge Mr. Whatley with shooting at Mr. Bunn. Later, the prosecutor argued that the prior offenses proven

90

at the penalty phase were just "the few times he's gotten caught." (T. 1524). This was a clear attempt to prejudice the jury and mislead it into believing that Mr. Whatley was more dangerous than the district attorney's own evidence would suggest. Finally, the prosecutor argued that Mr. Whatley had attempted to shoot the victim during a robbery in which the victim saw no gun and Mr. Whatley testified he carried a knife. (T. 1532). It was not enough to argue that Mr. Whatley had a gun; the prosecutor argued that Mr. Whatley actually pulled the trigger only to have the gun misfire. (T. 1532). There was not one shred of evidence that Mr. Whatley attempted to shoot the victim of the robbery, and the prosecutor's argument was a blatant attempt to inflame the jury.

## B. The Prosecutor Improperly "Testified" about Conditions in Prison

207. The district attorney argued that if Mr. Whatley was sentenced to prison, "he's going to open Whatley's School of Crime, because that's what they talk about in prison. They talk about crime. ... This man is going to tell other people how to do crimes ...." (T. 1527). The district attorney gave no basis for his statements about prison, and presented no evidence to show what conditions would be like for Mr. Whatley in prison.

208. Later, the district attorney improperly "testified" about two prisoners from other states and their alleged exploits while in prison. He "testified" as follows:

91

Any of you remember Albert DeSalvo, the Boston Strangler? I did a little -- I read a lot about crimes and stuff like that, and I found out that when he was in prison he made jewelry. You know what kind of jewelry he made? He made ladies (sic) chokers. Remember Richard Speck, the man that around 1968 killed six nurses in Chicago? That man -- some of you may have seen it. They had him on video. He made a video while he was in jail, it was undercover. They found it after he had died of natural causes, cause he didn't get the death penalty. The thought he deserved another chance. And on that film they're asking him, well, did you commit the crime? He said, hell, yes, I did it. And he made a statement I wrote down. I had taped this, and I went back -- and I went back and got it, and he said, if people knew how much fun I was having, they would turn me loose.

(T. 1533-1534).

209. This improper "testimony" was highly prejudicial and entirely inappropriate for a host of reasons. First, neither of the two other criminals mentioned was in prison in Georgia. Thus, the conditions under which they served their sentences were wholly unrelated to the conditions in Georgia's prisons. Second, both were notorious serial killers who killed more than one victim. By equating Mr. Whatley, convicted of one murder, with two of the most notorious killers in American history was highly prejudicial, and was done solely to inflame the jurors by misleading them into thinking that Mr. Whatley was as dangerous as two notorious multiple murderers. This is not to suggest that one murder is somehow not serious; rather, the important point is that there is a difference between a serial killer or multiple murderer and a person convicted of one homicide. Third, there was no evidence to support the district attorney's "testimony." The jury had no way

92

to know if it was even true that the Boston Strangler made ladies' chokers while in prison or that Speck enjoyed prison life. It is entirely improper for the district attorney to argue facts that he did not even attempt to prove. Finally, even if the district attorney's "testimony" were proven to be true, it was wholly irrelevant to Mr. Whatley's punishment. The jury was charged with making a reasoned decision on the appropriate punishment for Mr. Whatley based on the crime and Mr. Whatley's personal characteristics. It was improper to attempt to inflame the jury by arguing that other criminals, serving time in other states, in prison up to 30 years ago, had an easy time in prison.

## C.   **The Prosecutor Engaged in Other Instances of Misconduct Throughout His Closing Argument**

210. The district attorney argued that Mr. Whatley should not have presented any mitigating evidence. He argued "it just galls me that he can sit over there after you have found him guilty and say, oh, no, I don't want the death penalty, and bring these people in and let them beg for him." (T. 1520). This was an improper comment on Mr. Whatley's decision to exercise his right to a trial, and an attempt to imply that, because he presented mitigating evidence, Mr. Whatley somehow sought to escape responsibility for the crime. The district attorney's argument also suggested that the death penalty should be automatic once the defendant was convicted of murder.

93

211. The district attorney improperly "testified" that, during Mr. Whatley's testimony, someone at the state's counsel table noticed that Mr. Whatley did not look at the victim's family when he apologized for the crime. (T. 1535). Of course, there was no evidence that this was actually true. More important, this "testimony," though irrelevant, was a highly prejudicial attempt to convince the jury that Mr. Whatley was not truly remorseful.

## D. The Prosecutor Argued, Without a Shred of Evidence to Support It, That Mr. Whatley Would Kill Again

212. At the beginning of his closing argument, the district attorney argued "Frederick Whatley is going to kill somebody else unless you execute him." (T. 1524). Later, he argued "if you think that a guard gets between him and life and he won't kill a guard, you'd better think again." (T. 1527). There was absolutely no evidence that Mr. Whatley had misbehaved in any way while in jail or that he had ever misbehaved during his prior incarceration. Further, there was no testimony that Mr. Whatley was likely to be a danger in the future; the district attorney made up this argument without even a shred of evidence to support it.

213. Because the prosecutor's improper arguments--individually and taken together--resulted in the denial of Mr. Whatley's rights to due process, a fair trial, and a reliable determination of punishment, he must be granted a new penalty phase trial.

94

## CLAIM XIII

**THE TRIAL COURT ERRONEOUSLY FAILED TO ANSWER THE JURY'S QUESTION ABOUT PAROLE ELIGIBILITY IN VIOLATION OF THE Fifth, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.**

214. This claim is evidenced by the following facts:

215. All other allegations in the Petition are incorporated into this claim by specific reference.

216. Mr. Whatley's rights to due process, the assistance of counsel, a fair trial, and a reliable determination of punishment, pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and other applicable law, were violated by the trial court's failure to answer the jury's question about the meaning of life without parole.

217. After both sides had completed their closing arguments, but before the trial court's instructions, the jury foreman informed the trial judge that one of the jurors had a question. He stated "the question is, Your Honor, how often though they sentence (sic) to life without parole actually get committed (sic) out. Could this sentence get commuted at a later date, parole, discharge due to crowded conditions, etcetera." (T. 1563).

218. In response, the trial judge stated, "I cannot specifically answer that question because I don't know and nobody else knows what is going to occur in the future. Let me invite your attention to my charge of law ...." (T. 1564). This answer

95

was inadequate, and implied that a death sentence was the only sentence which would ensure that Mr. Whatley would not be released.

219. Mr. Whatley was tried after O.C.G.A. § 17-10-31.1 added life without parole as a sentencing option. Before this statute went into effect, the jury chose either a life or a death sentence. Under the old law, a judge was prohibited from commenting on the possibility or remoteness of parole if the defendant was sentenced to life imprisonment. Davis v. State, 255 Ga. 598, 340 S.E.2d 869 (1986). The rationale behind this rule was that the "jury should not be encouraged to recommend the death penalty because it fears that parole officials may grant parole if the defendant is given a life sentence." Id., 340 S.E.2d at 885.

220. In contrast, since the passage of O.C.G.A. § 17-10-31.1, juries are encouraged to consider the possibility of parole when making a sentencing decision. McClain v. State, 267 Ga. 378, 477 S.E.2d 814, 824 (1996), cert. denied 117 S. Ct. 2485 (1997). Because of this dramatic change in the law, the way trial courts respond to questions about parole eligibility must also change.

221. Although counsel for the defense and the state had discussed life without parole in their closing arguments, the jury was left with a question. This is a clear indication that the jury was confused on this important issue, and that it needed clear and specific information from the court. The jury's question also indicates that the jury was skeptical of defense counsel's

96

explanation of life without parole, (T. 1562), and wanted confirmation from the court that life without parole meant what it appeared to mean.

222. Requiring the trial court to provide a specific answer when a jury asks a specific question about parole eligibility would further the purpose of the life without parole option. This option exists to provide the jury with an alternative sentence to life with parole and death, and to provide the jury with more accurate information. While there were legitimate reasons not to answer such questions in the past, those reasons no longer exist.

223. The enactment of the life without parole statute removed from the law a paradox. On the one hand, jurors were supposed to presume that their sentence would be carried out. That is, if the jury sentenced the defendant to life imprisonment, it should presume that he would stay in prison for life; if it sentenced him to death, it should presume that he would be put to death. Indeed, a jury charge which undermined the jury's confidence that its sentence would be carried out could lead to a reversal. Caldwell v. Mississippi, 472 U.S. 320 (1985). On the other hand, it was common knowledge that even people sentenced to prison for life would eventually be eligible for parole. Thus, the law required jurors to assume that a defendant who would be eligible for parole would nonetheless stay in prison for the rest of his life.

224. The life without parole statute in place at trial was designed to resolve this paradox; it allows the two factors described above to co-exist. Jurors receive accurate information, which, in theory, will allow them to make an informed choice. Life without parole provides a sentencing option short of the ultimate sanction which will ensure that the defendant will never be released from prison. The gravity of the sentencing decision still falls squarely on the shoulders of the jury, but jurors may now preclude the possibility of parole in their decision without sentencing the defendant to death.

225. This policy fails, however, if the jury is not informed to its satisfaction about the sentencing options. In this case, when the jury sought assurances from the trial judge that life without parole really meant what it says, it got the vague answer that "nobody ... knows what is going to occur in the future." (T. 1564). While a trial judge should not speculate about what might occur in a defendant's case in the future, the court should tell the jury what the law provides. The court's response invited jurors to believe that if they sentenced Mr. Whatley to any sentence less than death, he might be released on parole. The trial judge's failure to provide an adequate answer to the jury's question about parole eligibility rendered Mr. Whatley's sentencing proceeding fundamentally unfair, and his sentence should be vacated.

## **CLAIM XIV**

**BY REQUIRING PETITIONER TO BE REPRESENTED AT TRIAL BY AN ATTORNEY WHO WAS KNOWN BY THE COURTS TO BE A RACIST, HIS TRIAL VIOLATED THE FIFTH, SIXTH, EIGHT AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

226. This claim is evidenced by the following facts:

227. All other allegations in the Petition are incorporated into this claim by specific reference.

228. This case is controlled by Powell v. Alabama, 287 U.S. 45 (1932). Powell held that the trial of the "Scottsboro Boys" violated their rights to due process, equal protection, and counsel under the Sixth and Fourteenth Amendments because the trial court did not "make an *effective* appointment of counsel" to the defendants and foredoomed "the giving of effective aid in the preparation and trial of the case." Id. at 71. In Petitioner's case, it was not an effective appointment in a capital case to provide an attorney:

known by bench and bar to refer to African-American people as "niggers;"

known by judges to refer to his own clients as "niggers" or "dumb nigger;"

known by judges, commissioners, and other attorneys to have an impossible caseload, a caseload so high that he could not or did not meaningfully prepare for this case; and

who referred to another capital defendant he represented as "that little nigger" who deserved to die, and foreswore spending any money in his capital case.

99

229. In *Powell*, nine African-American males had been convicted and eight had been sentenced to death for the rape of two white women in the freight car of a train passing through the state of Alabama. On the day of trial no one had appeared to defend them. The Court had appointed every member of the local bar to assist the defendants at an arraignment just a few days earlier, but there was no expectation that they would continue such representation between arraignment and trial, and, indeed, on the day of trial, one member of the local bar "accepted employment on the side of the prosecution." 287 U.S. at 57. One member of the local bar agreed on the day of trial to "go ahead and help do anything I can." 287 U.S. at 56.

230. This Court held that no lawyer was "given the clear appreciation of responsibility or impressed with that individual sense of duty which should" be entailed with the appointment of counsel in a capital case. Id. The trial court's "appointment" had been "an expansive gesture imposing no substantial or definite obligation upon any one." Id. The Court found that "the failure of the trial court to make an effective appointment of counsel" was a violation of due process under the Fourteenth Amendment:

> Whether this would be so in other criminal prosecutions, or under other circumstances, we need not determine. All that is necessary now to decide, as we now decide, is that in a capital case, where the defendant is unable to employ counsel, and is incapable adequately of making his own defense because of ignorance, feeble mindedness, illiteracy, or the like, it is the duty of the court, whether requested or not, to assign counsel for him as a

necessary requisite of due process of law; and that duty is not discharged by an assignment at such a time or under such circumstances as to preclude the giving of effective aid in the preparation and trial of the case.

Id. at 71.

231. In Mr. Whatley's case, the trial judge likewise did not make an *effective* appointment of counsel for Mr. Whatley, who "stood in deadly peril." Id. The circumstances of Mostiler's appointment were such that Mr. Whatley was never given the assistance of a lawyer who had a "clear appreciation of responsibility" or a "sense of duty" for performing the defense attorney's functions contemplated by the Sixth Amendment and Due Process. The trial court judges in Griffin knew or should have known about Mostiler's race-based disdain for his African-American clients; the judge knew or should have known about Mostiler's absurd caseload; and the judge knew or should have known that under these circumstances his appointment of Mostiler would leave Osborne in Ozie Powell's posture of having no lawyer who would assume genuine responsibility for defending him.

## CLAIM XV

**MR. WHATLEY'S DEATH SENTENCE IS TAINTED BY RACIAL BIAS AND DISCRIMINATION ON THE PART OF THE DECISION MAKERS IN HIS CASE IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

232. This claim is evidenced by the following facts:

233. All other allegations in the Petition are incorporated into this claim by specific reference.

234. Frederick Whatley is an African American male who was tried, convicted, and sentenced to death for the murder of a white person. The decision makers in his case acted with discriminatory purpose and they possessed racial bias that created an unacceptable risk that race affected the sentencing decision in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the analogous provisions of the Georgia Constitution.

## CLAIM XVI

**THE TRIAL COURT VIOLATED THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY FAILING TO INQUIRE INTO THE DEFENDANT'S COMPETENCY TO STAND TRIAL AFTER RECEIVING A REPORT FROM THE COURT APPOINTED MENTAL HEALTH EXPERTS INDICATING THAT THERE WERE SERIOUS CONCERNS ABOUT MR. WHATLEY'S COMPETENCY.**

235. This claim is evidenced by the following facts:

236. All other allegations in the Petition are incorporated into this claim by specific reference.

237. In August, 1996, defense counsel requested funds to hire a mental health expert to conduct an independent evaluation of Mr. Whatley. Instead of providing such an expert, on November 8, 1996 the trial court entered an Order that specified that Mr. Whatley was to be to be assessed on the questions of: (1) competency to

102

stand trial, (2) degree of criminal responsibility at the time of the act, and (3) the threat posed to himself or the community if bond was granted. The evaluation was conducted by clinical psychologists Dr. Karen Bailey-Smith and Dr. Margaret Fahey at West Central Regional Hospital. Dr. Bailey-Smith worked conducted regular evaluations for the trial court and knew both defense counsel and the prosecutor.

238. Dr. Bailey-Smith evaluated Mr. Whatley on December 13, 1996 for approximately eight (8) hours and on December 31, 1996 for approximately seven (7) hours. Dr. Bailey-Smith submitted her report to the trial court on January 3, 1996, the Friday before the Monday on which Mr. Whatley's trial was to begin. As ordered, the report was copied to the district attorney and to defense counsel as well.

239. The report submitted by the trial court's appointed experts raised several doubts as to Mr. Whatley's competency to stand trial. Dr. Bailey-Smith stated that Mr. Whatley's evaluation suggested an individual with "significant psychopathology" (H.T. 718, Competency Report, Petitioner's Exhibit 32). In her deposition, she testified that this meant that Mr. Whatley suffered from "serious mental health problems." (H.T. 283, Bailey-Smith Deposition, Petitioner's Exhibit 1). She reported that Mr. Whatley was dissatisfied and mistrusted his counsel. She further stated that while Mr. Whatley cognitively understood that the could

103

receive the death penalty, he did not believe that it was a realistic possibility because he had been endowed with a special mission and that God would intervene to prevent this from happening. In conclusion, regarding Mr. Whatley's competency to stand trial, the report stated:

> Although he is capable, verbally and cognitively, of working with an attorney to prepare a defense, Mr. Whatley has not demonstrated an interest in using his skills to their fullest ability to aid his attorney in constructing a defense….It also appears to be related to his beliefs that as a special individual, he will be guided through this experience by some type of higher power which will ultimately intervene in his behalf regardless of whether he is found guilty….This is of concern as Mr. Whatley may understand on a cognitive, but not on a motivational level, the gravity of his situation.

(H.T. 720, Competency Report, Petitioner's Exhibit 32)

240. In her deposition, Dr. Bailey-Smith explained that in her opinion, competency was a legal issue, not a psychological one. She testified that her role is to present the court with facts and observations about the case that related to a competency determination, but not to render an opinion about competency to stand trial. This is what she did in Mr. Whatley's case. In her report on Mr. Whatley, Dr. Bailey-Smith expressed concern about Mr. Whatley's grandiose thinking and its impact on the competency determination. In her deposition, Dr. Bailey-Smith indicated that she thought that she stated her concerns about Mr. Whatley's

competency "pretty clearly." (H.T. 276, Bailey-Smith Deposition, Petitioner's Exhibit 1).

241. Despite the strongly worded concerns about Mr. Whatley's competency, neither the district attorney nor defense counsel contacted Dr. Bailey-Smith to further discuss her findings (H.T. 278-279, Bailey-Smith Deposition, Petitioner's Exhibit 1). Additionally, neither raised the issue before proceeding to trial. And, with the report in hand, the Court itself failed to inquire into Mr. Whatley's competency to stand trial. Because the trial court failed to inquire into Mr. Whatley's competency, defendant's constitutional rights were violated and the writ must issue.

242. A criminal defendant has a common law, statutory, and constitutional right to not be tried while incompetent. A trial court is categorically obligated to conduct a hearing on competence *sua sponte* when a doubt exists as to the defendant's competence. Pate v. Robinson, 383 U.S. 375, 385 86 S.Ct. 836, 842 (1965). In Pate, the court held that even though defense counsel did not follow statutory procedures for requesting a hearing on competency, when evidence was presented indicating incompetency, there was a duty on the trial judge to inquire into the issue of competency and to hold a hearing on the issue.

243. The constitutional guarantees require the trial court to inquire into the defendant's competency. The trial court has the inherent authority and duty to question competency before or during

the trial and "if any time while criminal proceedings are pending, the court observes fact which raise doubt as to the sanity of the accused, or such facts are brought to its attention by counsel, the question of his sanity should be settled before further steps are taken." Lingo v. State, 224 Ga. 333, 341, 162 S.E.2d 1 (1968); Baker v. State, 250 Ga. 187, 190, 297 S.E.2d 9 (1982).

244. Here, the trial court was clearly on notice regarding Mr. Whatley's incompetency. The evaluation ordered by the court and performed by the court's own experts clearly raised doubts as to Mr. Whatley's incompetency. The report stated that the results of his psychiatric evaluation were indicative of an individual with **significant psychopathology**. (H.T. 719, Competency Report, Petitioner's Exhibit 32) (emphasis added). Dr. Bailey-Smith asserted, without equivocation, that Mr. Whatley did not meet the criteria for antisocial personality disorder. (H.T. 289, Bailey-Smith Deposition, Petitioner's Exhibit 1). Dr. Bailey-Smith's diagnostic impression of Mr. Whatley was best described as "Rule Out Bipolar Disorder; Personality Disorder NOS with antisocial, borderline, narcissistic, and schizotypal features.

245. Had the court inquired of Dr. Bailey-Smith the meaning of this diagnosis, she would have explained that she could not rule out the possibility that Mr. Whatley is bipolar. She stated "We can't decide it [bipolar] should be there or we can't say it's not there. It's something that needs to be considered." (H.T. 287,

106

Bailey-Smith Deposition, Petitioner's Exhibit 1). Dr. Bailey-Smith further explained that Mr. Whatley did not fit "any particular personality disorder, but he had a lot of flavor of different ones, and so we wanted to capture that descriptions and we used [antisocial, borderline, narcissistic, and schizotypal]." (H.T. 288, Bailey-Smith Deposition, Petitioner's Exhibit l). Dr. Bailey-Smith explained that borderline falls under a personality disorder and is very close to a major mental illness; schizotypal refers to people who believe in magical thinking; and that the narcissism would be close to a psychotic level (H.T. 288, Bailey-Smith Deposition, Petitioner's Exhibit 1).

246. These findings should have raised doubts to the trial court that Mr. Whatley's competency to stand trial was in question. At that point, the trial court had the inherent duty to inquire as to Mr. Whatley's competency and settle that issue before proceeding to trial.

247. The issue is not whether the defendant can distinguish between right and wrong, but is, whether he is capable at the time of trial the nature and object of the proceedings going on against him and rightly comprehends his own condition in reference to such proceedings, and is capable of rendering his such assistance as a proper defense to the indictment. Brown v. State, 215 Ga. App. 784, 787, 113 S.E.2d 618 (1960); Baker v. State, 250 Ga. 187, 189, 297 S.E.2d 9 (1982).

248. Dr. Bailey-Smith made it plain to the court that Mr. Whatley was not able to comprehend his own condition in reference to the proceedings against him and was not capable of rendering assistance in preparing a proper defense. Mr. Whatley indicated both dissatisfaction and mistrust of his attorney. The report stated that Mr. Whatley "thinks he is unique and special and ordained for a special purpose. He believes he has unique and special powers" (H.T. 718-719, Competency Report, Petitioner's Exhibit 32) She concluded:

> Due to his belief in his own importance and his special mission, Mr. Whatley does not think that a death sentence is a realistic possibility. This is of concern as Mr. Whatley may understand on a cognitive, but not on a motivational level, the gravity of his situation.

(H.T. 719, Competency Report, Petitioner's Exhibit 32). This statement should have made it clear that Mr. Whatley did not comprehend his situation and was not able to participate in formulating his defense.

249. Dr. Dudley agrees that there was a substantial issue relating to Mr. Whatley's competency to stand trial.

> 39) My findings raise several important forensic issues. First, like the 1997 evaluators, I have grave concerns about whether Fredrick was competent to stand trial. Because of the 1997 reports, we know that at the time of trial Fredrick was displaying many of the same symptoms of mental illness that I saw. He had a delusional thought process that included grandiosity, the belief that he was "endowed with a special mission," and the

108

> belief that he had special powers that could
> influence other people.   Given that there
> appears to be further deterioration in
> Fredrick's thought processes when he is under
> stress, during the pressure of a capital trial
> his mental condition could have further
> deteriorated.   While I have no doubt that
> Fredrick understood the roles of the
> prosecutor, the judge and his attorney, his
> mental illness and the symptoms displayed
> raise substantial questions about his ability
> to understand his situation and even greater
> concerns about to assist his attorney.  Given
> the 1997 findings and the similar kinds of
> symptoms that I saw when I evaluated Fredrick,
> he may well have been incompetent to stand
> trial in 1997.

(H.T. 324, Affidavit of Richard Dudley, Petitioner's Exhibit 2).

250. In determining whether a court committed constitutional error by failing to conduct a hearing on the defendant's competency:

> The question on review is "Did the trial judge
> receive information which, objectively
> considered, should reasonably have raised a
> doubt about defendant's competency and alerted
> him to the possibility that the defendant
> could neither understand the proceedings or
> appreciate their significance nor rationally
> aid his in attorney in his defense?"

Baker v. State, 250 Ga. 187, 190, 297 S.E.2d 9 (1982) (citations omitted); Mullinax v. State, 211 Ga.App. 831, 440 S.E.2d 720 (1994).  Here, Drs. Bailey-Smith gave the trial court the information that it needed to inquire into the defendant's competency as required by Pate.  The report stated that Mr. Whatley had a profile suggestive of an individual with significant pathology, he had magical thinking, he believed he had special

powers, he had antisocial, borderline, narcissistic, and schizotypal features, and that his motivational level for participating in his own defense was questionable. Objectively considered, this information should have reasonably raised a doubt as to Mr. Whatley's competency. At that point, the trial court had the inherent duty to conduct, *sua sponte*, a hearing to inquire into Mr. Whatley's competency. Because it did not do so, Mr. Whatley's due process rights were violated and the writ must issue.

## CLAIM XVII

**PETITIONER WAS TRIED WHILE INCOMPETENT IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

251. This claim is evidenced by the following facts:

252. All other allegations in the Petition are incorporated into this claim by specific reference.

253. If a defendant is incompetent at trial, sentencing, or at a critical stage of a criminal case, proceeding with the case while he or she is incompetent violates the defendant's Fifth, Sixth, Eighth, and Fourteenth Amendment rights as well as his analogous rights under the Georgia Constitution. Drope v. Missouri, 420 U.S. 162 (1975). Examination of the record and Mr. Whatley's history reveal that Petitioner did not have sufficient ability to assist in his defense or to assist counsel, and there is a substantial probability that he was incompetent pre-trial, at the guilt/innocence proceedings, and at sentencing. Consequently, the

Fifth, Sixth, Eighth, and Fourteenth Amendments were violated. A new trial is required.

## CLAIM XVIII

**WHEN THE ERRORS ARE CONSIDERED AS A WHOLE, MR. WHATLEY IS ENTITLED TO RELIEF UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

254. This claim is evidenced by the following facts:

255. All other allegations in the Petition are incorporated into this claim by specific reference.

256. Mr. Whatley has raised numerous, substantial claims of constitutional violations. He is entitled to relief on each of the claims individually. However, when taken as a whole, there is no doubt that Mr. Whatley's conviction and death sentence are unreliable and violate the Fifth, Sixth, Eighth, and Fourteenth Amendment. As a result, the cumulative or combined error justifies the granting of relief, even if the court does not find one individual error dictates relief. See United States ex. re. Sullivan v. Cuyler, 631 F.2d 14, 17 (3rd Cir. 1980)("unified consideration of the claims in the petition well satisfies the interests of justice because the cumulative effect of the alleged errors may violate due process, requiring the grant of the writ, whereas any one alleged error considered alone may be deemed harmless"); Darks v. Mullin, 327 F.3d 1001 (10th Cir. 2003); United States v. Frederick, 78 F.3d 1370 (9th Cir. 1996); cf. United States v. Blasco, 702 F.2d 1315 (11th Cir. 1983)("A piecemeal

111

review of each incident does not end our inquiry. We must consider the cumulative effect of these incidents and determine whether, viewing the trial as a whole, appellants received a fair trial as is their due under our Constitution").

## IV. **PRAYER FOR RELIEF**

WHEREFORE, Petitioner respectfully prays that this Court:

1. Issue a writ of habeas corpus to have Petitioner brought before it to the end that he may be discharged from his unconstitutional confinement and restraint, and/or be relieved of his unconstitutional sentence of death;

2. Conduct a hearing at which proof may be offered concerning the allegations of this petition;

3. Permit Petitioner, who is indigent, to continue to proceed in forma pauperis;

4. Grant Petitioner, who is indigent, sufficient funds to secure the expert testimony necessary to prove the facts as alleged in this petition;

5. Grant Petitioner the authority to obtain subpoenas in forma pauperis for witnesses and documents necessary to prove the facts as alleged in this petition;

6. Allow Petitioner a period of sixty (60) days, which period shall commence after the completion of any hearing this Court shall determine to conduct, in which to brief the issues of law raised by this petition;

7. Grant such other relief as may be appropriate.

This, the 30th day of June, 2009.

Respectfully submitted,

BRIAN MENDELSOHN
STATE BAR NO. 502031
ATTORNEY FOR FREDRICK WHATLEY

Federal Defender Program, Inc.
The Equitable Building
100 Peachtree Street, N.W.
Suite 1700
Atlanta, Georgia 30303
(404) 688-7530

VERIFICATION

STATE OF GEORGIA

COUNTY OF BUTTS

Before me, the undersigned authority, personally appeared FREDRICK R. WHATLEY who, being first duly sworn, says that he has personal knowledge of the allegations in the foregoing Petition For Writ Of Habeas Corpus, and that the allegations and statements contained therein are true and correct to the best of his knowledge.

FREDRICK R. WHATLEY

Sworn to, and subscribed before me,

this the 11th day of June, 2009

Notary

My Commission Expires: 2012/05/12

## **CERTIFICATE OF SERVICE AND TYPE FACE**

This is to certify that the foregoing pleading was produced using a Courier New 12 point font in accordance with Local Rule 5.1B and that I have served a copy of the foregoing on counsel for Respondent on this day by causing a copy of same to be deposited in the United States mail, first class, postage prepaid, addressed as follows:

> Beth A. Burton
> Senior Assistant Attorney General
> 40 Capitol Square, SW
> Atlanta, Georgia 30334

This the 30th day of June, 2009.

BRIAN MENDELSOHN