IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

FREDRICK R. WHATLEY,

                       Petitioner,

      v.                                          3:09-cv-0074-WSD

STEPHEN UPTON, Warden,
Georgia Diagnostic and
Classification Center,

                       Respondent.

## OPINION AND ORDER

This matter is before the Court on Fredrick R. Whatley's ("Petitioner" or

"Whatley") Petition for Writ of Habeas Corpus by a Person in State Custody

("Federal Petition for Writ of Habeas Corpus") [1].

# I.    BACKGROUND[1]

On June 4, 1996, a grand jury in the Superior Court of Spalding County indicted Petitioner with malice murder, felony murder, aggravated assault, armed robbery, motor vehicle hijacking, possession of a firearm during the commission of a crime, and possession of a firearm by a convicted felon.  (Resp't's Ex. 1A at 9-11).  These charges were tried before a jury in Spalding County, which, on January

---

[1] Under 28 U.S.C. § 2254(e)(1), "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  The Court held in its March 20, 2012, Order that Petitioner was not prevented from diligently developing the factual basis for his claims in the state habeas court, that Petitioner did not suffer a deprivation of due process, and that the determination of factual issues made by the state habeas court shall be presumed to be correct.  (Order of Mar. 20, 2012, at 13-14); see also Slater v. Sec'y, Dep't of Corr., 260 F. App'x 177, 179 (11th Cir. 2007) (district court did not err in denying petitioner's request for evidentiary hearing and applying presumption of correctness to state court's factual findings where petitioner received full and fair evidentiary hearing on his claims in state court).  Thus, the facts in this action that are taken from the state habeas court and Georgia Supreme Court findings are presumed to be correct unless they are rebutted by clear and convincing evidence.  See 28 U.S.C. § 2254(e)(1); Whatley v. Terry, 668 S.E.2d 651 (Ga. 2008); Whatley v. State, 509 S.E.2d 45 (Ga. 1998); (Resp't's Ex. 71 [14.14]).  Having reviewed the record in this action, the Court finds that where the Court does not accept as true a specific fact, a finding based on an interpretation of multiple facts, or a general interpretation of facts by the state courts, Petitioner has rebutted these facts and inferences based on clear and convincing evidence that exists in the record.  The Court in this Order also reviews the evidence presented in the state court proceedings to determine if the state court adjudication of the claims resulted in a decision that was based on an unreasonable determination of the facts.  See 28 U.S.C. § 2254(d), (e)(1).

16, 1997, found Petitioner guilty of malice murder and the other offenses with which he was charged.  Petitioner was sentenced to death.  <u>Whatley</u>, 509 S.E.2d at 48 n.1.  On December 4, 1998, the Supreme Court of Georgia affirmed Petitioner's conviction and sentence.  <u>Id.</u> at 53.  Petitioner's application for a writ of certiorari to the United States Supreme Court was denied.  <u>Whatley v. Georgia</u>, 526 U.S. 1101, <u>reh'g denied</u>, 527 U.S. 1016 (1999).

On August 6, 1999, Petitioner filed his state petition for writ of habeas corpus ("state habeas petition") in the Butts County Superior Court.  <u>Whatley</u>, 668 S.E.2d at 653.  The petition was amended on April 30, 2001.  <u>Id.</u>

On July 30, 2002, an evidentiary hearing on the state habeas petition was held at the Georgia Diagnostic and Classification Center.  <u>Id.</u>; (Resp't's Ex. 39). At the hearing, Petitioner presented affidavits, depositions, documentary evidence, and witness testimony in support of his claims.  (Resp't's Exs. 39-43).[2]

On December 8, 2005, closing arguments on the state habeas petition were heard in the Butts County Superior Court, and on November 29, 2006, an order was entered denying Petitioner's habeas petition on the grounds that several of

---

[2] The hearing was held before Fulton County Superior Court Judge Roland W. Barnes.  Judge Barnes was murdered in his courtroom on March 11, 2005, by Brian Nichols, and Fulton County Superior Court Judge John S. Langford was assigned to complete Petitioner's state habeas proceeding, including based on the record of the July 30, 2002, evidentiary hearing over which Judge Barnes presided. (Resp't's Ex. 64 at 1, 3-4).

Petitioner's claims were procedurally barred and that Petitioner was not otherwise entitled to relief. Whatley, 668 S.E.2d at 653; (Resp't's Ex. 64 at 1, 3-4; Resp't's Ex. 71 at 63). On October 6, 2008, the Supreme Court of Georgia affirmed the denial of Petitioner's request for habeas corpus relief. Whatley, 668 S.E.2d at 664. Petitioner's application for writ of certiorari was denied by the United States Supreme Court on May 18, 2009. Whatley v. Terry, 129 S. Ct. 2409 (2009).

On June 30, 2009, Petitioner filed his Federal Petition for Writ of Habeas Corpus in this Court. In his Petition, Whatley asserts the following eighteen (18) claims:

> Claim I – The State failed to disclose exculpatory information under the rule of Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972).
>
> Claims II and III – Petitioner was deprived of an impartial jury through improper juror exclusion and inclusion.
>
> Claim IV – Petitioner's constitutional rights were violated by the introduction of prejudicial and inflammatory evidence at trial.
>
> Claim V – Petitioner's constitutional rights were violated when he was visibly shackled during his trial and sentencing.
>
> Claim VI – Petitioner's constitutional rights were violated because the trial court did not provide him with the necessary assistance of competent and independent mental health experts.
>
> Claim VII – Petitioner's constitutional rights were violated because his trial counsel's overwhelming caseload rendered the adversarial

process meaningless under <u>United States v. Cronic</u>, 466 U.S. 648 (1984).

Claim VIII – Petitioner's constitutional rights were violated because his trial counsel's overwhelming caseload created an actual conflict of interest between Whatley's rights and the rights of the other indigent criminal defendants represented by his trial counsel.

Claim IX – Petitioner's trial counsel rendered ineffective assistance of counsel before, during, and after his trial because of counsel's:

    A – Failure to investigate and prepare evidence in mitigation, and to rebut evidence in aggravation, at Petitioner's sentencing;

    B – Mishandling of requests for mental health experts;

    C – Failure to object to unwarranted and improper shackling of Petitioner during sentencing;

    D – Failure to obtain assistance of a ballistics expert and to move for a ballistics expert;

    E – Failure to object to the prosecutor's improper closing argument during sentencing;

    F – Failure to move to strike for cause certain prospective jurors;

    G – Failure to object to the trial court's improper response to a juror question regarding the possibility of parole; and

    H – "Additional areas" of ineffective assistance of counsel.

Claim X – Petitioner was deprived of his right to effective assistance of counsel in the filing of his motion for new trial, and on direct appeal.

Claim XI – Petitioner's constitutional rights were violated when the prosecutor and other law enforcement officials engaged in serious

misconduct by secretly paying and threatening a witness in violation of the principles in Giglio v. United States.

Claim XII – Petitioner's constitutional rights were violated when the prosecutor engaged in improper conduct during his closing argument because of the prosecutor's:

> A – Improper argument that Whatley committed other crimes and that his criminal history was more extensive than the evidence showed;

> B – Improper "testimony" about conditions in prison;

> C – "Other instances of misconduct" during closing argument; and

> D – Argument, without evidentiary support, that Whatley would kill again.

Claim XIII – Petitioner's constitutional rights were violated when the trial court erroneously failed to answer the jury's question about parole eligibility.

Claim XIV – Petitioner's constitutional rights were violated when he was required to be represented by an attorney who was known by the courts to be a racist.

Claim XV – Petitioner's death sentence is tainted by racial bias and discrimination of the decision-makers in his case.

Claim XVI – Petitioner's constitutional rights were violated when the trial court failed to inquire into a report from the court-appointed mental health expert that there were serious concerns about his competency.

Claim XVII – Petitioner was tried while incompetent in violation of his constitutional rights.

Claim XVIII – When the cumulative effect of the errors are considered, Petitioner is entitled to relief.

On November 9, 2009, Stephen Upton, Warden, Georgia Diagnostic and Classification Center ("Respondent") filed his Motion and Brief in Support of Procedural Defenses to Petitioner's Procedurally Defaulted and Unexhausted Claims Raised in his Petition for Writ of Habeas Corpus. On March 29, 2011, the Court issued its Order on Respondent's procedural defenses and concluded that Petitioner's Claims II, IV, VI, XIV, XV, and XVI were procedurally defaulted, without prejudice to Petitioner demonstrating cause and prejudice to excuse the default; that Petitioner's Claim XI was not procedurally defaulted, but only if Petitioner can show cause and prejudice to set aside his procedural default; and, that Petitioner's Claim XVII was not procedurally defaulted. (Order of Mar. 29, 2011, at 17). On May 11, 2011, Petitioner filed his Motion for Evidentiary Hearing [29], which the Court denied on March 20, 2012. (Order of Mar. 20, 2012, at 15).

Twelve claims remain in the habeas proceeding. Petitioner briefed only Claims I, VII, VIII, IX, XI, XII, and XVIII.[3] In his Brief in Support of his Petition,

---

[3] Because Petitioner did not brief Claims III, V, X, XIII, and XVII, these claims are deemed abandoned. See Isaacs v. Head, 300 F.3d 1232, 1253 n.6 (11th Cir. 2002). Petitioner also did not brief the following subparts of his ineffective assistance of counsel claim, Claim IX: Subpart E, "Counsel Was Ineffective for Failing to

Petitioner asserts, for the first time, that his federal habeas action should be stayed and held in abeyance in light of Georgia's new lethal injection protocol.

This action arises from Petitioner's conviction in the Superior Court of Spalding County of malice murder, two counts of aggravated assault, armed robbery, motor vehicle hijacking, and possession of a firearm during the commission of a crime.  Petitioner was sentenced to death based on his malice murder conviction.[4]  The Georgia Supreme Court described the events that led to his conviction as follows:

> At 8:45 p.m. on January 26, 1995, Whatley entered Roy's Bait Shop in Griffin armed with a .32 caliber revolver he had stolen from a relative.  The only persons inside the store at the time were the owner, Ed Allen, and an employee named Tommy Bunn.  Whatley forced Bunn to lie on the floor behind the service counter and held the .32

---

Object to Improper Closing Argument Made by the Prosecutor During the Sentencing Phase;" Subpart F, "Trial Counsel Was Ineffective for Failing to Strike for Cause Prospective Jurors;" Subpart G, "Counsel Failed to Object to the Court's Improper Response to a Juror Question Regarding the Possibility of Parole;" and Subpart H, "Additional Areas of Ineffective Assistance of Counsel."  The Court deems these subparts of Claim IX to be abandoned.  See id.  The Court also finds that Petitioner failed to show that the state court adjudication on the merits of these unbriefed claims resulted in a decision that "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  See 28 U.S.C. § 2254(d)(1), (2).

[4] In addition to his death sentence, Petitioner also was sentenced to serve consecutive terms of life imprisonment for armed robbery, two twenty-year terms for the aggravated assault, a twenty-year term for motor vehicle hijacking, and a five-year term for possessing a firearm during the commission of a crime.

caliber revolver to Bunn's head, and he threatened to shoot Bunn if Allen did not comply with his demand for the money from the cash register. Allen placed the money in a paper sack, and Whatley took it. Whatley backed around to the front of the counter and fired two shots, one shot striking Allen in the chest from a range of 15 to 18 inches and a second shot striking the counter that Bunn was lying behind from a range of 8 inches. Allen pursued Whatley and fired his .44 caliber single-action pistol at him. Whatley left the store and encountered Ray Coursey, who had just arrived at the store in an automobile. Whatley held the revolver to Coursey and demanded a ride. Allen came out of the store and continued firing his pistol at Whatley. Whatley exited Coursey's automobile on the side opposite from Allen's position, and he fled on foot. At some point, Whatley was shot in the right knee. After Whatley ran away, Allen returned to the store, told Bunn to call 911, lay down on the floor, and died of internal bleeding.

Whatley, 668 S.E.2d at 653.[5]

## II.   DISCUSSION

A.   Section 2254 Standard of Review

Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective

Death Penalty Act ("AEDPA"),

---

[5] "We quote extensively from the [state court's] decision because its factfinding, arguments and theories must be the focus of our inquiry under AEDPA. The Supreme Court has made clear that 'a habeas court must determine what arguments or theories supported . . . the state's court decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court].'" Evans v. Sec'y, Dep't of Corrs., 681 F.3d 1241, 1250 n.11 (11th Cir. 2012) (quoting Harrington v. Richter, 131 S. Ct. 770, 786 (2011)), vacated other grounds, 703 F.3d 1316 (11th Cir. 2013) (en banc).

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  A state court's determination of factual issues is "presumed to be correct" unless a petitioner "rebut[s] the presumption of correctness by clear and convincing evidence."  Id. § 2254(e)(1).

In evaluating a habeas petition under § 2254(d)(1), a district court must first determine the applicable "clearly established Federal law, as determined by the Supreme Court of the United States."  Williams v. Taylor, 529 U.S. 362, 379 (2000) (quoting 28 U.S.C. § 2254(d)(1)).  "The decision of a state court is not 'contrary to' federal law unless it 'contradicts the United States Supreme Court on a settled question of law or holds differently than did that Court on a set of materially indistinguishable facts.'"  Evans v. Sec'y, Dep't of Corr., 703 F.3d 1316, 1325 (11th Cir. 2013) (en banc) (quoting Cummings v. Sec'y, Dep't of Corr., 588 F.3d 1331, 1355 (11th Cir. 2009)).  In determining whether federal law is "settled" or "clearly established," the court must look at the status of the law "at

the time the state conviction became final."  In re Perez, 682 F.3d 930, 933

(11th Cir. 2012) (quoting Williams, 529 U.S. at 380).

Second, the court must determine whether a state court decision is "'contrary

to, or involved an unreasonable application of,' that clearly established law."

Williams, 529 U.S. at 379 (quoting 28 U.S.C. § 2254(d)(1)).  "The question under

[§ 2254(d)(1)] is not whether a federal court believes the state court's

determination was correct but whether that determination was unreasonable—a

substantially higher threshold."  Evans, 703 F.3d at 1325 (quoting Cummings, 588

F.3d at 1355).  "Error alone" by the state court "is not enough" to warrant habeas

corpus relief because "an *unreasonable* application of federal law is different from

an *incorrect* application of federal law," and "even a strong case for relief does not

mean the state court's contrary conclusion was unreasonable."  Johnson v. Sec'y,

DOC, 643 F.3d 907, 910 (11th Cir. 2011) (quoting Harrington, 131 S. Ct. at 786

(2011)); accord Evans, 703 F.3d at 1326.  The inquiry requires the court to

"determine what arguments or theories supported or, [if none were stated], could

have supported [ ] the state court's decision" and then to "ask whether it is possible

that fairminded jurists could disagree that those arguments or theories are

inconsistent with the holding in a prior decision of [the Supreme Court]."  Evans,

703 F.3d at 1326 (alterations in original) (quoting Reese v. Sec'y, Fla. Dep't of

Corr., 675 F.3d 1277, 1286–87 (11th Cir. 2012)).  This standard "was intended to be, and is, a difficult one."  Johnson, 643 F.3d at 910 (citing Harrington, 131 S. Ct. at 786).  But there are cases that merit relief under the standard.  See id. at 911.

    B.     The Claims of the Federal Habeas Petition

         1.    *Claim I - Petitioner's claim that favorable evidence was suppressed in violation of* Brady v. Maryland

Whatley claims that favorable evidence was suppressed in violation of Brady v. Maryland when the State failed to disclose, prior to trial, a second statement that Tommy Bunn ("Bunn"), a key prosecution witness, gave regarding the events of Ed Allen's death (the "January 27th Statement").  See 373 U.S. 83 (1963).  This second statement was given to local law enforcement the day after Allen's death.  The state habeas court and the Supreme Court of Georgia found that Whatley's Brady claim[6] was procedurally defaulted.[7]

---

[6] Under Brady, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  When the Government withholds evidence, a Brady violation occurs only if the evidence is (1) favorable to the accused (because it is exculpatory or impeaching) and (2) material (so that its non-disclosure caused the defendant prejudice).  See, e.g., Cone v. Bell, 556 U.S. 449, 469-70 (2009); Strickler v. Greene, 527 U.S. 263, 281-82 (1999); Allen v. Sec'y, Fla. Dep't of Corr., 611 F.3d 740, 745-46 (11th Cir. 2010).  The government's failure to produce to a defendant impeaching or exculpatory evidence in its possession constitutes a violation of a defendant's due process rights if: (i) the government suppressed the evidence either willfully or inadvertently; and (ii) prejudice ensued, i.e., the

"[W]here the state court correctly applies a procedural default principle of state law to arrive at the conclusion that the petitioner's federal claims are barred, <u>Sykes</u> requires the federal court to respect the state court's decision." <u>Bailey v. Nagle</u>, 172 F.3d 1299, 1302 (11th Cir. 1999) (citing <u>Wainright v. Sykes</u>, 433 U.S. 72 (1977)); <u>see also</u> <u>Mincey v. Head</u>, 206 F.3d 1106, 1135 (11th Cir. 2000) ("It is well-settled that federal habeas courts may not consider claims that have been defaulted in state court pursuant to an adequate and independent state procedural rule, unless the petitioner can show 'cause' for the default and resulting 'prejudice,' or 'a fundamental miscarriage of justice.'"). When a state court

---

evidence was material. <u>Banks v. Dretke</u>, 540 U.S. 668, 691 (2004). Favorable evidence is material if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." <u>Id.</u> at 698 (quoting <u>Kyles v. Whitley</u>, 514 U.S. 419, 435 (1995)). A defendant "must show a reasonable probability of a different result." <u>Id.</u> at 699 (quoting <u>Kyles</u>, 514 U.S. at 435).

[7] Petitioner seems to assert that Respondent waived his procedural default defense to the <u>Brady</u> claim by failing to raise it in his Answer. (<u>See</u> Pet'r's Reply Br. in Supp. of Pet. at 2). The Court notes, however, that Respondent stated in his Answer that "Respondent expressly adopts and relies upon any findings made by the state courts as to the procedural default of any and all claims not timely raised at trial and on appeal as required by O.C.G.A. § 9-14-48(d)." (Resp't's Answer at 11). The state habeas court and Supreme Court of Georgia both found this claim was procedurally defaulted. <u>See</u> <u>Whatley</u>, 668 S.E.2d at 655; (Resp't's Ex. 71 at 55-56); <u>see also</u> <u>Coleman v. Thompson</u>, 501 U.S. 722, 735 n.1 (1991) (Claims may also be procedurally defaulted if a petitioner failed to present them in state court and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred.").

addresses the merits of a claim and finds a procedural default, a district court should apply the procedural bar and decline to reach the merits of the claim.  See Harris v. Reed, 489 U.S. 255, 264 n.10 (1989); Osborne v. Terry, 466 F.3d 1298, 1315 (11th Cir. 2006); White v. Singletary, 972 F.2d 1218, 1227 (11th Cir. 1992); Richardson v. Thigpen, 883 F.2d 895, 898 (11th Cir. 1989); Hittson v. Humphrey, No. 5:01-CV-384 (MTT), 2012 WL 5497808, at *8 n.10 (M.D. Ga. Nov. 13, 2012).

### a.  State court adjudication

The state habeas court found that Whatley's Brady-based claim was not raised at trial or on direct appeal, and thus was procedurally defaulted.  Whatley, 668 S.E.2d at 655.  Under Georgia law, a petitioner may excuse his procedural default of an evidence suppression claim in a habeas proceeding by satisfying a two-part cause and prejudice test.  See id.  To satisfy the "cause" prong, a petitioner must show that the State breached a "constitutional duty" to disclose the information forming the basis of the claim.  See id. at 655 n.8 (citing Turpin v. Todd, 493 S.E.2d 900 (Ga. 1997)).  To demonstrate prejudice, a petitioner must show:

> (1) the State possessed evidence favorable to the defendant; (2) the defendant did not possess the favorable evidence and could not obtain it himself with any reasonable diligence; (3) the State suppressed the favorable evidence; and (4) had the evidence been disclosed to the

> defense, a reasonable probability exists that the outcome of the trial
> would have been different.

Schofield v. Palmer, 621 S.E.2d 726, 731 (Ga. 2005) (applying Brady, 373 U.S. at 87).

The state habeas court determined that the January 27th Statement was disclosed and available to Whatley at the time of his trial and direct appeal and thus Whatley failed to satisfy his burden to show his procedural default should be excused. The Supreme Court of Georgia also found that Whatley did not satisfy his burden of setting aside the procedural default, but disagreed with the state habeas court's rationale for concluding that Whatley's evidence suppression claim was procedurally defaulted. The Georgia Supreme Court determined that the state habeas court erred when it applied the cause and prejudice test to Whatley's evidence suppression claim because there was cause to excuse Whatley's failure to raise the issue of nondisclosure of the January 27th Statement at trial and on direct appeal. The state Supreme Court based this conclusion on (1) the nondisclosure of the statement prior to the completion of Whatley's trial and direct appeal, and (2) the failure of the State to disclose the "arguably contradictory" January 27th Statement by Bunn. See Whatley, 668 S.E.2d at 655. The Supreme Court of Georgia stated in its opinion:

Whatley forced Bunn at gunpoint to lie on the floor next to the cash register during the robbery, and Bunn remained there until all of the shooting had stopped.  The theory presented to the jury by the State at trial was that, as Whatley began backing away from the service counter, he fired twice, once at Allen at close range and once downward toward Bunn.  Bunn's testimony under direct examination in the guilt/innocence phase was consistent with this theory, as he maintained that he had heard two shots fired before Allen stepped over him to pursue Whatley.  Trial counsel then cross-examined Bunn by specifically referring to a statement Bunn made to police on the night of the murder, January 26, 1995.  The written investigative summary counsel was referring to in his cross-examination reports that Bunn stated as follows on January 26:

> [Whatley] moved off of me and backed around the counter, when he went around the counter and Ed come around over top of me going after him.  I don't know where he was.  I was still laying on the floor when I heard the shot.

Counsel did not read this statement aloud at trial but, instead, simply had the witness himself acknowledge that he did not tell the police in his January 26 interview that shots were fired before Allen stepped over him.  Counsel specifically stated that it was the January 26 interview that he was relying on in forming his questions to Bunn.  Bunn explained his account in his January 26 interview regarding the timing of the shots by stating that he was "upset" during that interview.  Counsel, by pointing out to Bunn that Allen had not bled on him, was also able to get Bunn to admit on cross-examination that he did not know when Allen was shot. Whatley testified in the sentencing phase to a version of events different from Bunn's: Whatley claimed that he never intended to shoot anyone and that he fired at Allen only after Allen pulled out his gun.

At the habeas hearing, Whatley presented an audio recording of an interview of Bunn that was conducted the day after the murder, January 27.  Whatley obtained the recording through an Open Records Act request to the Griffin Police Department, which request was legally available only after Whatley's criminal case was concluded.

Like the January 26 statement used by counsel at trial, part of the January 27 interview at least arguably suggests that Allen stepped over Bunn to pursue Whatley before any shots were fired. Bunn stated as follows in the January 27 interview:

> [Whatley] done got the money and all, you know. I figured he's going on out, and that's when I see Ed go over me, and he went out, and that's when the shooting and all starts.

However, earlier in this January 27 interview, Bunn gave a different chronology, stating as follows:

> Then [Whatley] got off me, and backed around the corner, you know. I guess he was going on back toward the door. I heard something start shooting. Then I seen Ed come across me, on around the corner, too. Next thing I know I just kept hearing, ya know, gun shots.

Thus, at the most, the January 27 interview contains two contradictory chronologies, one placing the shooting before Allen stepped over Bunn to pursue Whatley and one placing the shooting after. Furthermore, in between these two arguably contradictory chronologies in the January 27 interview, Bunn expressed uncertainty when asked specifically whether the shots began before or after Allen stepped over him and went around the corner of the counter. Bunn was then further asked, "Who started shooting?" He responded as follows: "I guess [Whatley]. But, you know, I don't know." He then provided the following explanation for his uncertainty: "[I]t happened so quick, and I'm all shook up, too."

Whatley argues that his cross-examination of Bunn would have been enhanced if counsel had been provided the January 27 interview, particularly because counsel could have emphasized that, although Bunn might have been confused because he was "upset" on January 26, he would have calmed down by January 27 and would have given a more accurate account of the crime. Whatley argues that the portion of the January 27 interview in which Bunn arguably indicated that Allen began to pursue Whatley before any shots were fired could have

been used to show that Whatley did not enter the store with the intent
to commit murder, which the jury might have found mitigating in the
sentencing phase.

Id. at 653-54.

Although it found cause to excuse Whatley's procedural default based on the

State's failure to disclose the January 27th interview, the Supreme Court of

Georgia also found that Whatley failed to satisfy the prejudice prong.  The

Supreme Court determined that prejudice did not result from the failure to disclose

the January 27th Statement because, had the statement been disclosed to the

defense, there is no reasonable probability that the outcome of the trial would have

been different.  See id. at 659.[8]

The Supreme Court of Georgia reasoned that Whatley failed to establish

prejudice under the rule established in Brady v. Maryland:

We conclude that Whatley has failed to satisfy the fourth element [of
the test for prejudice under Brady], a showing that having the January
27 interview at trial would have created a reasonable probability of a
different outcome.  As we noted above, the January 27 interview
arguably contains contradictory statements by Tommy Bunn
regarding whether the first shots were fired before or after Ed Allen
began to pursue Whatley, as well as statements expressing uncertainty
regarding the timing of those shots.  However, Bunn himself
ultimately testified under cross-examination at trial that he could not
recall whether the shots came first or whether Allen's stepping over

---

[8] The evaluation of the prejudice prong for excusing a procedural default of an
evidence suppression claim is "co-extensive" with a merits evaluation of a claim
under the standard of Brady v. Maryland.  See Whatley, 668 S.E.2d at 656.

him to pursue Whatley came first.  Thus, the jury, either with or
without being presented with the full January 27 interview, would
have concluded that Bunn could not be relied upon to establish a
detailed chronology.

Furthermore, the district attorney persuasively argued that Whatley
must have fired at Allen before Allen was armed, because Allen was
shot in the chest at a range of 15 to 18 inches and because it otherwise
would have been unlikely for Whatley to have shot Allen in the chest
from such a close distance without being shot himself by Allen
somewhere other than just in the leg.  Furthermore, Whatley's account
of events cannot be reasonably reconciled with the testimony at trial
indicating that he fired a shot toward either Allen or Bunn from a
distance of merely eight inches from the service counter.  We
conclude as a matter of law that there would not have been a
reasonable probability of a different outcome at trial if Whatley had
been provided the January 27 interview and, therefore, that he can
neither show merit to his underlying evidence suppression claim nor
satisfy the prejudice prong of the cause and prejudice test, issues that
are "co-extensive."

Id. at 656.

The Supreme Court of Georgia weighed the evidence presented in the state

court proceedings, determined that timely disclosure of the "arguably

contradictory" January 27th Statement would not have affected the outcome of the

proceedings, and applied the clearly established Federal law standard established in

Brady v. Maryland to determine that Whatley failed to satisfy his burden of

showing that his procedural default should be excused.  See Whatley, 668 S.E.2d at

655-56.

19

b.  Review of the state court adjudication

The January 27th Statement, while it arguably might have been helpful on Bunn's cross-examination, was, as the Supreme Court of Georgia noted, contradictory, uncertain, and not dispositive of the determination of who fired first during the robbery by Whatley.[9]  The Court also notes, as did the Supreme Court of Georgia, that the timely disclosure of the January 27th Statement would not have presented a reasonable probability of changing the outcome at trial because the weight of the evidence admitted at trial—to include ballistics evidence regarding Whatley having discharged his handgun at the counter while demanding money from Allen—supported that Allen was shot at close range while behind the counter before obtaining his firearm and pursuing Whatley, which is inconsistent with Whatley's alternative theory that he fired the fatal shots only after Allen fired first and as Whatley was running out of the bait shop.

The Court finds the Supreme Court of Georgia correctly, and reasonably, applied Georgia's two-part test for excusing a procedural default in determining

---

[9] The Court has reviewed Bunn's testimony at trial, as well as the January 27th Statement, and concludes the Supreme Court of Georgia's finding that Bunn testified that he was not sure whether Whatley or Allen fired first and that Bunn could not recall the sequence of events during the robbery of the bait shop is not an unreasonable determination of the facts.  See Whatley, 668 S.E.2d at 655-56; (Resp't's Ex. 11 at 894-935; Resp't's Ex. 41F at 1406-21).

that Whatley's <u>Brady</u> claim is procedurally barred.[10]  The Court respects and defers

to the state court's determination that the claim is procedurally barred and finds

Whatley is not entitled to relief on this claim.  <u>See</u> <u>Harris</u>, 489 U.S. at 264 n.10;

<u>Bailey</u>, 172 F.3d at 1302; <u>Richardson</u>, 883 F.2d at 898.

Even if Whatley was entitled to a *de novo* review of this claim, the Court

finds the Supreme Court of Georgia correctly applied Georgia's procedural default

principles and the standards under <u>Brady</u>, and did not arrive at a decision that "was

contrary to, or involved an unreasonable application of, clearly established Federal

---

[10] Petitioner argues that the Supreme Court of Georgia "clearly and explicitly found this claim procedurally defaulted" and the Court should conduct a *de novo* review because there was no ruling on the merits of Petitioner's <u>Brady</u> claim. (Pet'r's Br. in Supp. of Pet. at 22-24).  Petitioner overlooks that, in determining that Petitioner's <u>Brady</u> claim was procedurally defaulted, the Supreme Court of Georgia concurrently evaluated whether Whatley could "prevail on the underlying evidence suppression claim" on the merits by applying the rule established in <u>Brady v. Maryland</u> to find "that Whatley has failed to satisfy the fourth element [of the <u>Brady</u> analysis], a showing that having the January 27 interview at trial would have created a reasonable probability of a different outcome."  <u>Whatley</u>, 668 S.E.2d at 655-56 (Whatley "can neither show merit to his underlying evidence suppression claim nor satisfy the prejudice prong of the cause and prejudice test, issues that are 'co-extensive.'").  Even considering the merits of Petitioner's <u>Brady</u> claim, the Court concludes the state court adjudication did not result in a decision that "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" and was not "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  <u>See</u> 28 U.S.C. § 2254(d)(1), (2).  The Court does not find the Supreme Court of Georgia unreasonably interpreted the facts or unreasonably applied clearly established Federal law in deciding this claim.

law, as determined by the Supreme Court of the United States," "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," or that Whaley was prejudiced by the unavailability of Bunn's second statement.  28 U.S.C. § 2254(d)(1), (2); <u>see also</u> <u>Wiggins v. Smith</u>, 539 U.S. 510, 520-21 (2003); <u>Williams</u>, 529 U.S. at 379, 385.  Whatley is not entitled to relief on his suppression of evidence claim.

> 2.    *Claim IX – Ineffective assistance of counsel under* <u>Strickland v. Washington</u>[11]

Whatley contends he was denied, in several ways, his constitutionally guaranteed right to the effective assistance of counsel, including because his trial lawyer failed to investigate and to offer to the sentencing jury substantial mitigating evidence about his background and mental health.  He claims the Georgia habeas court and the Georgia Supreme Court failed to find his effective assistance of counsel right was violated and that he is entitled to federal habeas relief because his trial counsel was ineffective during his trial.

The threshold question under the AEDPA is whether the state courts, in adjudicating Whatley's ineffective assistance of counsel claim, applied a rule of law that was "clearly established" at the time his state-court conviction became

---

[11] The Court considers Petitioner's <u>Strickland</u> claim (Claim IX) before his <u>Cronic</u> and actual conflict of interest claims (Claims VII and VIII) because these claims derive from a claim under <u>Strickland</u>.

final.  See 28 U.S.C. § 2254(d)(1).  The Supreme Court has held that "[i]t is past

question that the rule set forth in Strickland [v. Washington, 466 U.S. 668 (1984)]

qualifies as 'clearly established Federal law, as determined by the Supreme Court

of the United States.'"  Williams, 529 U.S. at 391.

The next question is whether the Georgia state court adjudication of the

death sentence was "contrary to" or was an "unreasonable application of"

Strickland.  See 28 U.S.C. § 2254(d)(1).

> "The Supreme Court has described this standard as 'a highly
> deferential' one that 'demands that state-court decisions be given the
> benefit of the doubt.'"  [Johnson v. Upton, 615 F.3d 1318, 1329 (11th
> Cir. 2010)] (quoting Renico v. Lett, 559 U.S. 766, 130 S. Ct. 1855,
> 1862, 176 L. Ed.2d 678 (2010)).  The decision of a state court is not
> "contrary to" federal law unless it "contradicts the United States
> Supreme Court on a settled question of law or holds differently than
> did that Court on a set of materially indistinguishable facts."
> Cummings v. Sec'y for Dep't of Corr., 588 F.3d 1331, 1355 (11th Cir.
> 2009) (quoting Kimbrough v. Sec'y, Dep't of Corr., Fla., 565 F.3d
> 796, 799 (11th Cir. 2009)).  The decision of a state court is not an
> "unreasonable application" of federal law unless the state court
> "identifies the correct governing legal principle as articulated by the
> United States Supreme Court, but unreasonably applies that principle
> to the facts of the petitioner's case, unreasonably extends the principle
> to a new context where it should not apply, or unreasonably refuses to
> extend it to a new context where it should apply."  Id. (quoting
> Kimbrough, 565 F.3d at 799).  "The question under [the Act] is not
> whether a federal court believes the state court's determination was
> correct but whether that determination was unreasonable—a
> substantially higher threshold."  Id. (quoting Schriro v. Landrigan,
> 550 U.S. 465, 473, 127 S. Ct. 1933, 1939, 167 L. Ed. 2d 836 (2007)).

Evans, 703 F.3d at 1325.

"[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations."  Id. at 1326 (quoting Richter, 131 S. Ct. at 786).  "The Strickland standard is a general one, so the range of reasonable applications is substantial."  Id. (quoting Premo v. Moore, 131 S. Ct. 733, 740 (2011)).

Under Strickland, a defendant is constitutionally denied effective counsel if two showings are made:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Strickland, 466 U.S. at 687.  To establish ineffectiveness, a "defendant must show that counsel's representation fell below an objective standard of reasonableness." Id. at 688.  This Strickland test necessarily is one that requires application on a case-by-case basis.  See Wright v. West, 505 U.S. 277, 308 (1992).  To conclude that Whatley's counsel was constitutionally ineffective, the Court must find that rejection of his ineffectiveness claim was either "contrary to, or involved an unreasonable application of" Strickland.  "[A] federal habeas court [may] 'grant

24

the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts' of petitioner's case." Wiggins, 539 U.S. at 520 (citing Williams, 529 U.S. at 413). "In order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous . . . [it] must have been 'objectively unreasonable.'" Wiggins, 539 U.S. at 520-21 (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)); see also Rompilla v. Beard, 545 U.S. 374, 380 (2005); Strickland, 466 U.S. at 688 ("The proper measure of attorney performance remains simply reasonableness under prevailing professional norms."). "To obtain [federal] habeas relief a 'state prisoner must show that the state court's ruling on the claim being presented in the federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" Evans, 703 F.3d at 1326 (quoting Reese, 675 F.3d at 1286). "The decision of a state court is not an 'unreasonable application' of federal law unless the state court 'identifies the correct governing legal principle as articulated by the United States Supreme Court, but unreasonably applies that principle to the facts of the petitioner's case, unreasonably extends the principle to a new context where it

should not apply, or unreasonably refuses to extend it to a new context where it should apply.'" Id. at 1325 (quoting Cummings, 588 F.3d at 1355).

In evaluating reasonableness, "hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made [and] by giving a 'heavy measure of deference to counsel's judgments.'" Rompilla, 545 U.S. at 381 (quoting Strickland, 466 U.S. at 689, 691) (internal citation omitted). The evaluation is conducted "as if one stood in counsel's shoes." Id. In determining reasonableness of counsel's representation, a court may consider strategic decisions counsel may make for not introducing mitigating evidence. The deference owed to strategic decisions is judged based on the adequacy of the investigation supporting those judgments. As the Supreme Court stated in Strickland:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

466 U.S. at 690-91; see also Wiggins, 539 U.S. at 524 ("investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available*

mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor'") (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(c), p. 93 (1989)).[12]

In evaluating the reasonableness of an investigation, a court "must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." Wiggins, 539 U.S. at 526-27 (courts cannot use "strategic decision" as a *post hoc* rationalization to explain counsel's investigation shortfalls and inattention to mitigation investigation). In evaluating whether an investigation met Strickland's performance standards, the Supreme Court has

> emphasize[d] that Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Nor does Strickland require defense counsel to present mitigating evidence at sentencing in every case. Both conclusions would interfere with the "constitutionally protected independence of counsel" at the heart of Strickland.

Wiggins, 539 U.S. at 533.

---

[12] In reviewing the application of Strickland in Williams v. Taylor, 529 U.S. 362 (2000), the Supreme Court "concluded that counsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision to focus on Williams' voluntary confessions, because counsel had not 'fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background.'" Wiggins, 539 U.S. at 522 (quoting Williams, 529 U.S. at 396).

There are, however, some fundamental benchmarks for a required investigation. For example, failure to examine a defendant's prior conviction file falls below the level of reasonable performance where counsel knows that the government intends to prove that the defendant had a history of felony convictions indicating the use or threat of use of violence as an aggravating factor. Rompilla, 545 U.S. at 383. "[O]btain[ing] information that the State has and will use against the defendant is not simply a matter of common sense," it is also what the ABA Standards for Criminal Justice require, standards the Supreme Court has "long referred to as 'guides to determining what is reasonable.'" Id. at 387 (quoting Wiggins, 539 U.S. at 524);[13] see also Bobby v. Van Hook, 130 S. Ct. 13, 19 (2009)

_____

[13] The ABA Standards for Criminal Justice provide:

> It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty.

1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.). The commentary accompanying the Standards explain that defense counsel "has a substantial and important role to perform in raising mitigating factors," and that "[i]nformation concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant, as will

("This is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face, or would have been apparent from documents any reasonable attorney would have obtained.  It is instead a case, like Strickland itself, in which defense counsel's 'decision not to seek more' mitigating evidence from the defendant's background 'than was already in hand' fell 'well within the range of professionally reasonable judgments.'") (internal citations omitted).

The analytical template a federal habeas court is required to use to evaluate ineffective assistance of counsel claims under Strickland has been refined by the United States Supreme Court and the Eleventh Circuit in recent years, especially claims regarding the adequacy of counsel's pre-trial and pre-sentencing investigations.  The Supreme Court in Wiggins considered, under Strickland, the Maryland state courts' considerations of the adequacy of counsel's investigation. The Supreme Court held:

> [T]he Maryland Court of Appeals' conclusion that the scope of counsel's investigation into petitioner's background met the legal standards set in Strickland represented an objectively unreasonable application of our precedent.  Moreover, the court's assumption that counsel learned of a major aspect of Wiggins' background, *i.e.*, the sexual abuse, from the DSS records was clearly erroneous.

mitigating circumstances surrounding the commission of the offense itself."  Id. at 4-55.

Wiggins, 539 U.S. at 528-29 (counsel's investigation into Wiggins' background did not reflect reasonable professional judgment and counsel's decision to end investigation when they did was neither consistent with professional standards that prevailed in 1989, nor reasonable in light of evidence counsel uncovered in the social services records—evidence that would have led a reasonably competent attorney to investigate further) (internal citation omitted).

Thus, if a federal habeas court finds that an investigation was inadequate or based on facts clearly erroneously found, a state court conclusion to the contrary may be an unreasonable application of Strickland.  If so, the federal habeas court must next determine if a petitioner was prejudiced by the inadequate investigation. "In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence.  In this case our review is not circumscribed by a state court conclusion with respect to prejudice, as neither of the state courts below reached this prong of the Strickland analysis." Id. at 534.[14]  In evaluating prejudice the court evaluates the "totality of the available mitigation evidence—both that

---

[14] "[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse." Penry v. Lynaugh, 492 U.S. 302, 319 (1989), overruled on other grounds by Atkins v. Virginia, 536 U.S. 304 (2002); Eddings v. Oklahoma, 455 U.S. 104, 112 (1982) (consideration of life history "part of the process of inflicting the penalty of death.").

adduced at trial, and the evidence adduced in the habeas proceeding . . . ."
Williams, 529 U.S. at 397-98 ("Mitigating evidence unrelated to dangerousness
may alter the jury's selection of penalty, even if it does not undermine or rebut the
prosecution's death-eligibility case."); see also Wiggins, 539 U.S. at 537 ("Had the
jury been able to place petitioner's excruciating life history on the mitigating side
of the scale, there is a reasonable probability that at least one juror would have
struck a different balance.").

> a. Claim IX, Subpart A – Petitioner's claim that his trial
> counsel provided ineffective assistance of counsel based
> on his failure to conduct an adequate investigation,
> prepare a case in mitigation, or rebut the State's evidence
> in aggravation

To evaluate a state court's adjudication of the constitutional effectiveness of
counsel's penalty-phase investigation and presentation, the Court must determine
whether an adequate investigation was conducted and, if not, then consider the
evidence presented during the penalty phase and the evidence offered in the state
habeas proceeding to assess whether there was prejudice to Whatley from an
investigation found to be inadequate.  See Wiggins, 539 U.S. at 520-34, 537;
Williams, 529 U.S. at 397-98.  The Court first reviews the factual findings of the
state court and then its adjudication of Whatley's claim that he was provided
ineffective assistance of counsel in the investigation of his case.  In doing so, the

Court considers whether the Georgia state court adjudication of this claim was

"contrary to" or was an "unreasonable application of" Strickland.

i.     State court adjudication

The state habeas court made the following factual findings regarding

Whatley's background:

> Frederick Ramon [sic] Whatley was born on June 7, 1968 in Griffin,
> GA to Claudette Whatley[,] a very young, unmarried female.  Identity
> of his father is either unknown or is of conflicting information.  The
> "father" has never been significantly involved in Whatley's life.  The
> mother, though an occasional person in his life, abandoned or failed to
> function in any reasonable inspirational or meaningful parenting role.
> Frederick was, for all practical purposes raised by his mother's
> maternal aunt, Marie Thomas and her husband, Cleveland Thomas.
> The Thomas' [sic] were regarded as a religious family who provided
> guidelines to Frederick during his formative years.  He presented no
> problem in that home and was an active participant in church
> activities.  In his early school years he performed well but in later high
> school years his performance and grades became very poor.  He was
> suspended from Griffin High School in 1986 for sexual misconduct in
> the school building.  He apparently began involvement with and use
> of a variety of illegal drugs at about age 15.  He became sexually
> active at an early age, including sexual relationships with women
> twice his age.  He received a high school equivalency certificate of
> some kind apparently as a pre-condition to being accepted into the
> Navy.  He ultimately was turned down by both the Navy and the
> Army due to drug involvement.  He has no history of sustained
> employment and no noted job skills.  He deals poorly with authority
> figures and with women.  Several times he left Georgia to go to the
> District of Columbia to be with his mother.  Each of these sojourns
> resulted badly, with Frederick getting into trouble with the law,
> fighting with his mother, using drugs with his mother, being ejected
> from her house to allow space for her then current male companion.
> He is an admitted regular user of illegal drugs.  He has been in trouble

with the law, mostly in Washington D.C.  His criminal record is follows:

- Forgery and uttering, Washington D.C., Sentenced 4/24/88
- Robbery, Washington D.C., Sentenced 3/30/89, Probation Revoked 12/21/90
- Simple Assault, Washington D.C. Sentenced 12/12/90

He has served prison time in the Lorton (District of Columbia) prison, where he had some involvement in a prison riot.  In 1995, he was sentenced to a community based controlled residential facility commonly called a "halfway house."  At some point he failed to return to the facility and a warrant was issued for "escape" from a correctional facility.  He left the District of Columbia at that time and traveled to Griffin, Georgia.  He became involved in the drug trade there, needed money and planned the robbery (colloquially referred to as a "lick").  He pilfered a gun from his cousin.  The following day he coaxed a friend to drive him to a beer store on a secondary street so he could hit a "lick."  The friend was to pick him up a few minutes later on the other side of an adjacent road embankment. . . .

There is some mention in the evidence (and in Whatley's information that he gave to Attorney Mostiler) that Whatley's childhood was "ideal."  He was adequately cared for and supervised by his extended family during his younger years.  When he began to have interaction with his mother, by visits from her or by visits to her in Washington D.C., his behavior began to deteriorate — using drugs, sometimes with his mother, learning of her sexual promiscuity history and exploits, and being exposed to and encouraged in sexual activity with females of a variety of ages.

Mental health and intellect evaluations conducted after his arrests were inconclusive except to the effect that, as a youthful offender in Washington a fairly extensive mental examination was performed.  This young man was felt to have fairly high intellect — even college potential, but he was selfishly impatient and had poor judgment.  He failed to achieve success in a probation program crafted specifically

33

for him.  He had difficulty getting along with people either in or out of
prison.  He appears to have developed into a "loner" with no
willingness to be trained, no ability to get or maintain employment
and no track record of success except in criminal conduct.

(Resp't's Ex. 71 at 7-9).

Regarding Mostiler's investigation into Whatley's history for information to

be used as mitigating evidence and his investigation into the State's evidence in

aggravation, the state habeas court found:

A review of the evidence showed that counsel's pursuit and
investigation of mitigation evidence began long before the
commencement of Petitioner's trial.  Further, a review of the guilt
phase transcript showed that trial counsel elicited arguably mitigating
evidence from State's witness Tommy Bunn during the guilt phase of
trial when he had Mr. Bunn admit that he did not know who fired the
first shot.

In an attempt to find other potential mitigating evidence to present at
trial, counsel and his investigator met with Petitioner on many
different occasions.  During these meetings, Petitioner was asked
about his life and background and any information, including potential
witnesses, that, he thought would be helpful to his case.  The evidence
showed that investigator Yarbrough shared the information that
Petitioner provided to him with counsel.

Additionally, the evidence showed that investigator Yarbrough
contacted and attempted to interview each of the potential witnesses
Petitioner identified prior to trial including his biological mother, Mr.
Watson, the program director for the Washington D.C. Public
Defender's Office, and Petitioner's former Washington D.C. attorney
and informed counsel of the substance of these conversations so that
counsel could make an informed decision as to whether to call these
witnesses to testify.

34

Although Mr. Yarbrough attempted to convince Petitioner's biological mother to testify on Petitioner's behalf, the evidence showed that she was not cooperative. . . .

As to Mr. Watson, although investigator Yarbrough was unable to make contact with him upon his initial attempts, this Court finds that the evidence showed that counsel interviewed Mr. Watson several times prior to his testifying for the sentencing stage.

In addition to contacting and attempting to interview the aforementioned individuals, the evidence showed that investigator Yarbrough also interviewed the son of Petitioner's uncle, Cleveland Thomas, Jr., Reverend McDougal who knew Petitioner from church, his wife, Mrs. McDougal, Nancy Ward, one of Petitioner's former Sunday school teachers, Arnetta Hall and Barbara Ellis, friends of Petitioner, Linda Dixon, a member of Petitioner's church, and Reverend Walker, another clergy person who knew Petitioner from church on counsel's behalf to attempt to uncover further potential mitigating evidence, and provided counsel with the information he learned as a result of these interviews.

[T]he evidence showed that counsel declined to call them either because "they didn't want to testify" or because "there wasn't anything that they could tell us that would help" Petitioner's case.

To further pursue potential mitigating evidence, the evidence showed that counsel sought and obtained a court-ordered pre-trial psychological evaluation of Petitioner. . . .

In addition to the defense team's . . . attempts to secure mitigating evidence, . . . the evidence showed that the defense team attempted to interview all of the State's penalty phase witnesses prior to their taking the stand.

(Id. at 42-44 (internal record citations omitted)).

With regard to Mostiler's investigation into Whatley's prior mental health history, the state habeas court further stated:

> The evidence showed that counsel learned in advance of trial that Petitioner had previously been evaluated in connection with his Washington D.C. criminal cases.  To facilitate his acquisition of these reports, counsel had Petitioner sign a release form which was faxed to Eugene Watson of the Washington D.C. Public Defender's Office who, by Petitioner's own admission, had access to these reports.  As counsel's investigator testified, he specifically recalled Mr. Mostiler asking him to "dig up a release form and make sure that it was sent to Watson" to obtain "anything that Watson had."  Further, investigator Yarbrough testified that he recalled informing Mr. Watson that Mr. Mostiler wanted all of Petitioner's Washington D.C. records and additionally recalled that Mr. Watson brought several documents with him when he came to Georgia to meet with Mr. Mostiler prior to his testimony in this case.

(Id. at 32-33 (internal record citations and footnote omitted)).  Although there was evidence in the state court proceedings that Mostiler sent a written, signed request for records to Watson prior to trial, the state habeas court noted that the evidence was ambiguous regarding whether those files were delivered to Mostiler prior to the conclusion of Whatley's trial.  (Id. at 33-34).[15]

_____

[15] Investigator Yarbrough testified it was possible Mostiler reviewed documents in Watson's possession prior to the end of the trial, but Watson submitted an affidavit denying that this information was available to Mostiler prior to trial.  (Resp't's Ex. 71 at 33-34).  The record evidence and the state court determination therefore are that there is no evidence that Mostiler ever received Whatley's psychological records.  At most the record and the state court determination are that Yarbrough testified that he assumed Watson brought some unknown and unspecified documents to Georgia because he had a bag and briefcase with him.  Yarbrough's

With regard to the presentation of evidence in mitigation during the penalty phase of Whatley's trial, the state habeas court noted:

> A review of the sentencing phase transcript showed that trial counsel called eleven witnesses to testify on Petitioner's behalf.  These witnesses, which consisted of Petitioner, several of his friends, a relative, and Eugene Watson, the program developer for the Washington, D.C. Federal Defender's Office, testified either concerning Petitioner's background, his redeeming qualities and their desire for his life to be spared, and/or Petitioner's remorse for his crimes.

(Id. at 45).

---

testimony at his deposition on these matters was vague, speculative, and circumspect.  For example, Yarbrough stated he tried to get in touch with Whatley's former attorney, but then immediately stated: "I may have never made contact with him at all . . . ."  (Dep. Yarbrough at 26).  In another exchange, Yarbrough's information about contacting Whatley's mother was consistently qualified by his claim that it was to the "best of [his] recollection," signaling that after the passage of many years, it was the best he could recall in the absence of any handwritten notes.  (Id. at 37).  Yarbrough could not recall "off the top of [his] head" if Mostiler had a strategy in mitigation, but merely presumed there was one. (Id. at 47).  On cross examination and through leading questions, the State had to explain to Yarbrough that Mostiler did not have an independent psychological evaluation completed.  (Id. at 49-50).  Yarbrough was confused regarding whether funds were made available by the State to obtain the assistance of Watson at trial. (Id. at 50).  Yarbrough could not recall if he, as the investigator, knew of the existence of prior psychological reports for Whatley, could not recall seeing any documents that Watson brought with him to Georgia, could not recall the substance of any conversations between Watson and Mostiler, and could not remember ever seeing Whatley's prior psychological reports that were produced in the state habeas court.  (Id. at 55, 61, 64).  Contrasted against Watson's clear affidavit testimony that no mental health documents were provided to Mostiler, the Court finds that there is no proof, and the state court factual findings do not support, that Mostiler received Whatley's prior mental health records from Watson and it was unreasonable and plainly erroneous for the state court to give the weight it did to Yarbrough's faulty memory and deposition testimony.

The state habeas court also noted that, although Mostiler did not tell the witnesses the questions he would ask or rehearse their testimony, Mostiler's investigator spoke with each witness "prior to trial about their potentially helpful testimony and then reported [that] information to counsel."  (Id. at 45-46).  The state habeas court found that there was no credible evidence at the time of the trial that Whatley had been sexually abused as a child, that Whatley did not inform his counsel or counsel's investigator of any prior sexual abuse, and that there are no allegations of sexual abuse in Whatley's prior psychological evaluations or pre-trial mental health evaluation.  (Id. at 47-48).

Based on the state habeas court's findings of fact, the Supreme Court of Georgia concluded—as to all of Whatley's various ineffective assistance of counsel claims—"as a matter of law that, even if counsel performed deficiently in the ways we assume in the discussion below, the absence of those professional deficiencies would not in reasonable probability have resulted in a different outcome in either phase of Whatley's trial, and, accordingly, we affirm the habeas court's denial of Whatley's ineffective assistance claim."  Whatley, 668 S.E.2d at 659.

Regarding Whatley's specific claim of ineffective assistance of counsel based on an inadequate investigation into his background to develop evidence in

mitigation and rebut the State's evidence in aggravation, the Supreme Court of

Georgia stated:

> Whatley argues that trial counsel rendered ineffective assistance by
> failing to contact certain witnesses and by failing to use the testimony
> of other witnesses, including, in particular, witnesses from the District
> of Columbia.  Whatley argues that counsel failed to make use of
> testimony from his mother; however, the defense investigator testified
> that he made repeated attempts to contact her but that she "was not
> that cooperative" and that his "first interview with [her] went to hell in
> a handbasket."  Whatley contends that trial counsel failed to contact
> the defense attorney who had represented him in the District of
> Columbia; however, the defense investigator testified that he
> contacted the attorney and then "put him on the phone with" trial
> counsel when the investigator grew nervous answering the attorney's
> questions about Whatley's murder case.[16]  Whatley argues that trial
> counsel failed to obtain criminal records in the District of Columbia,
> but transcripts of Whatley's criminal proceedings were served on
> defense counsel and placed in the trial record by the prosecution, so
> trial counsel certainly were aware of them.  The psychological records
> associated with those criminal proceedings are discussed below.
> Whatley argues that trial counsel rendered ineffective assistance by
> failing to contact his step-siblings; however, these minors were living
> with Whatley's uncooperative mother.  He argues that trial counsel
> should have contacted one of his aunts and two of his uncles;
> however, a review of their affidavit testimony reveals little mitigating
> evidence that was unknown to trial counsel and that would have been
> admissible.  We note that these affidavits in large part concern things
> that affected Whatley's family members, such as his mother, aunts,
> and uncles, rather than things that would have directly affected
> Whatley.

---

[16] The Court notes again here that the Supreme Court of Georgia's reliance on the
memory and recollection of Yarbrough for the conclusion that events, such as this
supposed phone call, occurred that are not documented in writing in Whatley's
case file is unreasonable in light of the vague, unreliable, and uncertain nature of
his deposition testimony.

Whatley argues that trial counsel rendered ineffective assistance in failing to develop evidence regarding Cleveland and Marie Thomas, Whatley's great uncle and great aunt, who raised him but who had passed away by the time of Whatley's trial.  First, the evidence shows that the investigation into Whatley's life with the Thomases was not deficient, because the defense investigator testified that he met 16 times with Whatley and contacted the Thomases' son, who testified at trial.  Whatley told trial counsel and testified at trial that he had an "ideal" childhood living with the Thomases.  Vague allegations now that Cleveland Thomas drank too much, abused Marie Thomas, shared a bed with Whatley, and touched him inappropriately fail to show that the defense team was deficient in its attempts to find mitigating evidence, because the defense investigator testified that Whatley never revealed these alleged facts.  The allegation that Cleveland Thomas raped Whatley's mother might have been discoverable pre-trial, because there are references to it in her mental health records; however, this allegation, and the alleged fact that she informed Whatley of the rape when he was a boy, would not have been significantly mitigating, particularly in light of the fact that use of the allegations may have offended the jurors if they perceived counsel as attacking the one couple who, while they were still living, had taken care of Whatley.

Whatley argues that trial counsel rendered ineffective assistance by failing to obtain evidence that Whatley, along with other inmates, had been involved in a successful lawsuit against guards at the prison in the District of Columbia where he was previously incarcerated.  He argues that evidence that he suffered brutal treatment at the prison could have been used at trial to explain why he never returned to a halfway house in the District of Columbia when he was out past curfew one night.  This argument lacks merit, because the jury would not have been significantly swayed by an argument that Whatley's fear of returning to prison justified his escape from the halfway house.  Furthermore, Whatley has not shown that he informed his trial counsel of the alleged brutality, and Whatley did not mention being afraid of returning to prison when he testified in the sentencing phase about his escape from the halfway house.

Whatley argues that trial counsel made deficient use of the testimony available from Eugene Watson, a caseworker in the District of Columbia who designed a rehabilitation plan for Whatley as part of Whatley's criminal proceedings there.  Based on the testimony of the defense investigator and billing records, it is clear that trial counsel had repeated contacts with Watson and considered Watson's testimony to be the centerpiece of the sentencing phase strategy.  The record shows that, not only did counsel communicate with Watson by telephone, but counsel also met with Watson in person several times once he arrived in Georgia and that counsel even arranged to have Watson with him and Whatley in a room near the courtroom during breaks at trial.  Watson's habeas testimony downplaying the level of contact he had with trial counsel does not show the habeas court's conclusion that counsel performed adequately to be error in light of the entire record.

Whatley also argues that trial counsel failed to properly prepare mitigation witnesses for their testimony.  The record supports the habeas court's finding that the defense team, through the efforts of both trial counsel and the defense investigator, interviewed the mitigation witnesses and were aware of their potential testimony.  Although it might be understandable that those witnesses now state that they felt ill at ease because trial counsel did not give them detailed instructions about what they should expect at trial, it was not unreasonable attorney conduct for trial counsel not to rehearse his witnesses' testimony with them.  As the habeas court found and as was supported by the testimony of the defense investigator, trial counsel reasonably chose not to overly prepare his witnesses, because he wanted their testimony to come across as sincere.

Whatley argues that trial counsel failed to obtain several mental health reports that had been prepared in the District of Columbia as a result of his criminal activities there and that trial counsel failed to interview the experts who authored the reports.  The habeas court's conclusion that trial counsel performed adequately with regard to these reports is reasonable, as it is supported by the presumption that counsel performed adequately, by documentary evidence showing that counsel

obtained a signed release from Whatley and requested the materials from Whatley's caseworker in the District of Columbia, and by testimony from the defense investigator confirming that counsel sought the records from Whatley's caseworker.  This conclusion is not made erroneous simply because Whatley's caseworker, in giving his habeas testimony, could not recall providing the materials to counsel.  The habeas court also correctly concluded that Whatley would not have been prejudiced by counsel's alleged failure to obtain and use these mental health reports or to present testimony from the experts who authored them.  A review of the reports confirms the habeas court's finding that they contain material that would have been damaging to Whatley's mitigation case, including statements that he lacked remorse for his crimes and believed he could "get away with anything."  The reports did note signs of neglect by Whatley's biological mother and a potential for psychotic symptoms under stress; however, these tentative findings would have proved of little effect, particularly in light of the fact that no clear findings of mental illness were noted in another mental health examination performed in preparation for Whatley's murder trial.

Trial counsel presented testimony from Whatley himself suggesting that he was remorseful.  However, Whatley argues that trial counsel rendered ineffective assistance by failing to present additional testimony about his alleged remorse from his friends and from jail guards.  This additional testimony about Whatley's remorse would not have had a significant impact on the jury, particularly because the prosecutor would have been able to explain Whatley's emotional reaction to learning that the victim had died as being a concern for his own punishment rather than true remorse for his actions.

Whatley argues that trial counsel failed to present any records from his past other than his school records.  Other than the records discussed elsewhere in this opinion, Whatley has not elaborated on what records trial counsel failed to obtain or how that failure affected his trial.

<u>Whatley</u>, 668 S.E.2d at 660-62 (alteration in original) (footnote omitted).

ii.    Review of the State court adjudication

Whatley asserts that his counsel, Mostiler, failed to conduct an adequate investigation, prepare a case in mitigation, or rebut the State's evidence in aggravation by not developing evidence about childhood sexual and physical abuse, failing to obtain information about his background and mental health, and failing to prepare for the examination of the State's witnesses at trial.  Whether Mostiler, individually and through his investigator, adequately prepared for trial and undertook an adequate investigation into Whatley's background that was not "outside the wide range of professionally competent assistance" is an important issue that deserves critical analysis.  See Strickland, 466 U.S. at 690.

a)  Whether Mostiler conducted an adequate
investigation into Whatley's background

The Court initially finds that it was not unreasonable for Mostiler not to develop mitigating evidence regarding childhood physical or sexual abuse including because Whatley did not tell his counsel about any childhood sexual abuse and there otherwise was no available information indicating childhood abuse.  See DeYoung v. Schofield, 609 F.3d 1260, 1288 (11th Cir. 2010) ("[A] defense attorney 'does not render ineffective assistance by failing to discover and develop evidence of childhood abuse that his client does not mention to him.'"); (Resp't's Ex. 13B at 1468; Resp't's Ex. 71 at 48); see also McClain v. Hall,

552 F.3d 1245, 1251-52 (11th Cir. 2008); Lambrix v. Singletary, 72 F.3d 1500,

1505-06 (11th Cir. 1996). The Court acknowledges that Mostiler's investigation

began promptly, involved his investigator seeking to contact each of the State's

witnesses, obtained Whatley's school and criminal-history records, and involved

interviews of people who knew Whatley and who provided information about

Whatley's upbringing and background. See Sears v. Upton, 130 S. Ct. 3259, 3264-

67 (2010) (adequate investigation should include more than spending one day

talking to witnesses selected by a petitioner's mother and should include efforts to

determine if significant mental or psychological impairments exist); Rompilla, 545

U.S. at 383, 389-90 (adequate investigation should include examination of school

and criminal-history records); Williams, 529 U.S. at 393-96 (investigation

inadequate where penalty-phase preparations did not commence until one week

before trial); Johnson, 643 F.3d at 931-33 (investigation inadequate where no

inquiry into petitioner's background and preparation of case in mitigation did not

begin until the "eleventh hour" before trial); Ferrell v. Hall, 640 F.3d 1199, 1227-

31, 1237-38 (11th Cir. 2011) (counsel not inadequate for failing to investigate

mental health issues where petitioner's behavior not unusual, but investigation

inadequate where penalty-phase preparations did not begin until immediately

following guilt-innocence phase); Williams v. Allen, 542 F.3d 1326, 1340-41

(11th Cir. 2008) (investigation unreasonable where trial counsel relied upon a single family member for information about petitioner's background).[17]

The concern with the adequacy of counsel's representation of Whatley involves the adequacy of Mostiler's investigation into Whatley's background and mental health issues and Whatley's claim of prejudice based on Mostiler's failure "to obtain several mental health reports that had been prepared in the District of Columbia as a result of his criminal activities there and . . . to interview the experts who authored the reports."  Whatley, 668 S.E.2d at 659-662.  An understanding of the dates these reports were created, their contents, Mostiler's knowledge of their existence,[18] and what investigative steps he took to understand their meaning and to investigate these mental health issues further, is the necessary first step to

---

[17] As the Supreme Court of Georgia noted, it was not unreasonable to take penalty-phase testimony from Whatley's witnesses without detailed witness preparation in order to avoid having it sound rehearsed.  See McClain, 552 F.3d at 1253 (quoting Gordon v. United States, 518 F.3d 1291, 1301 (11th Cir. 2008)) ("The relevant question is not what actually motivated counsel, but what reasonably could have motivated counsel."); Provenzano v. Singletary, 148 F.3d 1327, 1330 (11th Cir. 1998) ("The question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact, and a state court's decision concerning that issue is presumptively correct.").

[18] The Court notes that it is difficult to determine what Mostiler knew because he died and, unlike in most habeas actions, was unavailable to testify regarding his knowledge and decisions.  Although Mostiler did not testify, the record is complete enough to reconstruct what information was conveyed to him and what he knew through his handwritten notes, time record, billing record, and Yarbrough's deposition.

evaluate the constitutional adequacy of Mostiler's investigation into Whatley's

background and mental health history and whether his development of a penalty-

phase strategy was ineffective assistance.

b)  Evidence of Whatley's mental health history

On April 19, 1988, the Superior Court of the District of Columbia issued an

order that committed Whatley for observation and study under the Youth

Rehabilitation Act of 1985.  (Pet'r's Habeas Court Ex. 30).  The order was based

on Whatley's robbery of a citizen of $1.00 in the Georgetown section of

Washington, D.C., on January 28, 1988.  (Id.).  A report was produced by a

classification committee (the "Classification Committee Report"), based on

information developed during the study and observation of Whatley.  (Id.).  Part of

the study was conducted by a psychologist, Dr. Shaw.  (Id.).  The Classification

Committee Report contained detailed background information about Whatley.

(Id.).  This background information was similar in meaningful ways to the

information in the post-trial affidavits presented in the state habeas court.  (Id.).

The background information includes details about Whatley's upbringing, his

strained relationship with his mother and his history of substance abuse, and

concludes that he "evidences symptoms of schizophrenia and uses it to deal with

his problems" and is a "deeply disturbed person."  (Id.).  The Classification

Committee Report observed that "Whatley is not a criminally oriented individual, rather one whose parental abandonment has prompted anti-social behavior." (Id.). The examining psychologist, Dr. Shaw, recommended a treatment program that includes "long-term psy[]chotherapy, drug therapy and stabilization in an educational program." (Id.).

On August 18, 1988, Whatley was administered a neuropsychological evaluation by Dr. Sarah Jane Elpern, Ph.D., in Virginia. (Pet'r's Habeas Court Ex. 34). The results of this evaluation contain information about Whatley's difficult relationship with his mother, his upbringing in Georgia, his drug use, and his overall functioning and intelligence. (Id.). The evaluation concludes there is evidence of brain dysfunction. (Id.). Dr. Elpern recommended that Whatley be provided drug treatment, psychotherapy, and vocational rehabilitation. (Id.).

It is undisputed that the Classification Committee Report and the August 18, 1988, neuropsychological report (collectively, the "1988 Reports") were both in the possession of Watson throughout the duration of Mostiler's representation of Whatley.

The evidence also is that Whatley directed Mostiler to these materials. On May 19, 1995, Mostiler noted on his time record to "order psychological" from Watson and listed Watson's number and address in Washington, D.C. (Resp't's

47

Habeas Court Ex. 20).[19]  Mostiler, however, did not order any psychological

records from Watson for more than nineteen (19) months.

On September 29, 1995, Mostiler noted in his time record that Whatley had

psychological testing done in 1988 and that Mostiler wanted to "check Personal

Growth Center" for records from a counseling center in Griffin, Georgia, to which

Whatley had been sent by his great uncle and aunt.  (Resp't's Habeas Court Exs.

20 and 61).  Mostiler did not take any steps to obtain these psychological records

for more than fifteen (15) months.

Not until November 8, 1996, shortly before trial was to begin, was any

psychological evaluation of Whatley conducted and it was ordered by the trial

judge, based on a request by Mostiler, for Whatley to be given an evaluation to

assess Whatley's: "1) competency to stand tr[ia]l, 2) degree of criminal

responsibility at the time of the act, and 3) the threat posed to himself or the

community if bond was granted."  (Resp't's Habeas Court Ex. 61).

The competency evaluation was conducted on December 13, 1996, by Drs.

Karen Bailey-Smith and Margaret A. Fahey, who interviewed and tested Whatley

---

[19] There are also undated, handwritten notes by Mostiler in the state habeas court
record about Watson and the need to coordinate his attendance at trial.  (Resp't's
Habeas Court Ex. 74).

for approximately eight (8) hours.  (Id.).[20]  Drs. Bailey-Smith and Fahey did not have access to the 1988 Reports or any other psychological counseling records for Whatley.  (Id.).

On December 19, 1996, about three weeks before the trial began, Whatley's investigator, for the first time, contacted Watson about his testifying on Whatley's behalf and to determine what information he had about Whatley's background and activities in Washington, D.C.[21]  (See Pet'r's Habeas Court Ex. 19).  Mostiler was responsible for determining what Watson might know and whether what he knew would be helpful at trial.  (Dep. Yarbrough at 61-62).

On January 3, 1997, Drs. Bailey-Smith and Fahey issued their competency report (the "Court Report").  (Resp't's Habeas Court Ex. 61).  The Court Report found Whatley competent to stand trial and determined that he could distinguish right from wrong at the time of the offense.  (Id.).  The Court Report also noted:

> - "There are no obvious memory impairments evident but he did indicate that he frequently loses his 'focus' for periods of 30 to 60 minutes and will have no recollection afterward of what transpired during these episodes."

---

[20] On December 31, 1996, they also interviewed and tested Whatley for seven (7) hours.  (Resp't's Habeas Court Ex. 61).

[21] Yarbrough testified that when Watson asked Yarbrough questions that he was not comfortable answering, he put Watson on the phone with Mostiler and they spoke at that time.  (Dep. Yarbrough at 58-59).  Watson stated in his affidavit that he did not speak to Mostiler until after the trial started.  (Pet'r's Habeas Court Ex. 4).

- "[Whatley] expressed some paranoia in terms of evil forces seeking to undermine him and influence his mind."

- "Judgement [sic], as measured by common-sense type questions, is somewhat impaired."

- "He has some insight into his condition, but does not appear to fully appreciate the extent to which his thinking deviates from the norm."

- "His responses on the [Minnesota Multiphastic Personality Inventory-2] resulted in an interpretable profile, which is suggestive of an individual with significant psychopathology."

- Individuals, such as Whatley, with an interpretable profile "often become disorganized and they may engage in excessive daydreaming and fantasy. At such times, their thinking may become autistic and circumstantial. Their behavior may be unpredictable and they may act out unexpectedly. At such times, their judgment and reality testing may be quite poor. In Mr. Whatley's case, this appears to take the form of magical thinking. Specifically, Mr. Whatley thinks he is unique and special, and ordained for a special purpose. He believes he has unique and special powers which can impact and often directly influence other's thinking and behavior, and consequently, the outcome of some situations."

- "Based on all available information, the examiners believe that Mr. Whatley's behavior can be best described by the following diagnoses: Rule Out Bipolar Disorder [and] Personality Disorder [Not Otherwise Specified] with antisocial, borderline, narcissistic, and schizotypal features."

- "Although he expressed a cognitive understanding of the fact that he could receive the death penalty, due to his belief in his own importance and the fact that he has been endowed with a special mission, he does not think that a death sentence is a realistic possibility. He indicated that he believes that God would intervene to prevent this from happening."

- "Due to his belief in his own importance and his special mission, Mr. Whatley does not think that a death sentence is a realistic possibility."

(Id.).  The Court Report, which was received three days before trial started, also included a "brief social history" that stated, based exclusively on what Whatley conveyed to the examining psychologists, that he had a troubled relationship with his psychologically-troubled mother, that Whatley had engaged in substance abuse as a youth, and that Whatley had received unknown, prior psychological counseling as a youth at the Personal Growth Center in Griffin, Georgia.  (Id.).

On January 6, 1997, on the first day of voir dire, Mostiler, for the first time, spoke with Watson on the phone.  (Pet'r's Habeas Court Exs. 4, 44).  Three days later, on January 9, 1997, while in the middle of trial, Mostiler spoke again with Watson.  (Pet'r's Habeas Court Ex. 44).  Also on January 9, 1997,  Mostiler sent to Watson a records release authorization for Whatley's records and asked Watson if he could come to Georgia for the trial if they flew him in the following Tuesday. (Resp't's Habeas Court Ex. 71).

At some point early in the trial, Whatley, Mostiler and Yarbrough exchanged a series of handwritten questions and answers on a piece of paper.  (See Dep. Yarbrough at 24-26; Resp't's Habeas Court Ex. 75).  At the top of the page was an entry written by Yarbrough about a witness.  (Dep. Yarbrough at 24-26; Resp't's

Habeas Court Ex. 75).  Beneath this entry, Whatley wrote a note asking to talk to

Mostiler during a break.  (Dep. Yarbrough at 24-26; Resp't's Habeas Court Ex.

75).  In the next entry, Whatley asks if any efforts had been made to get Whatley's

1988 psychological records from Watson or Mr. Stern, Whatley's former attorney

in the District of Columbia, to compare to the court-ordered evaluation.  (Dep.

Yarbrough at 24-26; Resp't's Habeas Court Ex. 75).  Even though Mostiler had

already spoken on the phone twice with Watson, Mostiler wrote a note in response

to Whatley asking who were Stern and Watson.  (Dep. Yarbrough at 24-26;

Resp't's Habeas Court Ex. 75).  In a later handwritten note, Whatley stated that

Watson was the program developer from Washington, D.C., who supervised his

rehabilitation program after his armed robbery conviction.  (Dep. Yarbrough at 24-

26; Resp't's Habeas Court Ex. 75).  Beneath this entry, Yarbrough wrote that

several calls had been made to find Stern or Watson, but the calls were

unsuccessful.  (Dep. Yarbrough at 24-26; Resp't's Habeas Court Ex. 75).

On January 15, 1997, after Whatley's conviction, Watson arrived in Georgia

to testify at Whatley's sentencing proceeding.  (Pet'r's Habeas Court Ex. 4).

Mostiler's billing statement indicates the he "interviewed" Watson for two hours

that day in anticipation of his testimony the following day.  (Pet'r's Habeas Court

Ex. 44).  Yarbrough's deposition and Watson's affidavit state that this was a dinner

meeting and did not involve any substantive review of Watson's knowledge of

Whatley or the documents that Watson may have had in his possession.  (Dep.

Yarbrough at 63-64; Pet'r's Habeas Court Ex. 4).

On January 16, 1997, Watson testified at trial.  Watson mentioned, but did

not discuss, the 1988 Records and briefly discussed Whatley's social history and

background.  Mostiler focused his questioning on Watson's opinion of how

Whatley would react to a long prison sentence.

c)  <u>Mostiler's knowledge and possession of
Whatley's mental health information</u>

The record in the state habeas court supports the timeline stated above.  The

record does not show that Mostiler ever received or reviewed the 1988 Reports.

Yarbrough testified that he talked to Watson on December 19, 1996, just before

trial, and that during this call he believes he asked Watson what documents he had

about Whatley and whether Watson could bring any documents he had with him

when he came to Georgia so Mostiler could review them.  (Dep. Yarbrough at 60-

61).  Yarbrough testified that he could not recall seeing the 1988 Reports and could

not recall if Mostiler ever saw them.[22]  (<u>Id.</u> at 61).  Watson stated in his affidavit

---

[22] When asked by counsel for the State in his October 11, 2002, deposition if it was
possible Mostiler saw these documents, Yarbrough acknowledged that it was
possible.  (Dep. Yarbrough at 62).  Yarbrough was not aware what Mostiler
discussed with Watson and did not know when or where they met other than a

that he did not talk to Mostiler until after the trial began, that Mostiler had not prepared a defense case in mitigation, and that Mostiler did not ask for, and he did not provide him with, any of the documents he brought with him from Washington, D.C., to include the 1988 Reports.  (Pet'r's Habeas Court Ex. 4).

It is, however, undisputed that Mostiler knew of the existence of prior psychological reports, including the 1988 Reports, as early as May 19, 1995, including based upon information that Whatley provided to him, and that Mostiler did not, for nineteen (19) months, even talk to Watson.  When he did, he generally asked him to bring any documents he had on Whatley.  There is no evidence he asked specifically for the 1988 Reports or asked Watson what they showed.  This is so even though he knew the result of the Court Report on Whatley's competency and thus knew the mental health and psychological assessment presented in the report.  (See Pet'r's Habeas Court Ex. 1; Resp't's Habeas Court Ex. 61; Dep. Yarbrough at 48).  The Court Report stated that Whatley had significant psychological issues and the "brief social history" in the Court Report indicated Whatley's difficult relationship with his psychologically-troubled mother, and that

---

meeting in a meeting area in the basement of the courthouse during a trial break and over dinner.  (Id. at 64).  Yarbrough did not state what was discussed during these meetings.  (Id.).  Yarbrough vaguely recalled a discussion of some kind between Mostiler and Watson at Mostiler's office regarding some psychological issue, the specifics of which he did not remember.  (Id.).

Whatley had a substance abuse problem.  (See Resp't's Habeas Court Ex. 61).

Mostiler did not act on the information contained in the Court Report and did not

ask for a continuance to develop evidence in mitigation based on the contents of

the report.  The question is whether Mostiler's failure to act in the face of the

evidence that his client had significant signs of psychological issues by conducting

further investigation, his failure to obtain the 1988 Reports once aware of them, his

failure to ask Watson about the findings in the 1988 Reports, and his failure to

request a continuance to look into these significant psychological and mental

health issues, was objectively reasonable for counsel representing a defendant in a

capital case, particularly where the evidence of his guilt was significant and where

the expectation was high that the penalty phase would be the most important part

of Whatley's prosecution.  See Johnson, 643 F.3d at 932-33.

The Supreme Court of Georgia's factual finding that Mostiler "facilitated"

the receipt of the 1988 Reports by having a release signed by Whatley, and the

inference made that Mostiler reviewed the 1988 Reports in Georgia when Watson

arrived to testify at trial, to suggest later that Mostiler made strategic decisions not

to introduce the 1988 Reports or their contents is disputed by the record and is

erroneous.  The state habeas court's further finding that the evaluations in the 1988

Reports and those conducted by Drs. Bailey-Smith and Fahey were "inconclusive"

is demonstrated by the reports themselves and this finding is also erroneous.

> d) Whether Mostiler acted reasonably by not conducting further investigation into Whatley's mental health based on the information known to him

The Supreme Court and the Eleventh Circuit have made clear that when a document or information in the possession of a trial counsel indicates significant adverse circumstances or mental health problems in the background of a defendant facing the death penalty, a reasonably competent attorney will necessarily pursue this information to make an informed choice among possible defenses and strategies for a case in mitigation. See Wiggins, 539 U.S. at 525; Johnson, 643 F.3d at 933. It is unreasonable to fail to investigate further where "potentially powerful mitigation evidence stare[s] [an attorney] in the face or would have been apparent from documents any reasonable attorney would have obtained." See Bobby, 130 S. Ct. at 19 (internal citation omitted). The information developed is not required to be presented as mitigating evidence, but the information must be developed so a trial counsel may make informed decisions about defenses and mitigation strategies. See Wiggins, 539 U.S. at 523-25; Johnson, 643 F.3d at 932-33.

In Williams, a petitioner challenged the adequacy of his counsel's investigation into his background and asserted that his counsel provided ineffective

assistance by failing to investigate and discover information about his "nightmarish childhood," lack of education, and deficits in cognitive thinking.  529 U.S. at 393-95.  Counsel for petitioner failed to begin to prepare for the penalty phase until a week before trial and a diligent investigation would have uncovered records containing substantial mitigating evidence, much like the circumstances here where Mostiler could have obtained the 1988 Reports had he made even a minimal, much less a diligent, effort to obtain the documents from Watson.  See id. at 394-96.  In Williams, this failure to investigate and uncover available evidence of a significant mitigating nature constituted an inadequate investigation that, under Strickland, constituted ineffective assistance of counsel.  Id.

In Wiggins, the Supreme Court considered facts similar to those here.  See 539 U.S. at 521-22.  There the Court considered the adequacy of counsel's investigation into a petitioner's background and mental health in a death penalty case.  Id.  Counsel obtained limited records and received reports from a psychologist who conducted a number of tests on petitioner, similar to the court-ordered evaluation testing that was conducted in this action.  See id. at 523.  The report of the examining psychologist in Wiggins revealed "features of a personality disorder" and counsel knew rudimentary information about petitioner's background and life history based on a handful of documents obtained during an

investigation, which included facts that petitioner had a poor relationship with his alcoholic mother and had a troubled upbringing.  Id. at 523-25.  Counsel did not expand their investigation beyond these sources of information and did not further investigate or develop information about petitioner's background or social history. Id.  The Supreme Court found that petitioner's counsel in Wiggins did not exercise reasonable judgment by failing to conduct further inquiry into his background in light of the information that was in his possession and that this conduct "fell short of the professional standards that prevailed in . . . 1989," the same standards that applied during Mostiler's representation of Whatley.  See id. at 523-24, 534.

In Johnson, the Eleventh Circuit, in a case similar to the one here, addressed the inadequacy of a counsel's investigation into a petitioner's background and mental health issues where there was "overwhelming evidence of guilt" such that "any reasonable attorney would have known . . . that the sentence stage was the only part of the trial in which [petitioner] had any reasonable chance of success." See 643 F.3d at 931-32.  In Johnson, the petitioner reported to his counsel that "he had a bad childhood, including an alcoholic and abusive father who would abandon the family," similar to Whatley's report to Mostiler and Yarbrough that he was abandoned by his mother.  See id. at 932.  Petitioner's counsel did not follow up on or develop any information beyond taking, at face value, his father's denial of an

abusive relationship.  Id. at 932-33.  The Circuit found that, given the

overwhelming evidence of petitioner's guilt, it was unreasonable for counsel not to

investigate petitioner's claim of an abusive and troubled childhood.  Id.  Finding

that counsel failed to adequately investigate the information communicated to him

by his client, the Circuit held that counsel's conduct "was 'outside the wide range

of professionally competent assistance'" guaranteed by the Sixth and Fourteenth

Amendments to the Constitution.  Id. at 934 (quoting Strickland, 466 U.S. at 690).

     In Pooler v. Sec'y, Fla. Dep't of Corr., 702 F.3d 1252 (11th Cir. 2012), the

petitioner alleged that his counsel failed to conduct an adequate background

investigation, failed to present mental health information in mitigation, and failed

to obtain records on his behalf that he told him about.  The Eleventh Circuit found

effective the assistance of counsel that was provided, but in doing so underscored

the adequacy of the investigation required.  See Pooler, 702 F.3d at 1270-74.  The

Circuit based its conclusion on the fact that an extensive, multi-source

investigation was conducted by counsel and his investigator, and that counsel

obtained confirmation of Pooler's background information by means other than

those that the petitioner alleged were required.  Id.  The Circuit concluded that

> (1) trial counsel was already performing a mitigation investigation
> into Pooler's background, including an inquiry into his medical and
> psychological history; and (2) well before trial, counsel read the
> reports from, and heard the competency-hearing testimony of,

> multiple experts who had evaluated Pooler's then-current mental
> functioning.  And most importantly, nothing in those expert reports
> during competency proceedings, or in the additional mitigation search
> [counsel] performed, suggested a need for mental health experts to
> look further.

Id. at 1273.  The Circuit noted that counsel diligently attempted and made a

concerted effort to obtain documents about Pooler's military service, education,

and employment history and that it was reasonable to stop looking when he did and

after obtaining information from relatives on the matters expected to be covered in

those records.  See id.  The Circuit observed that Pooler was not "a case where

counsel ignored evidence in his possession that cast doubt upon his client's story or

suggested the need for further investigation."  Id. at 1272.  The facts in Whatley's

case are very different.

    The Court finds that Williams, Wiggins, and Johnson are substantially

similar to the circumstances here and support, together with Pooler, that Mostiler's

conduct in response to the information in his possession—and provided to him by

Whatley—about Whatley's background and mental health was objectively

unreasonable.[23]  Whatley's counsel did not take the routine step of arranging to get

---

[23] The issue on this claim is whether Mostiler undertook a constitutionally adequate
investigation.  The Court recognizes that the Supreme Court of Georgia found
based on the record that some unspecified, unknown documents were provided by
Watson to Mostiler on the eve of Watson's testimony on the last day of trial.  This
factual determination by the Supreme Court of Georgia, to the extent it is

the 1988 Reports, even after Whatley advised him of their existence and, as a result, Mostiler did not have them at a time when meaningful further investigation was possible regarding the significant information about Whatley and his mental health that was set out in the reports.  Even when Mostiler became aware of the Court Report, indicating that Whatley showed signs of "significant psychopathology," "magical thinking," paranoia, blackout episodes, and a belief that God would intervene in his case to prevent him from being sentenced to death, Mostiler did not investigate further and did not request a continuance for the time necessary to do so.

Mostiler even received information, presumably from Whatley, about the adverse circumstances of Whatley's youth and the existence of the 1988 Reports, and yet did not conduct any further investigation to develop this information.  See Pooler, 702 F.3d at 1269; Johnson, 643 F.3d at 932-35.  In short, confronted with the undisputed facts known by Mostiler before trial—to include that Whatley had undergone previous psychological examination in 1988 in Washington, D.C., and that Whatley had signs of "significant psychopathology" based on the court-ordered competency examination that was received by Mostiler before trial—

supported by the record, does not undermine the conclusion that Mostiler's investigation of Whatley's background was inadequate because Mostiler's conduct in investigating Whatley's background prior to trial is what is relevant to the analysis of the adequacy of his investigation.

Mostiler chose not to pursue any further investigation of Whatley's background or his mental health by either ensuring that he obtained Whatley's mental health records from Watson before trial, or by requesting an independent mental health examination by a defense expert who could have developed the mental health and social history information that was self-evident in the 1988 Reports and the Court Report.

The Court finds that, because it was reported to Mostiler that his client had prior psychological evaluations performed in 1988, that Whatley had a troubled upbringing, and that his client had signs of "significant psychopathology" and other serious mental health issues based on the results of the court-ordered mental health examination, under these circumstances, no reasonably competent counsel would choose not to pursue additional mental health, social history, or other additional information about his client, and the failure to do so violated the professional standards to which Mostiler was required to abide in his death penalty representation of Whatley.  See, e.g., Rompilla, 545 U.S. at 381; Wiggins, 539 U.S. at 522-27, 533; cf. Bobby, 130 S. Ct. at 19.  There simply is no evidence of a conscious, deliberate effort by Mostiler to pursue obviously available information as part of his penalty-phase investigation and there is no evidence that an adequate investigation was done upon which counsel could competently rely to make

reasonable, meaningful strategic decisions.  See Strickland, 466 U.S. at 690-91;

Pooler, 702 F.3d at 1272-73.  Even giving significant deference to Mostiler's

judgments and considering his perspective at the time his decisions in Whatley's

case were made, Mostiler's conduct, under the circumstances here and specifically

his failure to inquire further into Whatley's background and mental and

psychological health, "was 'outside the wide range of professionally competent

assistance'" guaranteed by the Sixth and Fourteenth Amendments.  See Johnson,

643 F.3d at 934 (quoting Strickland, 466 U.S. at 690).  There can be no *post hoc*

rationalization that can explain this serious deficiency in his investigation of this

case or his representation of Whatley.  See, e.g., Rompilla, 545 U.S. at 381;

Wiggins, 539 U.S. at 522-27, 533; cf. Bobby, 130 S. Ct. at 19.

　　　　Considering the investigatory and case-preparation actions taken by Mostiler

and his knowledge of Whatley's background, the Court finds Mostiler failed to

"conduct[] an adequate background investigation [and did not] reasonably decide[]

to end the background investigation when he did."  See Johnson, 643 F.3d at 931-

32 (citing Strickland, 466 U.S. at 690-91); see also Wiggins, 539 U.S. at 522-27,

533; DeYoung, 609 F.3d at 1285-88; Chandler v. United States, 218 F.3d 1305,

1315 n.15 (11th Cir. 2000) (ambiguities or omissions in the record regarding a trial

counsel's investigation are not sufficient to overcome presumption of

reasonableness on part of trial counsel).  The Court finds that fairminded jurists would not disagree that the Supreme Court of Georgia's conclusion that Mostiler conducted an adequate investigation into Whatley's background and mental health issues was objectively unreasonable under the facts of this case, outside the wide range of professionally competent assistance, and contrary to clearly established Federal law.  See Wiggins, 539 U.S. at 520-22, 526-27; Wright, 505 U.S. at 308; Strickland, 466 U.S. at 687; Evans, 703 F.3d at 1325-26; Johnson, 643 F.3d at 934. The Court finds that the failure to conduct an adequate investigation and enacting a mitigation presentation without one failed to meet the professional norms that apply to the representation of defendants in death penalty cases and that fairminded jurists would all agree that the state court's finding of an adequate investigation is an objectively unreasonable application of Strickland.  See Wiggins, 539 U.S. at 520-21; Evans, 703 F.3d at 1326.  Finally, the Court concludes that the Supreme Court of Georgia's decision was based on an unreasonable determination of the facts presented in the state court proceedings, including that Mostiler sought to "facilitate" obtaining the 1988 Reports and received and reviewed them when Watson came to Georgia, and the clearly erroneous assumption that a decision was made that the contents of the 1988 Reports were not helpful in mitigation and that this was the likely reason they were not presented.  These facts were not supported,

64

and in fact were contradicted, by the record.  See Wiggins, 539 U.S. at 528-29,

534.

> e)  Whether Mostiler's inadequate investigation
> prejudiced Whatley

Having determined that Mostiler's performance and investigation of

Whatley's background and mental health issues was inadequate and violated

Whatley's Sixth and Fourteenth Amendment rights, the Court must next determine

if Whatley was prejudiced such that there is a reasonable probability that the

outcome of the sentencing phase would have been different had Mostiler

conducted an adequate investigation.  See, e.g., Wiggins, 539 U.S. at 534, 536-38;

Williams, 529 U.S. at 397-98.  To do so, the Court must reweigh the evidence in

aggravation against the totality of available mitigating evidence, both adduced at

trial and in the state habeas proceedings.  See Wiggins, 539 U.S. at 534, 536-38;

Williams, 529 U.S. at 397-98.

> f)  The evidence adduced at trial and in the state
> habeas proceedings

During the penalty phase of Whatley's trial, the State presented evidence of

Whatley's lack of remorse for the death of Allen, evidence of Whatley's

dangerousness, and evidence about Whatley's prior convictions for forgery, armed

robbery, and assault.  The State also presented evidence of Whatley's status as an

escapee from a halfway house at the time of the murder.  The State's argument that

death was an appropriate punishment was based on the premise that Whatley "is

dangerous and he's always going to be dangerous until the day he's executed."

(Tr. at 1323).

    To show lack of remorse, the State presented witnesses who testified

regarding Whatley's request to have the money he stole from the bait shop returned

to him and Whatley's concern during the trial about how long it would take to be

processed to state prison after the conclusion because he did not want to miss the

Super Bowl.  (Id. at 1324-32).  To illustrate dangerousness, the State presented

testimony from a detective from Washington, D.C., and introduced a number of

exhibits and testimony regarding Whatley's commission of an armed robbery using

a shotgun in Washington, D.C., in 1988.  (Id. at 1332-48).  The victim of the armed

robbery testified that Whatley placed the shotgun in his back and that he heard two

clicking noises after Whatley did so, to support that Whatley had readied the

weapon to fire.  (Id. at 1348-53).

    The State introduced exhibits that documented Whatley's convictions for the

offenses of forgery and simple assault, as well as exhibits and testimony regarding

his probation revocation and assignment to the halfway house from which he

escaped before returning to Georgia in January 1995.  (State's Trial Exs. 42, 43, 50, 51).

In arguing against the imposition of the death penalty, Whatley's counsel sought to highlight the adverse upbringing that Whatley experienced and argued that, even though he had been in trouble with the law, Whatley's youth and rehabilitative potential made death an inappropriate punishment.  (Tr. at 1323-24). Whatley's counsel presented the testimony of eleven witnesses, including Whatley, several friends who knew him while growing up in Georgia, relatives, and Watson.[24]  (Id. at 1355-1510).  These witnesses "testified either concerning Petitioner's background, his redeeming qualities and their desire for his life to be spared, and/or Petitioner's remorse for his crimes."  (Resp't's Ex. 71 at 45).

Whatley's friends and relatives generally testified about his redeeming qualities, his upbringing, and asked that his life be spared.[25]  (Tr. at 1355-1412).

---

[24] One of Whatley's eleven witnesses was the custodian of the records for the Griffin-Spalding County Schools, through whom Whatley introduced a copy of his school records for consideration by the jury during the sentencing phase.

[25] Whatley's friend, Barbara Ellis, testified that Whatley had redeeming qualities and was a good person.  Janet Wyche, a cousin, testified about how Whatley previously lived with her in Griffin, Georgia, was obedient, and stayed out of trouble.  Linda Dixon testified about how she taught Whatley in Sunday school while he was growing up and how he was a nice and respectful young man. Cleveland Thomas, Jr., testified about how Whatley was raised by his father and stepmother, expressed his belief that Whatley had potential to do great things with his life, and pleaded with the jury to spare Whatley's life.  Arnetta Hall testified

Several witnesses testified about Whatley's lack of a relationship with his mother and that he was raised by his great uncle and aunt, Cleveland Thomas, Sr. and Marie Thomas.  One of Whatley's relatives, Lorraine Goodman, explained that Whatley did not know his father, that Whatley's mother was incapable of raising him, that his mother abandoned him, and that Whatley was very involved in his church as a youth.  (Id. at 1366-74).  Goodman testified that Whatley returned to Griffin, Georgia, before the murder of Allen, was not working, and that she had to ask him to stop staying at her home when he failed to pay rent.  (Id.).

Whatley's older cousin, Franklin White, testified about Whatley's upbringing in the Griffin, Georgia, community.  (Id. at 1374-79).  White, who knew Whatley most of his life, explained that Whatley was a nice young boy who was very involved in church activities.  (Id.).  White explained that, when Whatley returned to Griffin from Washington, D.C., White tried to help him, provided him money, saw Whatley interact favorably with his young grandchildren when they were at his house, and that he did not expect him to steal his handgun.  (Id.).

---

about how she knew Whatley while growing up, how he was a respectful man, and that his life is worth saving.  Nancy Ward, who taught Whatley in Sunday school while he was growing up in Griffin, testified about how Whatley was a nice, well-mannered, and helpful young man who deserves forgiveness.  Ward also testified about how Whatley's mother left him in Georgia to be raised by the Thomases when she left for Washington, D.C.

Watson explained that he worked with Whatley in 1989 to develop a rehabilitation plan for him while he was awaiting sentencing after his armed robbery conviction.  (Id. at 1486-1510).  Watson explained that he sought to understand Whatley's social history and psychological background.  (Id. at 1489-90).  Watson told the jury how he developed a social history of Whatley based on numerous discussions with Whatley and after speaking with the Thomases, while they were still alive.  (Id.).  Watson stated that he attempted to contact Whatley's mother on multiple occasions, but was unable to contact her and was not able to get her involved in Whatley's rehabilitation.  (Id. at 1494).

Watson stated that a clinical psychologist and educational psychologist examined Whatley to determine his academic potential, vocational potential, and whether a rehabilitation plan was realistic.  (Id. at 1490).[26]  Watson developed a workable rehabilitation plan for Whatley based on these examinations and in consultation with the other organizations and individuals who would assist in helping Whatley become a productive member of society.  (Id. at 1491).

Watson testified that he presented the proposed rehabilitation plan to the sentencing judge in Whatley's criminal case and that it envisioned psychological counseling, vocational training, and academic refresher training to prepare Whatley

---

[26]  Watson was not asked to elaborate on Whatley's social or psychological background based on the findings in the 1988 Reports or otherwise.

69

for possible college courses and to find employment.  (Id. at 1491-92).  Watson

stated he was pleased when the judge in Whatley's case approved the plan to be

implemented.  (Id.).  Watson explained how he worked with Whatley for a year

and a half and met with him about once every other week to help him execute the

rehabilitation plan.  (Id. at 1493).  Watson testified that the execution of the

rehabilitation plan ended when Whatley absconded from the halfway house to

which he was assigned.  (Id.).

Based on the totality of his experiences with Whatley, Watson stated his

view that Whatley came from a good family having been raised by the Thomases

and that he was personable, likeable, bright, and ambitious with a lot of potential.

(Id. at 1493-94).  Watson believed that Whatley's success in being rehabilitated

was adversely affected by his relationships with female acquaintances because it

often caused him to miss his curfew at the halfway house.  (Id. at 1495-97).

Watson expressed his opinion that Whatley was a very complicated person

who would not react well to being incarcerated.  (Id. at 1493, 1497-99).  Based on

this belief, Watson stated that life in prison without parole would punish Whatley

every day of confinement and that incarceration would affect him more deeply

than the average prisoner.  (Id. at 1499-1500).  Watson stated that Whatley had

rehabilitative potential and is one of the few people he had worked with who, when

facing incarceration, responded enthusiastically to a rehabilitation plan.  (<u>Id.</u> at 1500-01).

Whatley testified about his upbringing, criminal history, and about the death of Allen.  (<u>Id.</u> at 1412-86).  He explained that he was raised by the Thomases because his mother had problems that prevented her from raising him.  (<u>Id.</u> at 1413-15).  Whatley said he had an ideal childhood while growing up with the Thomases and that he left their household around the eighth or ninth grade to be with his mother in Washington, D.C., because he wanted to have a relationship with her.  (<u>Id.</u> at 1414-15).  Whatley said that he had a poor relationship with his mother, did not know who his father was, and that this contributed to many of his problems in life.  (<u>Id.</u> at 1414-16).  Whatley explained that his mother initially lied to him about his father's identity, only to later reveal his father was someone else, and that this confused him.  (<u>Id.</u> at 1415-16).

Whatley testified that in his later teenage years, he moved back in with his mother and worked multiple jobs as a laborer and security guard in an attempt to support her and her family.  (<u>Id.</u> at 1421-23).  He eventually moved out for good after his mother began taking money from him and reported him to the police for possessing drugs.  (<u>Id.</u>).

Whatley testified at length about his criminal history.  (Id. at 1423-35).  He explained that, to try and support his mother and her family in Washington, D.C., he began dealing drugs and financing street-level drug dealers to sell drugs on his behalf.  (Id. at 1423).  Whatley later became involved with "some individuals that were into forgery and uttering and credit cards, white-collar crimes," explaining that this led to being arrested for using a fake identification card to cash a check that was mistakenly delivered to his mailbox at one of the residences where he was staying.  (Id. at 1424).  He was placed on probation for this forgery offense and required to move into a halfway house.  (Id. at 1424-27).  His probation ultimately was revoked after he failed to return to the halfway house.  (Id.).

Whatley testified that the victim in the Washington, D.C., robbery offense for which he was convicted actually owed Whatley money, that he did not use a shotgun to commit the crime, and that he only stuck a closed knife in the victim's back to make him think that he had a gun.[27]  (Id. at 1428-29).  Whatley received a suspended sentence and probation for the robbery and spent the following year

---

[27] Whatley's version of events was directly contradicted on cross-examination when District Attorney McBroom used the transcript from his sentencing in Washington, D.C. for the armed robbery conviction, where he admitted to using a shotgun to rob the victim, to impeach Whatley's version of events.  (Tr. at 1448-51).

working, reporting to his probation officer, and working with his program

developer, Watson, who helped Whatley integrate into society.  (Id. at 1429-31).

Whatley was reassigned to a halfway house after failing to report to his

probation officer, and later was reincarcerated.  (Id. at 1431-34).  Whatley missed

his halfway house curfew one evening and did not know what would happen if he

returned, having been deemed an escapee.  (Id.).  Whatley decided to return to

Georgia to earn some money so he could return to Washington, D.C., in a better

financial situation.  (Id. at 1434-35).

Whatley stayed with different acquaintances after returning to Griffin, sold

drugs in Griffin, and stole Franklin White's gun because he feared for his safety.

(Id. at 1435, 1437-38).

Whatley explained the circumstances surrounding the murder of Allen,

asserted it was not premeditated, and that he only shot Allen after Allen shot at him

as he was leaving the store.[28]  (Id. at 1438-41).  Whatley expressed his remorse to

Allen's family and stated that he had asked God for forgiveness for the crime.  (Id.

at 1436, 1477).  On cross-examination, Whatley re-enacted the crime in front of

---

[28] Whatley admitted in his testimony that he fired one shot inside the store that hit
the counter in front of where Tommy Bunn was laying and behind which Allen
was standing.

the jury.  (<u>Id.</u> at 1478-81).  The shackles he was wearing, which previously were not visible to the jury, were visible during the re-enactment.  (<u>Id.</u>).

No evidence of Whatley's psychological or mental health issues was presented to the jury during the penalty phase of his trial.[29]

The jury sentenced Whatley to death on his malice murder conviction. <u>Whatley</u>, 509 S.E.2d at 48 n.1.

At the state habeas proceeding, the mitigating evidence presented was broader, more extensive, and different from that presented during sentencing.  The evidence specifically addressed various aspect of Whatley's background and upbringing, the nature of his social and family relationships, and his mental health and psychological history, characteristics, and problems, little of which was presented to the jury during the penalty phase.

Affidavits and testimony were presented from a number of people who knew Whatley and who, if called at his sentencing, could have testified about significant events in Whatley's life while living with his relatives in Griffin that impacted his long-term psychological and mental health and other information which could account for Whatley's behavior, or at least inform an evaluation of it.

---

[29] Whatley's comments to the examining psychologist, Dr. Bailey-Smith, for the court-ordered mental health examination were used by the State during its cross-examination of Whatley during the penalty phase.

Several of Whatley's family members and friends submitted affidavits testifying about Whatley's background and upbringing, including that Whatley had a bad relationship with his mother, that he had a regrettable childhood because he was raised, in part, by an abusive alcoholic uncle, and that he was exposed to various forms of mental illness and abuse, including forms of sexual abuse, throughout his childhood.  (See Pet'r's Habeas Court Exs. 5-8, 10, 12-15, 18, 20-21).  Other individuals submitted affidavits testifying that they observed Whatley express remorse for Allen's killing, including when he learned of Allen's death.  (See Pet'r's Habeas Court Exs. 9, 16-17, 24).  Some who testified at the sentencing indicated that they felt unprepared to testify because Mostiler failed to meet with them individually or go over their testimony—he simply addressed them all once as a group and advised them to "say nice things" about Whatley.  (See Pet'r's Habeas Court Exs. 8-9, 12, 14-18).  Those who did not testify at the sentencing stated that they would have if Mostiler had asked them to.  (See Pet'r's Habeas Court Exs. 5, 7, 10-11, 13, 20).

Additional evidence of Whatley's remorse upon learning of the death of Allen was also presented.  (See Pet'r's Habeas Court Exs. 9, 16-17, 23-24, 56).  Jason Jackson, who was incarcerated for nine months in the Spalding County Jail with Whatley prior to his trial, testified in an affidavit that Whatley had remorse at

the death of Allen.  (Pet'r's Habeas Court Ex. 23).  Mostiler never talked to him

about Whatley.  (Id.).  Bridgette Bridges, who was employed as a guard at the

Spalding County Jail while Whatley was incarcerated there after his arrest, testified

in an affidavit that she treated Whatley's wounds after he was first admitted to the

jail and that Whatley told her that he was high on drugs when he murdered Ed

Allen, testifying further that Whatley expressed remorse when he learned that

Allen had died.  (Pet'r's Habeas Court Ex. 56).  Bridges stated that if she had been

asked by Mostiler, she would have told him this information and that she could

have been a helpful witness at trial.  (Id.).

Whatley also presented an affidavit from Watson, the Offender Division

Program Developer from Washington, D.C.  (Pet'r's Habeas Court Ex. 4).  Watson

discussed his knowledge of Whatley's background based on his having worked

with him in the District of Columbia after his criminal convictions.  (Id.).  Watson

explained the steps taken to obtain evaluations of Whatley by a neuropsychologist,

to get him treatment, and to put him on the path to a successful future.  (Id.).

Watson discussed his interactions with Mostiler and stated that Mostiler's

characterizations of their contacts and the duration of the discussions in Mostiler's

billing records are inaccurate.  (Id.).  Watson expressed his belief that Mostiler did

not have a theory for his case in mitigation and that he was first contacted in

December 1996 by Mostiler's investigator.  (Id.).  Watson testified that he did not

talk to Mostiler until the first week of January, after the trial had started.  (Id.).

Watson stated his opinion that the defense case in mitigation was a "charade" and

that "[i]t was clear that Mr. Mostiler had not prepared for the sentencing phase and

was just throwing witnesses up so it looked like there was a mitigation case being

presented."  (Id.).  Watson asserted further that Mostiler did not ask for, and he did

not provide him with, any documents in his possession from Washington, D.C., to

include the 1988 Reports.  (Id.).

There was significant evidence offered about Whatley's psychological issues

and mental health during the state habeas proceeding.  Whatley presented a

transcript of the deposition of Dr. Bailey-Smith, the examining psychiatrist for

Whatley's court-ordered psychological evaluation following the murder of Ed

Allen.  (Pet'r's Habeas Court Ex. 1).  Dr. Bailey-Smith testified in her deposition

that if Mostiler had called her to discuss mitigating evidence, she would have

provided information about Whatley and how there were areas in his psychological

background that merited further investigation.  (Id.).  The results of Whatley's pre-

trial, court-ordered psychiatric examinations by Drs. Bailey-Smith and Fahey were

attached to the deposition transcript.  (Id.).

Whatley also introduced copies of the 1988 Reports and presented the affidavit of Richard G. Dudley, Jr., M.D.  (Pet'r's Habeas Court Ex. 2).  Dr. Dudley is a New York psychiatrist who examined Whatley following his conviction and sentencing.  (Id.).  His evaluation included a review of relevant documents pertaining to Whatley and his background.  (Id.).  Dr. Dudley documented an abusive and troubling upbringing.  (Id.).  He presented a picture of a troubled young man with mental health issues.  (Id.).  He noted that the 1988 psychological evaluation of Whatley that was done as part of the District of Columbia Department of Corrections and Youth Study showed evidence of "symptoms of schizophrenia" and the 1997 Court Report noted "significant psychopathology."  (Id.).  Dr. Dudley concluded that there are grave concerns regarding whether Whatley was competent to stand trial, that his history and mental disorders offer an explanation for his conduct, and that Whatley's mental capacity at the time of the offense may have been substantially diminished.  (Id.).

Whatley also presented the affidavit of Dr. David Lisak, a clinical psychologist from Massachusetts who also examined Whatley.  (Pet'r's Habeas Court Ex. 3).  Dr. Lisak's findings and conclusions mirror those of Dr. Dudley, but

provide a more in-depth analysis of Whatley's background and that Whatley was

the victim of male sexual abuse.  (Id.).[30]

Respondent presented evidence[31] during the state habeas hearing that it

argues supports that Whatley's counsel conducted a thorough background

investigation, engaged in substantive motions practice, received information from

the State about his background and prior convictions, subpoenaed numerous

witnesses to potentially testify (to include Drs. Fahey and Bailey-Smith), and made

deliberate strategic decisions in the presentation of his mitigation case.[32]

---

[30] The Court considers the affidavits of Drs. Dudley and Lisak as examples of the
kind of independent evaluation that was not requested by Mostiler and the type of
information that could be presented to a jury in a death penalty sentencing phase
and for use in evaluating the prejudice suffered by Whatley based on Mostiler's
inadequate investigation in this case.

[31] Mostiler's death, before the state habeas proceedings were conducted, denied the
state habeas court, the Supreme Court of Georgia, and this Court of Mostiler's
explanation for his investigation decisions and why he made the mitigation
presentation decisions that he did.

[32] The Court notes that the state courts reached a variety of conclusions about trial
counsel's conduct based on information provided by investigator Yarbrough.
These findings did not critically evaluate the nature and uncertainty of Yarbrough's
testimony.  The Court notes, as it did previously in this Order (see footnote 15),
that many of the responses by Yarbrough to questions about Mostiler's rationale
for certain strategic decisions were based on Yarbrough's recollection of the case
and his attempt to interpret what Mostiler may have done and may have decided
based on his past experiences working with him.  For obvious reasons,
Yarbrough's recollection was poor and, to the extent he tried to provide
interpretive information, it was prompted by leading questions which, even then,
resulted in unspecific, speculative answers.  The Court finds that Yarbrough's
testimony does not discredit the undisputed fact that, prior to trial, Mostiler did not

g) <u>Whether there is a reasonable probability that one member of the jury would have voted for life</u>

The evidence presented to the state habeas court establishes that if Mostiler had conducted an adequate investigation and obtained the significant information about Whatley's social history and mental health that was available, the jury would have learned about a number of significant, compelling mitigating circumstances in Whatley's life and they would have been provided a complete picture of the adverse circumstances that affected Whatley's conduct, behavior, and mental and psychological health.  <u>See, e.g.</u>, <u>Wiggins</u>, 539 U.S. at 534-37 (powerful mitigating evidence included physical abuse, sexual molestation, homelessness, diminished mental capabilities, and having an absentee mother with substance abuse problems); <u>Williams</u>, 529 U.S. at 397-98.  Although mental health and psychological evidence may be a double-edged sword that can work against a defendant during a sentencing proceeding, the information presented before the state habeas court does not suggest an enhanced risk of dangerousness to others or that Whatley was irretrievably broken.  <u>See</u> <u>Evans</u>, 703 F.3d at 1328-29.  The mitigating evidence regarding Whatley's background and mental health presented

---

obtain the 1988 Reports, did not have Whatley examined by an independent mental health expert, and did not conduct any other mental or psychological health evaluation such that the investigation into this aspect of Whatley's life was constitutionally inadequate under <u>Strickland</u>.  <u>See</u> <u>Strickland</u>, 466 U.S. at 687; <u>Evans</u>, 703 F.3d at 1325-26.

to the state habeas court that was not available to the sentencing jury focuses on how Whatley's mental health issues, drug abuse, and upbringing affected his conduct and perception of events and people.  The 1988 Reports support that he is intelligent, subject to being rehabilitated, was not a lost cause, and had mental and social environmental influences and events that would cause a reasonable jury to conclude the death penalty should not be imposed.

The Court finds that in reweighing the evidence in aggravation against the totality of available mitigating evidence, from both the sentencing phase at trial and from the state habeas proceedings, there is a reasonable probability that one member of the jury would have voted for life instead of death.  See, e.g., Wiggins, 539 U.S. at 534, 537; Williams, 529 U.S. at 397-98 ("[T]he graphic description of [petitioner's] childhood, filled with abuse and privation . . . might well have influenced the jury's appraisal of his moral culpability.").  That is, the jury would not have sentenced Whatley to death if Mostiler had conducted an adequate investigation of his background and mental health issues.  See, e.g., Wiggins, 539 U.S. at 534, 536-38; Williams, 529 U.S. at 397-98.[33]

The Court thus finds that the Supreme Court of Georgia's decision regarding Whatley's claim of ineffective assistance of counsel based on an inadequate

---

[33]  An adequate investigation was the necessary first step to developing a penalty-phase strategy.  See Wiggins, 539 U.S. at 534, 537; Williams, 529 U.S. at 397-98.

background investigation "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" and "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1), (2); see also Wiggins, 539 U.S. at 520-21, 537; Williams, 529 U.S. at 379, 385, 397-98.  The Court further finds that Whatley was prejudiced by the ineffective assistance of his counsel including because counsel's investigation was constitutionally inadequate and did not allow an effective penalty-phase strategy to be developed, and denied the jury of information that had a reasonable probability of producing a different sentencing result.  Whatley thus is entitled to relief on his ineffective assistance of counsel claim based on a failure by Mostiler to conduct an adequate investigation, and his death sentence is required to be vacated.

> b.  Claim IX, Subpart B – Petitioner's claim that his trial counsel provided ineffective assistance of counsel in mishandling requests for mental health experts

Whatley's claim regarding the mishandling of requests for mental health experts is that his counsel was constitutionally ineffective in failing to renew a motion to retain, and in failing to present testimony from, a mental health expert. (See Pet'r's Br. in Supp. of Pet. at 117-18; Pet. for Writ of Habeas Corpus ¶¶ 142-

47); see also Ake v. Oklahoma, 470 U.S. 68 (1985).  Because Whatley bases his

claim upon the decisions of his counsel and not a denial of a request for assistance

by the trial court, this claim also is required to be evaluated under Strickland.

i.   State court adjudication

Regarding Whatley's claim that his trial counsel was constitutionally

ineffective in his handling of requests for mental health experts, the Supreme Court

of Georgia stated:

> Whatley also argues that trial counsel rendered ineffective assistance
> in his preparation and use of new mental health evidence.  Counsel
> initially sought funds from the trial court to obtain his own mental
> health expert.  The trial court authorized an initial examination of
> Whatley by psychologists working for the state mental hospital, Dr.
> Karen Bailey-Smith and Dr. Margaret Fahey.  Counsel received two
> written reports from the evaluation.  Dr. Bailey-Smith gave
> inconsistent testimony in the habeas proceedings, the balance of
> which suggested that she possibly spoke with trial counsel but that she
> could not specifically recall doing so.  The defense investigator
> testified that counsel did communicate with Dr. Bailey-Smith after
> reviewing her report, and it is clear that counsel did receive a copy of
> her report.  Thus, the evidence supports the habeas court's finding of
> fact that counsel did communicate with Dr. Bailey-Smith.  Whatley
> faults trial counsel for not providing Dr. Bailey-Smith the mental
> health evaluations performed in the District of Columbia as a result of
> his criminal proceedings there; however, she testified in the habeas
> hearing that they would not have changed her expert opinions if she
> had seen them pre-trial and, therefore, counsel's use of her report
> would not have been affected by his alleged failure to obtain the
> records either in a timely fashion or at all.  Dr. Bailey-Smith's report
> did note that Whatley's MMPI-2, a personality inventory, "was
> suggestive of . . . significant psychopathology" and that Whatley used
> some "idiosyncratic" words.  However, she never concluded that he

83

suffered from psychosis, and, in fact, she testified at the habeas hearing that she "didn't think he had any delusional thoughts" but merely had "some thought patterns that we thought were different and bordered delusional thinking."  Furthermore, her report's description of the possible "psychopathology" suggested that Whatley merely had a "boastful and egocentric" attitude and that he had a "form of magical thinking" characterized merely by a belief that he was "unique and special" and had "unique and special powers" to influence others.  The diagnostic impression set out in her report contained hints of mitigation, but overall it could have been more aggravating than mitigating.  That diagnosis was as follows: "Rule Out [i.e., there are some signs of but not enough to reach a diagnosis of] Bipolar Disorder" and "Personality Disorder NOS [not otherwise specified] with antisocial, borderline, narcissistic, and schizotypal features."

As we noted above, counsel's use at trial of Dr. Bailey-Smith's report would not have been affected if counsel had not failed, as Whatley alleges, to obtain the records from mental health evaluations performed in the District of Columbia as a result of his criminal proceedings.  We further conclude as a matter of law that the failure of trial counsel to present the records directly to the trial court in a renewed motion for Whatley's own expert did not result in significant prejudice to his ability to prevail on that motion.  The evaluations described in those records had been conducted more than eight years before Dr. Bailey-Smith's, and they reached conclusions similar to, and in some respects less favorable than, the conclusions reached in Dr. Bailey-Smith's report.  For example, although the older evaluations referred to Whatley as "evidenc[ing] symptoms of schizophrenia," those symptoms are described in the reports as arising from Whatley's use of illegal drugs.

Whatley also argues that trial counsel performed deficiently in failing to cite certain case law or to request an ex parte hearing in support of his motion for a defense expert.  Even assuming counsel performed deficiently in these respects, we conclude that Whatley's motion for his own expert was not prejudiced by those deficiencies.

> In light of the foregoing discussion, we conclude as a matter of law
> that, even given the deficiencies in counsel's performance that we
> have assumed in our discussion above, Whatley's defense was not
> prejudiced.  This is true because, even if counsel had performed in the
> manner Whatley now says he should have, counsel still would
> reasonably have declined to renew Whatley's motion for his own
> mental health expert and because the trial court would have properly
> denied such a renewed motion if it had been made.

Whatley, 668 S.E.2d at 662-63 (footnotes and internal citation omitted).

ii.     Review of the state court adjudication

Mostiler made his mental health expert assistance determinations based on

the results of state-provided, pre-trial mental health evaluations and his initial

investigation into Whatley's background.  The diagnostic impressions by Dr.

Bailey-Smith in Whatley's pre-trial mental health evaluation did not conclude that

he suffered from psychosis, but contained information, as recounted above, that

contained significant mitigating evidence.  Based on the results of Dr. Bailey-

Smith's evaluation of Whatley, and it having discounted the existence of a trial

defense based on a lack of *mens rea*, Mostiler did not pursue a further mental

examination of his client by renewing his motion for expert assistance.  See Ake,

470 U.S. at 82-83 (government-provided mental health expert warranted "when a

defendant demonstrates to the trial judge that his sanity at the time of the offense is

to be a significant factor at trial"); McClain, 552 F.3d at 1253 ("The relevant

question is not what actually motivated counsel, but what reasonably could have motivated counsel.").

The Court concluded that Mostiler failed to adequately investigate Whatley's background and mental and psychological health and should have conducted further inquiry by retaining the services of an independent psychological or other expert and ensuring he received Whatley's prior psychological records.  The ineffective assistance claim presented here is based on a failure to renew a motion.  A decision by Mostiler to forgo further inquiry into Whatley's mental health by not renewing his request for expert assistance occurred after Mostiler received the pre-trial mental health evaluations from Drs. Bailey-Smith and Fahey.  There are no grounds to support a request for further evaluation under Ake or state law.[34]  See Ake, 470 U.S. at 83 (where petitioner's competence to stand trial is not in question, no constitutional right to a psychiatrist of own choosing or funds to hire one); Hightower v. Schofield, 365 F.3d 1008, 1015, 1026 (11th Cir. 2004), vacated other grounds, 545 U.S. 1124 (2005); Medina v. Singletary, 59 F.3d 1095, 1107 (11th Cir. 1995); Brockman v. State, —S.E.2d —, No. S12P1490, 2013 WL 776589, at *6 (Ga. Mar. 4, 2013); Bright v. State, 455

---

[34] This request is not reasonably interpreted as a general request for an independent psychological evaluation for mitigation purposes but to request the kind of evaluation which the state court agreed to conduct and which was conducted by Drs. Bailey-Smith and Fahey.

S.E.2d 37, 46-47, 50-51 (Ga. 1995) (indigent defendant has burden of showing,
with reasonable degree of precision, how capacity to understand wrongfulness of
conduct would be a significant and critical issue during penalty phase in order to
obtain expert mental health assistance to help prepare case in mitigation).

Mostiler's decision not to renew a motion for expert assistance is entitled to
a presumption that it was "within the wide range of reasonable professional
assistance." Strickland, 466 U.S. at 689. Whatley did not rely upon a *mens rea*
defense and there were no competency issues identified in the Court Report. Thus,
it was not unreasonable for Mostiler to determine that renewal of his motion for a
mental health expert was not necessary or warranted. See McClain, 552 F.3d at
1253; Holladay v. Haley, 209 F.3d 1243, 1250 (11th Cir. 2000) (quoting
Strickland, 466 U.S. at 691) ("[T]he choice not to seek out such an evaluation is a
tactical decision, which 'must be directly assessed for reasonableness in all the
circumstances, applying a heavy measure of deference to counsel's judgment.'").
The Court is unable to conclude that Mostiler committed "acts or omissions [that]
were outside the wide range of professionally competent assistance" by failing to
renew his motion for a mental health evaluation after receiving the results of
Whatley's pre-trial psychological evaluations and considering the futility of that

request under <u>Ake</u> and governing state-law standards.  <u>See</u> <u>Strickland</u>, 466 U.S. at 690.

Assuming, as did the Supreme Court of Georgia, that Mostiler exhibited unprofessional judgment errors in not renewing a motion for a mental health expert, the Court further concludes that there is no "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" during the guilt or penalty phase.  Had Mostiler renewed his motion for mental health expert assistance after receiving the pre-trial mental health evaluation reports or the 1988 Reports, relied on controlling applicable case law in his renewed motion, required further examination by someone Whatley chose, or sought an *ex parte* hearing on any renewed motion, there is no reasonable likelihood that his motion to be provided funds for further assistance by mental health experts would have been granted by the trial court because there was an absence of information indicating that Whatley suffered from a specified mental illness, that Whatley's capacity to understand wrongfulness of conduct was impaired, or that there were other questions of competency sufficient to justify granting his request.  <u>See</u> <u>Ake</u>, 470 U.S. at 83 (where petitioner's competence to stand trial is not in question, no constitutional right to psychiatrist of own choosing

or funds to hire one); <u>Hightower</u>, 365 F.3d at 1015, 1026; <u>Medina</u>, 59 F.3d at 1107;

<u>Brockman</u>, 2013 WL 776589, at *6; <u>Bright</u>, 455 S.E.2d at 46-47, 50-51.

The Court does not find that the Supreme Court of Georgia's decision

regarding Whatley's claims of ineffective assistance of counsel based on

Mostiler's failure to renew a mental health expert request "was contrary to, or

involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States," "was based on an

unreasonable determination of the facts in light of the evidence presented in the

State court proceeding," or that Whatley was prejudiced by Mostiler's failure to

renew this request.  28 U.S.C. § 2254(d)(1), (2); <u>see also</u> <u>Wiggins</u>, 539 U.S. at 520-

21; <u>Williams</u>, 529 U.S. at 379, 385.  Whatley is not entitled to relief on his

ineffective assistance of counsel claim based on a failure by Mostiler to renew his

request for a further mental health evaluation.

       c. Claim IX, Subpart C – Petitioner's claim that his trial
          counsel provided ineffective assistance of counsel in
          failing to object to his unwarranted and improper visible
          shackling during the penalty phase of his trial

Whatley's claim is not that his substantive constitutional rights were violated

by his being visibly shackled during the penalty phase of his trial, but that his

counsel was constitutionally ineffective for failing to object to his being visibly

shackled during the penalty phase of his trial.[35]  The ineffective assistance of

counsel standards established by Strickland apply to this claim.

Under Strickland's deferential standard, a court must first determine

"whether, in light of all the circumstances, the identified acts or omissions [of

counsel] were outside the wide range of professionally competent assistance."

Strickland, 466 U.S. at 690.  "Judicial scrutiny of counsel's performance must be

highly deferential. . . . [A] court must indulge a strong presumption that counsel's

conduct falls within the wide range of reasonable professional assistance."  Id. at

689.  Courts "must avoid second-guessing counsel's performance," recognizing

that "the Petitioner's burden of persuasion—though the presumption is not

insurmountable—is a heavy one."  Chandler, 218 F.3d at 1314.

Second, the "defendant must show that there is a reasonable probability that,

but for counsel's unprofessional errors, the result of the proceeding would have

been different.  A reasonable probability is a probability sufficient to undermine

confidence in the outcome."  Strickland, 466 U.S. at 694; see also Allen, 611 F.3d

at 751.  The court may "dispose of [the] ineffectiveness [claim] on either of its two

---

[35] See Deck v. Missouri, 544 U.S. 622, 624 (2005) ("[T]he Constitution forbids the
use of visible shackles during the penalty phase, as it forbids their use during the
guilt phase, *unless* that use is 'justified by an essential state interest'—such as the
interest in courtroom security—specific to the defendant on trial.") (quoting
Holbrook v. Flynn, 474 U.S. 560, 568-69 (1986)).

grounds."  <u>Atkins</u>, 965 F.2d at 959; <u>see also</u> <u>Strickland</u>, 466 U.S. at 697 ("[T]here

is no reason for a court deciding an ineffective assistance claim . . . to address both

components of the inquiry if the defendant makes an insufficient showing on

one.").

i.    State court adjudication

The Supreme Court of Georgia made the following determination regarding

Whatley's claim that his counsel provided ineffective assistance of counsel by

failing to object to his being visibly shackled before the jury during the penalty

phase of his trial:

> Whatley argues that his trial counsel rendered ineffective assistance
> by failing to object to his being placed in visible shackles during the
> sentencing phase, including during his physical demonstration of his
> version of events for the jury.  The Supreme Court of the United
> States decided in 2005, well after Whatley's trial and direct appeal,
> that visibly shackling a defendant during the sentencing phase is
> unconstitutional unless the record shows "'an essential state interest'-
> such as the interest in courtroom security-specific to the defendant on
> trial."  The Warden argues that counsel should not be regarded as
> having performed deficiently by failing to object to the shackling,
> because the practice had not yet been established as unconstitutional.
> However, at the time of Whatley's trial, this Court had already
> strongly suggested in dictum that it was unconstitutional to place
> visible shackles on a death penalty defendant during the sentencing
> phase without a showing of particular need.  We therefore assume, at
> least for the purpose of this discussion, that trial counsel performed
> deficiently in failing to recognize the legal basis for an objection to
> visible shackling in the sentencing phase.

> On direct appeal where unconstitutional shackling has occurred, there is a presumption of harm that can be overcome only upon a showing by the State that the shackling was harmless beyond a reasonable doubt.  However, where, as here, the issue is the ineffective assistance of trial counsel in failing to object to such shackling, the petitioner is entitled to relief only if he or she can show that there is a reasonable probability that the shackling affected the outcome of the trial.  In view of the balance of the evidence presented at his trial, we conclude as a matter of law that Whatley cannot show that his trial counsel's failure to object to his shackling in the sentencing phase in reasonable probability affected the jury's selection of a sentence.

Whatley, 668 S.E.2d at 663 (footnotes omitted).

                        ii.     Review of the state court adjudication

The Court finds that Whatley's counsel did not render constitutionally ineffective assistance of counsel by failing to object to Whatley being seen in shackles by the jury after he had been convicted.

Whatley's counsel could have had a number of valid reasons for declining to object to his client being seen in restraints during the penalty phase of his trial and the Court, avoiding a "second-guessing [of] counsel's performance," presumes that Mostiler's decisions fell "within the wide range of reasonable professional assistance" expected of a trial counsel.  See Chandler, 218 F.3d at 1314 & n.15 (quoting Strickland, 466 U.S. at 689); see also McClain, 552 F.3d at 1253.  On the facts of this case, the Court concludes that Whatley's counsel's decision in 1997—before the Supreme Court determined that visible shackling was unjustified absent

a state interest specific to a particular trial[36]—not to object to Whatley's visible

shackling was not a professional error that fell "outside the wide range of

professionally competent assistance."  See Strickland, 466 U.S. at 690; see also

Deck, 544 U.S. at 624.  The Court also concludes that there is no presumption of

prejudice from the visible shackling, based on an ineffective assistance or due

process claim, because Whatley was given an opportunity to object and declined to

do so.  See Moon v. Head, 285 F.3d 1301, 1317 (11th Cir. 2002); Holladay,

209 F.3d at 1255 (citing Elledge v. Dugger, 823 F.2d 1439, 1452 (11th Cir. 1987),

withdrawn in part on other grounds, 833 F.2d 250 (11th Cir. 1987) (per curiam));

(Resp't Ex. 13A at 1412).[37]

    In evaluating whether there is a reasonable probability that the result of the

proceeding would have been different if Whatley's counsel had objected, the Court

notes that Whatley was seen in restraints during the penalty phase of his trial while

testifying and reenacting, before the jury, Allen's murder, which implicates an

---

[36] The Supreme Court of Georgia had suggested visible shackling should not occur.
See Moon v. State, 375 S.E.2d 442, 449 (Ga. 1988).

[37] The Court notes that Petitioner is incorrect in asserting that "had counsel
objected at trial, the result of Petitioner's appeal would have been different."
(Pet'r's Br. in Supp. of Pet. at 89).  Elledge v. Dugger, upon which Petitioner relies
for that proposition, found reversible error where a petitioner was not afforded an
opportunity to object or respond to the imposition of visible shackles.  See
Holladay, 209 F.3d at 1255 (citing Elledge, 823 F.2d at 1452).  Here, Petitioner
was given an opportunity to object and he did not do so.  (Resp't Ex. 13A at
1412).

interest in jury and courtroom security —an essential state interest.  Considering the evidence that was introduced at trial, the jury's implicit rejection of Whatley's claim that Allen shot at him first, the State's case in aggravation during the penalty phase, and that there was some support for a need to protect the jury during the reenactment, the Court is unable to conclude—even if there were unprofessional errors by his counsel—that there is a reasonable probability that Whatley would have received a sentence other than death had Whatley's counsel objected to his being seen in shackles.

The Court does not find that the Supreme Court of Georgia's decision regarding Whatley's claim of ineffective assistance of counsel based on a failure to object to shackling disclosed during a reenactment "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," or that Whatley was prejudiced by Mostiler's failure to object to Whatley's visible shackling.  See 28 U.S.C. § 2254(d)(1), (2); see also Wiggins, 539 U.S. at 520-21; Williams, 529 U.S. at 379, 385.  Whatley is not entitled to relief on his ineffective assistance of counsel claim based on a failure by Mostiler to object to his visible shackling during the penalty phase of his trial.

      d. Claim IX, Subpart D – Petitioner's claim that his trial counsel provided ineffective assistance of counsel in failing to obtain the assistance of a ballistics expert and for failing to file a proper motion for a ballistics expert

Like Whatley's claims of error regarding counsel's failure to conduct an adequate investigation, to obtain mental health experts, or to object to Whatley's visible shackling, Whatley's claim of ineffective assistance of counsel in failing to retain and present testimony from an independent ballistics expert is also required to be evaluated under Strickland.

      i. State court adjudication

The Supreme Court of Georgia, in reviewing Whatley's ineffective assistance claim based on his trial counsel's failure to obtain an independent ballistics expert, stated:

> Finally, Whatley argues that his trial counsel rendered ineffective assistance by failing to obtain funds for a ballistics expert.  In support of his argument, Whatley cites the affidavit testimony of an expert witness opining that the evidence in Whatley's case is inconsistent with Whatley's having fired downward toward Tommy Bunn, that it would have been "virtually impossible" for the bullet that struck the service counter to have deflected upward and struck the ceiling, and that the gunshot wound to Ed Allen's chest from a range of 15 to 18 inches could have been inflicted after Allen had stepped over Bunn and had gone around the service counter pursuing Whatley.  The habeas court filed an order striking the affidavit, among others, because it was filed without authorization after the close of the evidentiary hearing.

The affidavit alleges that the gunpowder residue pattern associated with the bullet mark on the service counter demonstrates that the bullet was traveling on a trajectory somewhat level with the floor, not sharply downward toward Tommy Bunn.  However, this testimony, coupled with the still-uncontradicted trial testimony showing that the bullet that struck the counter very close to Allen's position was fired from a range of approximately eight inches, would have led the jury to conclude, at the most, that the shot was intended for Allen and was fired at very close range before Whatley had retreated from the counter.  The affidavit's assertions that the shot that struck the counter could not have also struck the ceiling and that the shot to Allen's chest could have been inflicted as Whatley was exiting and being pursued fail to shed light on the question of whether Whatley fired his pistol before Allen armed himself, particularly given the fact that Whatley fired at least one shot in the direction of either Allen or Bunn from a distance of only eight inches from the counter.  Thus, even assuming trial counsel should have obtained expert testimony like that contained in the affidavit, we conclude as a matter of law that Whatley's defense did not, by his being deprived of such testimony at trial, suffer prejudice sufficient to support his ineffective assistance claim.  Accordingly, even assuming the habeas court erred in refusing to consider Whatley's untimely affidavit, such error would be harmless.

Whatley, 668 S.E.2d at 664 (footnote omitted).

ii.    Review of the state court adjudication

Mostiler's initial decision to seek an expert in ballistics was premised on a possibility that someone other than Whatley may have committed the murder of Ed Allen.[38]  That Whatley's counsel did not further pursue his motion is not an

---

[38] The Supreme Court of Georgia limited its review to the evidence before the state habeas court and did not consider Petitioner's ballistics expert affidavit (the "Fite Affidavit") as part of the record in its resolution of his claim on merits.  Although the Supreme Court of Georgia assumed the assertions in the affidavit *arguendo* in

unprofessional error where it likely, and quickly, became clear based on a review of the State's evidence that Whatley was the person who shot and killed Ed Allen. See McClain, 552 F.3d at 1253. The decisions regarding whether to pursue independent ballistics expert assistance are, inherently, the sort of tactical and strategic decisions of counsel that, under Strickland's deferential standards, should not be second guessed unless that decision was so "patently unreasonable that no competent attorney would have chosen it." Kelly v. United States, 820 F.2d 1173, 1176 (11th Cir. 1987) (per curiam) (quoting Adams v. Wainwright, 709 F.2d 1443, 1445 (11th Cir. 1983) (per curiam)); see also Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995). The Court is unable to conclude here that Mostiler's decision not to retain and present testimony from an independent ballistics expert after determining that Whatley shot Allen is the sort of unprofessional error that falls "outside the wide range of professionally competent assistance." See Strickland, 466 U.S. at 690.

The Court is also unable to conclude that there is a reasonable probability that Whatley was prejudiced by the absence of an independent ballistics expert.

---

its resolution of Petitioner's claim, the Fite Affidavit was not made part of the record that was before the Supreme Court. This Court's review under Section 2254 is similarly limited to the record before the Supreme Court of Georgia and the Fite Affidavit will not be considered. See Grim v. Sec'y, Fla. Dep't of Corrs., 705 F.3d 1284, 1286 n.3 (11th Cir. 2013) (per curiam).

The Supreme Court of Georgia noted the information in the Fite Affidavit, which is not part of the state habeas record, does not support Whatley's alternative theory that he only shot Allen after Allen shot at him and does not call into question the uncontradicted trial testimony showing that the gunshots fired into the counter in front of Allen were fired from a range of eight inches—which supports that Whatley shot at Bunn and that Allen was shot and killed at close range by Whatley before Allen had the opportunity to retrieve his gun and pursue Whatley out of the bait shop.[39]

The Court does not find that the Supreme Court of Georgia's decision regarding Whatley's claim of ineffective assistance of counsel based on a failure to retain and present testimony from an independent ballistics expert "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," or that Whatley was prejudiced by Mostiler's failure to retain and present testimony from an independent ballistics expert.  See 28 U.S.C.

---

[39] Petitioner's argument regarding the inadmissible, extra-record information in the Fite Affidavit about a "bullet impact area" around the frame of the door to the bait shop is consistent with the facts found by the state court that there was an exchange of gunfire between Whatley and Allen after Allen was shot and Whatley was fleeing the scene of the crime.  See Whatley, 668 S.E.2d at 664; (Resp't's Ex. 52A).

§ 2254(d)(1), (2); see also Wiggins, 539 U.S. at 520-21; Williams, 529 U.S. at 379,

385.  Whatley is not entitled to relief on his ineffective assistance of counsel claim

based on a failure by Mostiler to retain and present testimony from an independent

ballistics expert.

> 3.  *Claim VII – Ineffective assistance of counsel should be presumed under the rule of* United States v. Cronic *because his trial counsel's caseload rendered the adversarial process meaningless*

Under United States v. Cronic, a defendant may demonstrate ineffective

assistance of counsel that renders the adversarial process meaningless where it is

shown that "although counsel is available to assist the accused during trial, the

likelihood that any lawyer, even a fully competent one, could provide effective

assistance is so small that a presumption of prejudice is appropriate without inquiry

into the actual conduct of the trial."  466 U.S. at 659-60.  The circumstances under

which prejudice is presumed are "very narrow" and the burden on a petitioner to

demonstrate prejudice under Cronic is "a very heavy one."  See Stano v. Dugger,

921 F.2d 1125, 1153 (11th Cir. 1991).[40]  Whatley asserts that his trial counsel's

---

[40] The narrow circumstances where a presumption of prejudice may be found to exist include: (i) a denial of counsel; (ii) various kinds of state interference with counsel's assistance; and, (iii) where counsel is burdened with an actual conflict of interest.  See Smith v. Robbins, 528 U.S. 259, 287 (2000).

"overwhelming caseload at the time of Mr. Whatley's trial created one of those

circumstances." (Pet'r's Br. in Supp. of Pet. at 30).

a. State court adjudication

The state habeas court made the following factual findings regarding

Whatley's legal representation:

> The petitioner was represented at trial and on appeal by Attorney
> Johnny Mostiler, the contract Public Defender for Spalding County.
> Mr. Mostiler had been admitted to practice law in Georgia since 1977.
> In 1990, under the direction of the Superior Court Judges of the
> Circuit and the Spalding County governing commission, Mr. Mostiler
> was engaged to serve as the Public Defender for that county, to
> provide, with assistance from other qualified attorneys, representation
> for indigent defendants. The contractor Mostiler, apparently received
> funding and, approval, or at least acquiescence, from the Indigent
> Defense Council for the State of Georgia. However, the contract
> between Mostiler and the county as Public Defender did not apply to
> "any case in which the State seeks the death penalty." Death Penalty
> cases involving indigent defendants were defended by attorneys
> (including Mr. Mostiler) individually and specifically appointed by a
> judge. Mr. Mostiler was appointed as defense counsel in this case on
> Feb. 7, 1995. He was an experienced criminal defense attorney and
> was prima facie presumed qualified to represent a person confronting
> the possibility of receiving a death sentence.
>
> Attorney Mostiler was generally well known and well regarded in the
> legal community and was professionally well regarded in the legal
> community in which he practiced. He was generally permitted an
> "open file" policy by the District Attorney's office on this and other
> cases. This meant that, by having access to the prosecution's files, he
> did not have to spend a great deal of time to determine what the
> prosecution's evidence was likely to be. Nevertheless he filed
> appropriate motions and demands to see that the defense was provided
> with the information compellable to be produced by the state.

(Resp't's Ex. 71 at 5-6).[41]

The Supreme Court of Georgia, applying the clearly established federal law in Cronic, made the following factual and legal determination regarding Whatley's claim that Mostiler's "heavy caseload as the contract defender for Spalding County" requires a presumptive finding of prejudice:

> In general, an ineffective assistance claim can succeed only where the prisoner can show actual prejudice to his or her defense that in reasonable probability changed the outcome of the trial. However, Whatley correctly notes that an exception to this general rule applies and prejudice will be presumed where,
>
> > although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial.
>
> An example of where such extreme circumstances existed is a case where the entire membership of the state bar had been appointed to defend racially vilified defendants in a highly emotional public setting, where it "'was a matter of speculation only'" whether *anyone* would actually represent the defendants at trial until the last moment, where "[n]o attempt was made to investigate . . . [and n]o opportunity to do so was given," and where the trial began "within a few moments after counsel for the first time charged with any degree of responsibility began to represent [the defendants]."
>
> Whatley asserts that, during the two-year period when his case was pending, Mostiler represented 70% of 1,558 felony defendants with

---

[41] Mostiler died shortly after the conclusion of Whatley's direct appeal. (Resp't's Ex. 71 at 26).

the remainder being represented by his associate, opened 70 civil cases, represented one murder defendant outside the county, and represented four death penalty defendants.  A review of the record reveals that Whatley's assertion may be somewhat exaggerated; however, more importantly, we find that his assertion regarding Mostiler's general caseload is irrelevant.  As was noted by the habeas court, it is the amount of time *actually* spent by Mostiler on Whatley's case that matters, not the number of other cases he might have had that *potentially* could have taken his time. The habeas court found that Mostiler was a highly experienced attorney, was experienced in death penalty cases, was appointed two years before Whatley's trial, and "spent over 157 hours on [Whatley's] case in addition to the 96 hours that his investigator logged."  The habeas court further noted with approval testimony by the defense investigator stating that it was likely that Mostiler's billing records under-represented the time he actually spent on the case.

The Eleventh Circuit recently addressed a similar claim regarding Mostiler's heavy caseload and its bearing on another death penalty case in which he was defense counsel.  Although the case was decided on procedural grounds, the Eleventh Circuit stated the following in dictum:

> As the district court found, Mostiler was an experienced and effective advocate for Osborne.  Osborne presented no evidence, other than vague statistics, to support his allegation that trial counsel's caseload impeded his representation.  As such, Osborne cannot show that Mostiler's representation fell below an objective standard of reasonableness such that prejudice is presumed.

We agree with the reasoning of the Eleventh Circuit that vague statistics that fail to shed light on the amount of work actually done in the particular case at issue are insufficient to show the kind of complete breakdown in representation necessary for prejudice to the defense to be presumed.

Whatley, 668 S.E.2d at 656-57 (alterations in original) (footnotes omitted).

b.  Review of the state court adjudication

Whatley's statistical analysis of the hours expended by Mostiler in preparing for Whatley's trial, and his claim that Mostiler's failure to spend the recommended amount of hours set forth by the American Bar Association constitutes a presumption of prejudice, fails to meet the heavy burden to demonstrate that Mostiler's performance rendered the adversarial process meaningless.  The Court agrees with the Eleventh Circuit and Supreme Court of Georgia that statistics regarding hours spent in preparation for trial or the number of cases assigned to a contract public defender are not alone sufficient to establish that a presumption of prejudice arises.  See Osborne, 466 F.3d at 1315 n.3; Whatley, 668 S.E.2d at 657. Here, it is undisputed that Mostiler spent more than 100 hours preparing for Whatley's trial, his investigator spent 96 hours assisting with his defense,[42] Mostiler challenged the State's evidence at trial through cross-examination, Mostiler presented opening and closing argument, and Mostiler presented evidence during the sentencing phase of Whatley's trial.[43]

---

[42] Trial counsel does not perform deficiently by delegating the mitigation investigation to his investigators and relying upon them to interview potential witnesses.  See Rhode v. Hall, 582 F.3d 1273, 1283 (11th Cir. 2009).

[43] The state habeas court made the following factual determinations:

> A review of the sentencing phase transcript showed that trial counsel called eleven witnesses to testify on Petitioner's behalf. . . .

The Court does not find that the Supreme Court of Georgia's decision regarding Whatley's claim of presumed prejudice "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," or that Whatley was prejudiced by Mostiler's heavy caseload.  See 28 U.S.C. § 2254(d)(1), (2); see also Wiggins, 539 U.S. at 520-21; Williams, 529 U.S. at 379, 385.  Whatley is not entitled to relief on his claim that there is a presumption of ineffective assistance of counsel under Cronic based on Mostiler's heavy caseload.

    4.    *Claim VIII – Trial counsel's caseload created an actual conflict of interest between Petitioner's rights and those of his counsel's other clients*

Where a defendant has a constitutional right to counsel, the Sixth Amendment right to representation is one that must be free from an actual conflict of interest.  See Wood v. Georgia, 450 U.S. 261, 271 (1981).  An actual conflict of

---

[T]he evidence [also] showed that counsel filed over twenty pretrial motions in this case, interviewed potential guilt phase and penalty witnesses in preparation for trial, examined the crime scene, and reviewed the State's investigative file.

(Resp't's Ex. 71 at 45, 62).

interest exists where a counsel's loyalties are divided and he is unable to pursue his client's interests "single-mindedly."  See id. at 271-72.  To demonstrate an actual conflict of interest, a petitioner "must show 'inconsistent interests and must demonstrate that the attorney made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other.'"  McConico v. Alabama, 919 F.2d 1543, 1546 (11th Cir. 1990) (quoting Smith v. White, 815 F.2d 1401, 1404 (11th Cir. 1987)).  An actual conflict of interest typically includes circumstances where a lawyer represents different parties or codefendants whose interests are in actual conflict.  See Wood, 450 U.S. at 267-72; Cuyler v. Sullivan, 446 U.S. 335, 345-48 (1980); Holloway v. Arkansas, 435 U.S. 475, 481 (1978) (citing Glasser v. United States, 315 U.S. 60 (1942)); McConico, 919 F.2d at 1546 n.2.

The existence of an actual conflict of interest is an exception to the general rule under Strickland that a criminal "defendant alleging a Sixth Amendment violation must demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" Mickens v. Taylor, 535 U.S. 162, 166 (2002) (citing Strickland, 466 U.S. at 694). Where a petitioner objects at trial to representation based on an actual conflict of interest, prejudice is presumed entitling a petitioner to an automatic reversal of his

conviction, unless the trial court determines that a conflict of interest in the representation does not exist.  See id. at 167-68.  Absent an objection by trial counsel to concurrent representation of parties or codefendants whose interests are in conflict, a petitioner "must demonstrate that 'a conflict of interest actually affected the adequacy of his representation.'"  See id. at 168 (quoting Cuyler, 446 U.S. at 348-49).

Whatley asserts that Mostiler was unable to pursue his rights with undivided loyalty free of an actual conflict of interest because:

> Trial counsel worked as the contract public defender for Spalding County at the time he represented Mr. Whatley.  Because the contract required counsel to accept far more cases than he could handle, Mr. Mostiler was forced to choose between defending the rights of Mr. Whatley and the rights of the many other clients to which he was assigned.

(Pet'r's Br. in Supp. of Pet. at 43).

### a.  State court adjudication

The Supreme Court of Georgia reviewed, and rejected, Whatley's claim that his "trial counsel was forced to choose between representing Whatley and representing counsel's other clients."  Whatley, 668 S.E.2d at 658.  The Supreme Court of Georgia stated:

> The Supreme Court [of the United States] has cast some doubt on Whatley's assertion that the alleged circumstances in his case should be considered under specialized Sixth Amendment conflict of interest

case law requiring presumptions of prejudice rather than under ordinary Sixth Amendment ineffective assistance of counsel case law, because Whatley's case is not a case involving the joint representation of co-defendants and because it appears not to be a case involving other factors that make prejudice both highly probable and exceptionally difficult to prove.  However, the discussion below shows that, even assuming that Whatley's allegation of a potential conflict of interest should be subjected to analysis under specialized Sixth Amendment conflict of interest case law, prejudice should not be presumed in his case, because he has not shown that an actual conflict of interest adversely affected his trial counsel's performance.

The Supreme Court has emphasized that a trial court should pay special attention to counsel when he or she attempts to satisfy the professional duty to notify the trial court that his or her representation might be compromised by a conflict of interest, and the Supreme Court has stated that it will apply "an automatic reversal rule" where counsel has announced the existence of a conflict of interest arising out of the joint representation of co-defendants "unless the trial court has determined that there is no conflict."  However, that particular automatic reversal rule clearly does not apply in Whatley's case, because there was no joint representation of co-defendants and no objection by counsel.

The Supreme Court has further held that, in general, other potential conflicts of interest may warrant a presumption of prejudice only if the defendant proves the existence of a conflict that "actually affected the adequacy of [counsel's] representation."  A trial court certainly bears a duty to inquire into a potential conflict of interest whenever "the trial court is aware of" circumstances creating more than "a vague, unspecified possibility of conflict."  However, the Supreme Court has held that a trial court's failure to inquire into the circumstances of a "potential conflict" does not relieve a prisoner of his or her duty to show on appeal that, in fact, a conflict existed that "adversely affected his [or her] counsel's performance."

As the discussion above highlights, Whatley has shown nothing more than "vague statistics[ ] to support his allegation that trial counsel's

> caseload impeded his representation." Given the time counsel
> actually dedicated to Whatley's case and the quality of representation
> that the record shows that counsel provided, Whatley's vague
> statistics are not sufficient to show the existence of an actual conflict
> of interest that adversely affected counsel's performance.
> Accordingly, Whatley is not entitled to any presumption that his
> defense suffered prejudice.

Id. (second, third, and fourth alterations in original) (footnotes omitted).

b. Review of the state court adjudication

Although Mostiler was the contract defender for Spalding County, it is undisputed that he did not have an actual conflict of interest based on his representation of co-defendants, witnesses, or other parties involved in Whatley's criminal case. Mostiler did not represent to the state trial court or Whatley that he believed his representation was compromised by his representation of other criminal defendants. Whatley did not identify any circumstance where an actual conflict of interest caused Mostiler to make "a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other." See McConico, 919 F.2d at 1546 (quoting Smith, 815 F.2d at 1404).

The Court concludes that Mostiler did not have an actual conflict of interest that affected his representation of Whatley. The fact that Mostiler had other clients to whom he owed obligations of professional representation did not affect, or

108

interfere with, his trial decisions or representation of Whatley in his criminal case. Whatley failed to demonstrate that Mostiler's representation of other criminal defendants adversely affected his performance in Whatley's case including because Mostiler effectively advocated for Whatley by challenging the State's evidence and presenting the jury with an alternative version of events suggesting that Whatley acted in self-defense after Allen armed himself with a firearm.[44]

The Court does not find that the Supreme Court of Georgia's decision regarding Whatley's claims of an actual conflict of interest "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," or that Whatley was prejudiced by any perceived conflict of interest.  See 28 U.S.C. § 2254(d)(1), (2); see also Wiggins, 539 U.S. at 520-21;

_____

[44] To the extent Petitioner argues that "[t]he trial court was plainly on notice" of a conflict of interest based on Mostiler's representation of other defendants as the Spalding County contract public defender, this argument is unfounded.  (Pet'r's Br. in Supp. of Pet. at 45).  A conflict of interest is not demonstrated by "a vague, unspecified possibility of conflict" or a speculative or hypothetical conflict.  See Mickens, 535 U.S. at 169; see also McConico, 919 F.2d at 1546.  The issue of a conflict of interest involving Mostiler's representation of Whatley was not raised and the trial court was not required to speculate regarding whether any such conflict existed.  See Mickens, 535 U.S. at 168-69.  Indeed, a possibility of a conflict "inheres in almost every instance" where an attorney represents multiple defendants.  See id.

<u>Williams</u>, 529 U.S. at 379, 386.  Whatley is not entitled to relief on his claim that that Mostiler was unable to pursue his rights with undivided loyalty free of an actual conflict of interest.

> 5. *Claim XI – Petitioner's claim that the prosecutor and other law enforcement personnel failed to disclose threats and payments to a witness, Rarlan Jackson, in violation of the Constitution and the rule of* <u>Giglio v. United States</u>

Whatley asserts there was a secret, undisclosed arrangement between the State and Rarland Jackson that violated the Constitution and violated the disclosure principles of <u>Giglio v. United States</u>, 405 U.S. 150 (1972).  Jackson testified at trial that Whatley had told him prior to the murder of Ed Allen that Whatley was planning on robbing a store in the vicinity of the bait shop, that Whatley asked him for a gun to use in the robbery, and that Whatley later admitted that he committed the robbery and had been shot in the process.  (Resp't's Ex. 11A at 998-1001).

Whatley asserts, based on affidavits admitted during the state habeas proceedings, "that: 1) the State[, through Sergeant Sanders of the Spalding County Sheriff's Department,] paid Mr. Jackson for his testimony; 2) the State threatened Mr. Jackson with prosecution if he did not testify in the manner that the prosecutor desired; and 3) Mr. Jackson changed his testimony in response to these threats." (Pet'r's Br. in Supp. of Pet. at 162).  In the state habeas court, Whatley supported this claim with affidavit testimony.  Jackson testified in the state habeas court that

his testimony at Whatley's trial was truthful and was not improperly influenced by the State.  (See Resp't's Ex. 39B at 142-209).

After reviewing the evidence presented in the state habeas proceedings, the state habeas court determined that Whatley's Giglio claim[45] was procedurally defaulted.[46]  (Resp't's Ex. 71 at 56-59).

---

[45] Under Giglio, the prosecution must turn over to the defense evidence in its possession or control which could impeach the credibility of an important prosecution witness.  United States v. Jordan, 316 F.3d 1215, 1226 & n.16 (11th Cir. 2003) (citing Giglio, 405 U.S. at 154).  This includes "any agreement, formal or informal, the prosecution has with a witness concerning criminal charges against that witness, and the failure to disclose such an agreement violates the due process requirements of Brady v. Maryland."  Childress v. State, 489 S.E.2d 799, 799 n.1 (Ga. 1997).  A failure to disclose information required by Giglio does not "automatically require a new trial," but requires one "only if the [undisclosed] evidence is material in the sense that its suppression undermines confidence in the outcome of the trial, i.e., 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  Owen v. State, 453 S.E.2d 728, 730-31 (Ga. 1995) (quoting Giglio, 405 U.S. at 154; United States v. Bagley, 473 U.S. 667, 676-78, 682 (1985)); see also United States v. Agurs, 427 U.S. 97, 109-10 (1976) ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense.").

[46] As with Petitioner's Brady claim, to the extent Petitioner asserts that Respondent waived the defense of a procedural default regarding his Giglio claim by failing to raise it in his Answer, the Court disagrees.  Respondent stated in his Answer that "Respondent expressly adopts and relies upon any findings made by the state courts as to the procedural default of any and all claims not timely raised at trial and on appeal as required by O.C.G.A. § 9-14-48(d)."  (Resp't's Answer at 11).  The state habeas court found this claim to have been procedurally defaulted.  (See Resp't's Ex. 71 at 56-57); see also Coleman, 501 U.S. at 735 n.1.

"[W]here the state court correctly applies a procedural default principle of state law to arrive at the conclusion that the petitioner's federal claims are barred, Sykes requires the federal court to respect the state court's decision."  Bailey, 172 F.3d at 1302 (citing Sykes, 433 U.S. at 72); see also Mincey, 206 F.3d at 1135-36 ("It is well-settled that federal habeas courts may not consider claims that have been defaulted in state court pursuant to an adequate and independent state procedural rule, unless the petitioner can show 'cause' for the default and resulting 'prejudice,' or 'a fundamental miscarriage of justice.'").  When a state court addresses the merits of a claim and also finds a procedural default, a district court should apply the procedural bar and decline to reach the merits of that claim.  See Harris, 489 U.S. at 264 n.10; Osborne, 466 F.3d at 1315; White, 972 F.2d at 1227; Richardson, 883 F.2d at 898; Hittson, 2012 WL 5497808, at *8 n.10.

### a.  State court adjudication

Whatley did not raise this claim on direct appeal and the state habeas court found it was procedurally defaulted.  (Resp't's Ex. 71 at 56-59).[47]  The state habeas

---

[47] The Supreme Court of Georgia did not address Petitioner's Giglio claim in its review of the state habeas court's decision and, thus, the state habeas court's decision is the last state court to rule on his claim and that decision is subject to review under Section 2254 by this Court.  See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

court also found that there was no cause or prejudice to excuse the default because there was no agreement between the State and Jackson for his testimony.  (Id.).

The cause and prejudice analysis of a Giglio evidence suppression claim is the same as that for a Brady claim.  See Walker v. Johnson, 646 S.E.2d 44, 45-46 (Ga. 2007); Schofield, 621 S.E.2d at 730.  Under Georgia law, a petitioner may excuse his procedural default for an evidence suppression claim in a habeas proceeding by satisfying the two-part cause and prejudice test.  See Whatley, 668 S.E.2d at 655.  A petitioner may satisfy the "cause" prong of the test by showing the State breached a "constitutional duty" to disclose the information forming the basis of the claim.  See id. at 655 n.8.  To demonstrate prejudice, a petitioner must show that

> (1) the State possessed evidence favorable to the defendant; (2) the defendant did not possess the favorable evidence and could not obtain it himself with any reasonable diligence; (3) the State suppressed the favorable evidence; and (4) had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the trial would have been different.

Schofield, 621 S.E.2d at 731.[48]

---

[48] A petitioner asserting a Giglio claim need only show that there was "any reasonable likelihood" that false testimony could have affected the judgment of the jury and resulted in a different result in the guilt or sentencing phase.  See Ventura v. Attorney Gen., 419 F.3d 1269, 1278 (11th Cir. 2005).  The Court notes that the state habeas court applied the stricter "no reasonable probability" Brady standard to Petitioner's claim.  This error is harmless because the court found that there was

In concluding that Whatley's <u>Giglio</u> claim was procedurally defaulted, the

state habeas court stated:

> Although Sergeant Sanders obtained funds from the Spalding County Sheriff's Department to secure Mr. Jackson's release from a non-payment probation revocation hold following the completion of Petitioner's trial, this Court finds based on its review of the evidence that his occurrence was not the result of a deal for Mr. Jackson's testimony in this case.  As Sergeant Sanders explained, he did not even learn that Mr. Jackson was incarcerated due to his failure to pay his remaining parole fines until after the conclusion of Petitioner's trial.

> Although the case number for Petitioner's case was included on the paperwork documenting the disbursement, this Court credits Sergeant Sanders' testimony that this occurrence was merely the result of his supervisor's instruction to include on the paperwork the number of the last case that Mr. Jackson voluntarily provided information on, the instant case, along with the date of the inception of that case.

> Thus, as Petitioner failed to prove that Sergeant Sanders' arrangement for the payment of Mr. Jackson's fines to get him released from jail was the result of a deal for Mr. Jackson's cooperation or trial testimony in this case, this Court finds that Petitioner failed to establish prejudice to overcome his default of this <u>Giglio</u> claim.  <u>See</u> <u>Childress</u>, 268 Ga. 386, 388, 489 S.E.2d 799 (1977) (no <u>Giglio</u> violation for "failing to reveal the terms of a non-existent deal").

> Thus, as Petitioner failed to show the existence of a deal between Mr. Jackson and the prosecution team and as this Court finds that there is no reasonable probability that the outcome of this case would have been different without Mr. Jackson's trial testimony, this <u>Giglio</u> claim is defaulted.

---

no deal and there was no false testimony sufficient to establish prejudice to set aside the procedural default of this claim.

This Court also finds that Petitioner failed to establish prejudice to overcome the default of this claim as this Court finds following its review of all of the evidence presented that Rarland Jackson's trial testimony, which was consistent with his voluntary statements made at a time when Mr. Jackson was not incarcerated on any charges, was not the product of a deal.

As former Sergeant Sanders testified in his affidavit, "[n]either I nor any other law enforcement officer made any threats or promises to Rarland nor said anything to lead him to believe that he might receive some kind of benefit in exchange for his cooperation in the Whatley case. As in the past, Rarland's cooperation [in this case] was entirely voluntary." Thus, this Court finds that this claim is barred from litigation on the merits in this proceeding.

(Resp't's Ex. 71 at 57-59 (alteration in original) (footnote and internal record citations omitted)).

The state habeas court weighed the evidence presented in the habeas proceedings, determined that there was no agreement in exchange for Jackson's testimony, concluded that the non-existence of a deal meant that Whatley was unable to establish prejudice on his Giglio claim, and applied the clearly established Federal law standard established in Giglio to determine that Whatley failed to satisfy his burden of showing that his procedural default is excused.

b.  Review of the state court adjudication

This Court stated in its March 29, 2011, Order that if Whatley could show cause for setting aside the procedural default of his Giglio claim, the Court could consider the prejudice prong of his claim.  (See Order of Mar. 29, 2011, at 9).

115

The Court permitted Whatley the opportunity to present clear and convincing evidence of the existence of an arrangement required to be disclosed under <u>Giglio</u> that is sufficient to overcome the presumption of correctness that attaches to the state habeas court's factual finding that there was no agreement in exchange for Jackson's testimony.  The Court finds Whatley did not present clear and convincing evidence upon which to conclude that the state habeas court was unreasonable in its determination that there was no agreement, and thus no cause or prejudice exists to set aside the procedural default.

The Court otherwise agrees with the state habeas court that Whatley's post-trial evidence from Jackson was not credible or reliable and was insufficient to call into doubt his trial testimony or to support a conclusion that there was an agreement for his testimony.  Jackson denied the existence of any agreement and testified that his trial testimony was truthful and voluntary.  (Resp't's Ex. 39B at 142-209).  The state habeas court's conclusion that Whatley did not establish the existence of an agreement was not unreasonable and was sufficiently supported by the State's evidence, which included affidavit and deposition testimony of retired Sergeant Richard Sands, and testimony from District Attorney Bill McBroom and Officer Sam Parks of the Griffin Police Department.  The Court finds it significant that an employee of the Federal Public Defender Program assisted Jackson in

preparing the affidavit that was submitted by Jackson to the state habeas court, and

that Jackson, during the state habeas court proceedings, denied the truth of the

contents of the affidavit, stating that he signed the affidavit only because he was

told that "it was the same as what was said in court [at trial]" and that he took the

Federal Public Defender employee at her word that it was.  (See Resp't's Br. in

Opp'n to Pet. at 132 (quoting Resp't's Ex. 71 at 56 n.3); see also Resp't's Ex. 39B

at 142-209, 241).

 The Court also finds that the state habeas court correctly concluded, based

on the record in the habeas proceedings, that Whatley failed to show prejudice.

Even if Whatley had proved that an agreement existed between the State and

Jackson, the Court would find that Whatley was not prejudiced because Whatley

did not show that Jackson's trial testimony was false, including because Jackson

testified at the state habeas hearing that his testimony was true.  See Hammond v.

Hall, 586 F.3d 1289, 1307 (11th Cir. 2009) ("The testimony or statement elicited

or made must have been a false one."); Smith v. Sec'y, Dep't of Corr., 572 F.3d

1327, 1335 (11th Cir. 2009) ("Accurate statements do not violate the Giglio

rule."); United States v. Meros, 866 F.2d 1304, 1309 (11th Cir. 1989).  Without

demonstrating an agreement with Jackson for his testimony or that Jackson's trial

testimony was false, Whatley has not shown a reasonable likelihood that the result

of the proceeding would have been different, he is not entitled to set aside his procedural default, and he is not entitled to any other relief on his Giglio claim. See Bagley, 473 U.S. at 676-78, 682; Owen, 453 S.E.2d at 730-31.[49]

The state habeas court correctly determined that Whatley's Giglio claim is procedurally barred and that there is no prejudice from any asserted suppressed information regarding a claimed undisclosed agreement for Jackson's testimony. The Court thus respects and defers to the state court's determination that the claim is procedurally barred.  See Harris, 489 U.S. at 264 n.10; Osborne, 466 F.3d at 1315; Bailey, 172 F.3d at 1302; White, 972 F.2d at 1227; Richardson, 883 F.2d at 898; Hittson, 2012 WL 5497808, at *8 n.10.

To the extent Whatley claims he is entitled to a *de novo* review of his claim, the Court finds the state habeas court correctly applied Georgia's procedural default principles, examined the merits of Whatley's claim to determine if prejudice existed from any failure to disclose under the standards of Giglio, and did not reach a decision that "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme

---

[49] Even if Petitioner had (i) shown cause by demonstrating that a deal existed, and (ii) shown that Jackson's testimony was false in light of that deal, the Court would also find that Whatley was not prejudiced because because the weight of the evidence at trial supporting Petitioner's guilt in the absence of Jackson's testimony would not have been affected such that there would be any reasonable likelihood that the result of the proceeding would have been different.

Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  See 28 U.S.C. § 2254(d)(1), (2); see also Wiggins, 539 U.S. at 520-21; Williams, 529 U.S. at 379, 385.  The Court further finds that Whatley was not prejudiced by law enforcement's alleged failure to disclose.  Whatley is not entitled to relief on his claim regarding a secret, undisclosed agreement for Jackson's testimony or that Giglio was violated.

      6.    *Claim XII – Petitioner's claim that the prosecutor engaged in improper conduct during his closing argument at the penalty phase in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution*

Whatley next claims that the prosecutor's comments during his penalty phase argument violated his constitutional rights because the prosecutor (i) improperly argued that Whatley committed other crimes and his criminal history was more extensive than the evidence showed; (ii) improperly "testified" about conditions in prison; (iii) engaged in other instances of misconduct throughout his closing argument; and, (iv) argued, without evidentiary support, that Whatley would kill again.  (Pet. for Writ of Habeas Corpus ¶¶ 202-213).

"Improper argument will only warrant relief if it renders a petitioner's trial or sentencing 'fundamentally unfair.'"  Drake v. Kemp, 762 F.2d 1449, 1458 (11th Cir. 1985); see also United States v. Hernandez, 145 F.3d 1433, 1438

(11th Cir. 1998) (holding that prosecutorial misconduct warrants relief "only if . . . the remarks (1) were improper and (2) prejudiced the defendant's substantive rights").  A sentencing is fundamentally unfair if "there is a reasonable probability that, in the absence of the improper arguments, the outcome would have been different."  See Drake, 762 F.2d at 1458; see also United States v. Hill, 643 F.3d 807, 849 (11th Cir. 2011) (citing United States v. Hall, 47 F.3d 1091, 1098 (11th Cir. 1995)) ("For a prosecutor's prejudicial comments to affect a defendant's substantial rights, there must be a reasonable probability that, but for the remarks, the outcome would have been different.").  "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  See Drake, 762 F.2d at 1458 (quoting Strickland, 466 U.S. at 695).  "Thus, the defendant must show a reasonable probability that, but for the prosecutor's statements, the result of the proceeding would have been different."  Davis v. Zant, 36 F.3d 1538, 1545 (11th Cir. 1994).

### a.  State court adjudication

Whatley raised his claim regarding the prosecutor's penalty-phase comment on direct appeal, where the Supreme Court of Georgia found there was no prosecutorial misconduct and that the claim was procedurally defaulted.  Whatley, 509 S.E.2d at 50.  If the prosecutor made improper comments in his argument, any

alleged prejudicial errors in the State's closing argument in the penalty phase did

not present a reasonable probability of affecting the outcome and the jury's

ultimate determination that Whatley should be sentenced to death.  See id.

Whatley raised this argument again in the state habeas court, which concluded:

> This Court finds following its review of the Georgia Supreme Court's
> opinion that his claim was addressed and decided adversely to
> Petitioner on direct appeal.  Whatley, 270 Ga. at 298-299, 301, and
> 302.  Accordingly, this Court finds that this claim is *res judicata* and
> non-justiciable in this proceeding.  Gunter v. Hickman, 256 Ga. 315,
> 348 S.E.2d 644 (1986).
>
> To the extent that Petitioner attempted to raise new arguments or
> alleged facts in support of this claim in this habeas proceeding, this
> Court finds that these allegations are procedurally defaulted as
> Petitioner failed to show cause and prejudice or a miscarriage of
> justice to overcome his default of these new allegations.  Black v.
> Hardin, 255 Ga. 239, 336 S.E.2d 754 (1985); Valenzuela v.
> Newsome, 253 Ga. 793, 325 S.E.2d 370 (1985).  Thus, this claim is
> denied as barred.

(Resp't's Ex. 71 at 16).

### b.  Review of the state court adjudication

Having found this claim was procedurally defaulted, cause and prejudice is

required to be found to overcome the procedural default.[50]  The Court reviews

---

[50] As with Petitioner's Brady and Giglio claims, to the extent Petitioner asserts that
Respondent waived the defense of a procedural default regarding his prosecutorial
misconduct claims by failing to raise them in his Answer, the Court disagrees.
Respondent stated in his Answer that "Respondent expressly adopts and relies
upon any findings made by the state courts as to the procedural default of any and

Whatley's claim to determine if cause and prejudice exists.  See Mincey, 206 F.3d at 1135-36.

The Court finds that a reasonable probability does not exist that the sentencing verdict would have been different had the allegedly improper arguments not been made during the sentencing hearing.  The State's closing argument comments about Whatley's criminal history, his capacity for future violence, his conduct during the trial, prison conditions, and analogies to other well-known criminals either were proper inferences from the evidence admitted at trial or failed to give rise to a reasonable probability that they altered the outcome of the sentencing proceedings.  See Romine v. Head, 253 F.3d 1349, 1366, 1368 (11th Cir. 2001); see also Whatley, 509 S.E.2d at 52-53.

The Court concludes that the state habeas court and Supreme Court of Georgia correctly determined that Whatley's prosecutorial misconduct claims were procedurally barred and that there was no "reasonable probability that, in the absence of the improper arguments, the outcome would have been different."  See Drake, 762 F.2d at 1458.  Because the state habeas court and the Supreme Court of

---

all claims not timely raised at trial an on appeal as required by O.C.G.A. § 9-14-48(d)."  (Resp't's Answer at 11).  The Supreme Court of Georgia on direct appeal and state habeas court found this claim to have been procedurally defaulted.  See Whatley, 509 S.E.2d at 50; (Resp't's Ex. 71 at 16); see also Coleman, 501 U.S. at 735 n.1.

Georgia correctly applied Georgia's procedural default rules and addressed the merits of any prejudice from the alleged prosecutorial misconduct, the Court respects and defers to the state court determination that the claim is procedurally barred.  See Harris, 489 U.S. at 264 n.10; Osborne, 466 F.3d at 1315; Bailey, 172 F.3d at 1302; White, 972 F.2d at 1227; Richardson, 883 F.2d at 898; Hittson, 2012 WL 5497808, at *8 n.10.

To the extent Whatley is entitled to a *de novo* review of his claim, the Court finds that the state habeas court correctly applied Georgia's procedural default principles, examined the merits of Whatley's claim to determine if prejudice existed from any prosecutorial misconduct, and did not reach a decision that "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  See 28 U.S.C. § 2254(d)(1), (2); see also Wiggins, 539 U.S. at 520-21; Williams, 529 U.S. at 379, 385.  The Court further finds that Whatley was not prejudiced by any alleged prosecutorial misconduct.  Whatley is not entitled to relief on his prosecutorial misconduct claim.

>    *7.     Claim XVIII - Petitioner's claim that when the errors are*
>           *considered as a whole, Whatley is entitled to relief under the*
>           *Fifth, Sixth, Eighth and Fourteenth Amendments to the United*
>           *States Constitution*

Whatley claims that each of his individual claims, when "taken as a whole, [leave] no doubt that [his] conviction and death sentence are unreliable and violate the Fifth, Sixth, Eighth, and Fourteenth Amendment[s]."  (Pet. for Writ of Habeas Corpus ¶ 256).

Neither the Supreme Court of the United States nor the State of Georgia recognize a "cumulative error" claim in a habeas proceeding.  If a claim of cumulative error was cognizable in a habeas proceeding under Section 2254, it is required to be denied where the Court finds merit only in a single claim for relief and there are thus no errors to accumulate.  See Hardwick v. Benton, 318 F. App'x 844, 847 n.5 (11th Cir. 2009); United States v. Waldon, 363 F.3d 1103, 1110 (11th Cir. 2004); see also Sneed v. Fla. Dep't of Corrs., 496 F. App'x 20, 28 (11th Cir. 2012) ("[T]here are no errors to accumulate, and the state court's rejection of [a cumulative error] claim [is] not contrary to or an unreasonable application of Supreme Court law.").  The Court finds there is no cumulative effect of errors that deprived Whatley of a fair trial or sentencing proceeding.  See Hardwick, 318 F. App'x at 847 n.5; Conklin v. Schofield, 366 F.3d 1191, 1210 (11th Cir. 2004).  Even if the Court were to find additional errors beyond the

inadequacy of Mostiler's investigation into Whatley's background and mental and psychological health, the Court would still find, in light of its review of the record, that there was no fundamental unfairness in Whatley's state court proceedings that would make consideration of his cumulative error claim appropriate.  See Cargill v. Turpin, 120 F.3d 1366, 1386-87 (11th Cir. 1997).[51]

C.    Certificate of Appealability

A district court "must issue or deny a Certificate of Appealability when it enters a final order adverse to the appellant."  See Rule 11 of the Rules Governing Section 2254 Proceedings.  This Court finds that a Certificate of Appealability should not issue with regards to the claims on which Petitioner is not afforded relief because Whatley has not made a substantial showing of the denial of a constitutional right or that reasonable jurists could find "debatable or wrong" the conclusion that Whatley is not entitled to relief on his variety of claims for which

---

[51] Petitioner raised, for the first time in his merits brief, a claim challenging Georgia's use of lethal injection as an execution method.  (Pet'r's Br. in Supp. of Pet. at 174-77).  Petitioner's challenge to Georgia's method of execution is not cognizable in a habeas proceeding and is appropriately brought in a Section 1983 action.  See Hill v. McDonough, 547 U.S. 573, 579-83 (2006) (challenges to methods of execution that do not imply the invalidity of confinement or sentence are properly brought under Section 1983); Tompkins v. Sec'y, Dep't of Corrs., 557 F.3d 1257, 1261 (11th Cir. 2009) ("A [Section] 1983 lawsuit, not a habeas proceeding, is the proper way to challenge lethal injection procedures.").  To the extent Petitioner seeks to challenge Georgia's lethal injection execution procedures as a habeas claim, that claim is denied.  See Hill, 547 U.S. at 579-83; Tompkins, 557 F.3d at 1261.

the Court has not granted relief.  See Miller-El v. Cockrell, 537 U.S. 322, 336

(2003).  A certificate of appealability is denied.

## III.    CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Fredrick R. Whatley's Petition for Writ of

Habeas Corpus by a Person in State Custody [1] is **GRANTED IN PART** and

**DENIED IN PART**.  The Petition is **GRANTED** with respect to Petitioner's

claim of ineffective assistance of counsel based on an inadequate investigation

(Claim IX) and **DENIED** on Claims I, III, V, VII, VIII, X, XI, XII, and XIII.

Petitioner's sentence of death in Case No. 96R-374 in the Superior Court of

Spalding County, Georgia, is **VACATED** and the State of Georgia shall, within a

reasonable amount of time, decide whether to hold a new sentencing hearing or

impose a lesser sentence consistent with the law.

**IT IS FURTHER ORDERED** that Petitioner is **DENIED** a certificate of

appealability.

The effect of this Order will be automatically stayed pending resolution of

any appeal to the Eleventh Circuit Court of Appeals.

**SO ORDERED** this 9th day of April, 2013.


_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE